CONTAINS RESTRICTED INFORMATION

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| REAL TIME MEDICAL SYSTEMS, INC.<br>785 Elkridge Landing Road, Suite 300<br>Linthicum Heights, MD 21090<br><br>            Plaintiff,<br><br>   v.<br><br><br>POINTCLICKCARE TECHNOLOGIES,<br>INC. d/b/a POINTCLICKCARE<br>PointClickCare Technologies, Inc. d/b/a<br>Pointclickcare<br>3500 American Blvd. W., Suite 150,<br>Bloomington, MN 55431<br><br>            Defendant. | Case No. _____ |

## <u>COMPLAINT AND JURY DEMAND (UNREDACTED - TO BE SHIELDED)</u>

Plaintiff Real Time Medical Systems, LLC ("Real Time"), in this Complaint against PointClickCare Technologies, Inc. ("PCC"), alleges claims against PCC for: (I) declaratory judgment that PCC has violated the Maryland Medical Records Act and federal CURES Act; (II) unfair competition; (III) unlawful tying under Maryland Code, Commercial Law, Section 11-204(a); (IV) tortious interference with Real Time's contractual relations; (V) breach of contracts to which Real Time is an intended beneficiary; (VI) breach of contract and specific performance for violation of ███████████████████████████████; and (VII) preliminary and permanent injunctive relief. Real Time alleges as follows:

### SUMMARY OF ACTION

1.      As doctors and nurses at a Skilled Nursing Facility ("Nursing Facility") focus on treating and healing patients, they increasingly rely upon technology partners to provide the care and treatment information and analytics they need, when they need it. But if the Nursing Facility

<div style="border:2px solid black; display:inline-block; padding:4px; font-weight:bold;">EXHIBIT<br>1</div>

has partnered with Real Time that collaboration goes a step further, giving caretakers the information and analytics they need *before* they know that they need it. When other Nursing Facilities treat a patient, they have access to the patient's medical records; when a Nursing Facility has partnered with Real Time, it has access to the patient's medical records *and* to real-time warnings about any impending, life-threatening health complications.

2.      This care and treatment, whether utilizing Real Time's analytics or not, relies on careful analysis of patients' electronic medical records. As medical professionals care for their patients, they track their progress by writing notes—electronic medical records—which are saved to a database. Enter PCC, which stores those records on behalf of Nursing Facilities and their patients. Patient health and medical records need to be made available for doctors, nurses, pharmacies and other care partners like Real Time to access as needed.

3.      Because of government requirements for submission of certain information to Centers for Medicare and Medicaid Services ("CMS") and other agencies, the vast majority of patient medical records and related data only exist electronically (*i.e.* generally, there are no paper medical records available to the care team). Thus, data hosting vendors like PCC are necessary partners for Nursing Facilities.

4.      Upon admission, patients (or their legal guardians) provide permission to the Nursing Facility for the facility to access, use and share the patients' medical data. Nursing Facilities enter into contracts to share patient records (as authorized by the patients) with Real Time and other care partners in order to improve patient care and avoid needless suffering and death.

5.      Once Real Time is granted access through the Nursing Facilities to patient health and medical records stored on PCC's "Medical Records System," Real Time is able to track

individual patients and watch for troublesome patterns that might be overlooked in caregivers' daily fight against illness: for example, the patient who has gone too long without a bowel movement and is at risk of sepsis, or with a history of heart failure whose cough could signal a pending Pulmonary Edema. Once Real Time identifies troubling data, it alerts medical staff, prompting preventative measures that keep treatable symptoms from becoming deadly complications.

6.      Without close collaboration and extensive data-sharing between care providers and care partners, Nursing Facilities are less effective and efficient. While Nursing Facilities face the daunting task of caring for ailing and elderly patients—a job made especially difficult in the face of COVID-19 and other recent epidemics—care partners like Real Time monitor the vast amounts of data that this care necessitates, tracking patient interactions and conditions, and alerting medical professionals when necessary. This frees up time for doctors and nurses to care for their patients. And most importantly, it saves lives.

7.      Despite medical providers' expressed and obvious need for care partners like Real Time, PCC has now needlessly impeded, and in certain cases disabled, Real Time's access to patient records, jeopardizing the lifesaving alerts and other analytics on which doctors and nurses rely. Not only does this violate state and federal law and cripple Real Time's analytics provided to Nursing Facilities, but it will also directly increase the number of unnoticed health complications, resulting in hospitalizations and patient deaths in Nursing Facilities across the country.

8.      On the facts detailed below, Real Time asks this court to put an end to PCC's dangerous information-barricade, and to award Real Time injunctive relief, declaratory judgment, specific performance and damages.

## PARTIES

9.    Plaintiff Real Time Medical Systems, LLC ("Real Time") is a limited liability company organized under the laws of the State of Maryland, with its principal place of business at 785 Elkridge Landing Road, Suite 300, Linthicum Heights, Maryland.

10.    Defendant PointClickCare Technologies, Inc. ("PCC") is a foreign corporation, with its principal place of business at 5570 Explorer Drive, Mississauga, Ontario, Canada. It is registered to do business in Minnesota, with its domestic address at 3500 American Boulevard West, Suite 150, Bloomington, Minnesota.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over PCC because (1) Real Time's injuries arise at least in part out of PCC's transaction of business in the State, including offering and providing software and services to Maryland nursing facilities; (2) PCC's actions are causing injury to Real Time and Nursing Facilities in Maryland; and (3) PCC regularly does business in Maryland, and derives substantial revenue from products and services sold within the State.

12.    Venue is proper pursuant to Maryland Code, Courts and Judicial Proceedings, §§ 6-201 and 6-202 because PCC has no principal place of business in Maryland and Plaintiff Real Time carries on regular business in Montgomery County.

## FACTS

### *Real Time Provides a Lifesaving Service*

13.    Real Time offers a suite of cloud-based Value-Based Care software, Real Time Medical System v. 14.3, partnering with approximately 1,700 Nursing Facilities throughout the country, which collectively care for over 150,000 residents. The Real Time software platform is also used by major healthcare insurers, Quality Improvement Organizations ("QIOs"),

Accountable Care Organizations ("ACOs"), Health Information Exchanges ("HIEs") and state governments to improve the quality of patient care and reduce admissions from Nursing Facilities to hospitals. The software monitors patients' electronic medical records in real time and identifies certain dangerous patient information and data patterns that busy doctors and nurses may otherwise overlook. Once identified, Real Time's software then sends this information directly to the patient's doctor or nurse through an alert system, which allows caretakers to find and treat medical issues that would otherwise go unnoticed. By acting on these alerts, caretakers are often able to intervene before the patient becomes sicker, requires hospitalization, or dies.

14.     Much of Real Time's work involves connecting disparate, individually-innocuous symptoms that when viewed together, foretell an impending medical disaster. For example, the software may notice that a patient has gone 72 hours without a bowel movement, and thus alert caregivers that the patient should be treated to avoid bowel impaction, sepsis, and possible death; that a patient with a history of Congestive Heart Failure has developed a cough or swollen ankles, and thus alert caretakers that the patient should be treated for worsening heart failure, before being admitted to a hospital with Pulmonary Edema; or that a patient has stopped eating and drinking usual amounts, and thus alert caretakers that the patient should be assessed for urinary tract infection, pneumonia, and other life-threatening hazards.

15.     Real Time's monitoring and support has bettered patients' lives, having demonstrably improved patient outcomes and decreased hospital admissions by as much as 50% at Nursing Facilities using Real Time's analytics. For example, Real Time's internal research estimates that Real Time's analyses and alerts avert approximately 10,000 hospital admissions and 1,000 patient deaths *each year*. External research performed by the University of Pennsylvania Geriatric Research Department in an academic study of Real Time's care platform in Nursing

Facilities located in Southern Pennsylvania documented a dramatic drop of 52% of hospital admissions from these Nursing Facilities. These findings evidence a ground-breaking way to prevent hospital admissions.

16.     Because of these ground-breaking results, Real Time has been competitively selected by State and federally funded organizations, including QIOs and HIEs to help reduce hospitalizations and death. The State of Maryland, which funds the Chesapeake Regional Information Systems for our Patients, Inc. ("CRISP"), competitively selected Real Time's platform to assist the State in reducing hospitalizations and costs, and to protect Maryland's unique Medicare Hospital Waiver, for all of Maryland's 225 Nursing Facilities. To date, approximately 150 Maryland Nursing Facilities have voluntarily chosen to participate and are active in the program. PCC also competed for this contract but was not selected. The CRISP program, using Real Time's analytics has reduced admissions in Maryland from Nursing Facilities by 28% from the participating Nursing Facilities, which saves Maryland hospitals $40,000,000-$50,000,000 annually.

17.     Simply put, an alert from Real Time can be the difference between life and death.

18.     After the outbreak of COVID-19, Nursing Facilities discovered that Real Time's ability to predict diseases and health complications could also inform the fight against COVID-19 and other community-wide threats. By using Real Time to track data points associated with the virus—for example, a dip in blood oxygen levels or a rise in temperature—nurses and medical professionals are able to identify infected patients quickly. Real Time's analytics allow Nursing Facilities to spot infection trends within and across their facilities—at times identifying outbreaks three-to-five days before a positive test is returned—and to notify local health departments timely of new and worsening outbreaks, so that officials can isolate infected individuals and halt the virus'

spread sooner than would otherwise be possible. The State of Maryland through CRISP funded Real Time to develop a state-wide early warning system for pandemics.

19.     Real Time's Nursing Facility partners include nursing homes, assisted living facilities, and other establishments that care for the frail and elderly. But each of these Nursing Facilities specialize in caring for patients, not managing data or developing technology. So, in addition to Real Time, Nursing Facilities enter into contracts with other providers for the management of technology and the storage of patients' electronic medical records. This allows each Nursing Facility to focus on what it does best—caring for patients—while technology providers handle the technical aspects of organizing the information.

### *PCC's Data-Storage Product Lacks Real Time's Lifesaving Capabilities*

20.     PCC is one such technology provider. Through its product "Medical Record System," PCC stores patients' health and medical data. According to PCC's website, it provides electronic medical records storage and similar products to "more than 26,000 skilled nursing facilities, senior living communities, and home health agencies."  Through a related service, called "Data Relay," PCC is capable of packaging and sending patient data files from the stored Medical Record System to its customers and care partners, which includes a limited subset of patients' data.

21.     PCC's Medical Record System is far-and-away the most widely-used storage product among Nursing Facilities for their patients' medical records and data. According to a December 2020 press release by PCC, "[i]n the United States, 97 percent of all hospitals discharge patients to skilled nursing facilities using PointClickCare."

22.     But notwithstanding these data storage and access capabilities, PCC's products lack the analytics and data processing tools needed to properly monitor and prevent medical issues. Without more, Nursing Facilities cannot provide the high level of care that their patients need and

deserve. Thus, Nursing Facilities partner with Real Time and like companies to provide data analytics beyond PCC's storage of patients' health and medical data.

23.     Currently, over a thousand Real Time clients also use PCC's Medical Record System, contracting with Real Time for its ability to convert the data on a patient's medical chart into usable, lifesaving information.

24.     Real Time's software relies on access to patients' health and medical data that Nursing Facilities contract with PCC to store on PCC's Medical Record System.

25.     The patient data that Real Time's software needs to provide life-saving information to Nursing Facilities is largely only accessible through PCC. Real Time is unable to access the electronic patient health and medical data directly from their partner Nursing Facilities. To provide necessary care and treatment to patients, care providers need unfettered access to the patient's health and medical records.

26.     Patient health and medical data can be exported to or gathered from PCC's Medical Record System (on PCC's servers) by third parties, and PCC does export data to third parties. However, as outlined below, PCC is blocking Real Time from accessing certain patient data.

27.     Real Time's software specifically relies on accessing patients' health and medical data via two connections to the Medical Record System: (1) automated updates through Data Relay, and, at times, in certain Nursing Facilities through (2) the generation of on-demand reports for data not contained in Data Relay and where Data Relay is not a HIPAA-compliant solution.

28.     Data Relay and Follow Up Questions ("FUQ") Reports are both forms of raw patient medical data contained in the Medical Record System transmitted to third parties.

29.     PCC's FUQ Reports are a collection of patient data, directly-documented care and records by providers and caregivers, copied directly from the Nursing Facilities' Medical Record System patient charts.

30.     Data Relay sends packets of patient data from the Medical Record System to the user on an hourly basis. Per PCC's promotional materials, Data Relay allows Nursing Facilities to "import the data into their own databases, reporting tools *and third party systems* as they see fit," and to merge that data "with other corporate or 3rd party data for a broader perspective on operations."

31.     Many Nursing Facilities choose to use Data Relay to export their patient's data to Real Time. Before a Nursing Facility can export the data to Real Time, the Nursing Facility must provide user credentials to Real Time and then grant Real Time authorization as a Data Relay user. The Nursing Facility decides which partners it authorizes to access patient health and medical records, entering into contracts with those care providers, such as Real Time.

32.     The information available through Data Relay is limited by PCC; without access to more patient data, Real Time is unable to provide the full range of life-saving alerts to Nursing Facilities. So, Nursing Facilities also grant Real Time access to FUQ Reports, which contain certain patient data that are missing from Data Relay—namely point-of-care data, like a patient's use of feeding tubes or number of bowel movements. Unlike the automatically-generated Data Relay updates, FUQ Reports are generated on-demand by a nurse or other Medical Record System authorized user.

33.     Neither the Data Relay nor the FUQ Reports contain any confidential or proprietary information of PCC.

34.     Essentially, PCC copies and pastes patient data onto PCC Letterhead and calls it an FUQ Report, but it is nothing more than the health and medical data from a patient's chart. That patients' health and medical data is stored with PCC does not mean that PCC owns the data. PCC acknowledges that it does not own the patients' health and medical data in its Master Service Agreements it enters into with Nursing Facilities.

35.     Thus, the Nursing Facilities' patient data from the Medical Record System accessed through PCC's servers is not proprietary data of PCC.

36.     Whereas Data Relay allows Nursing Facilities to access a broad but high-level view of patient data, PCC has chosen to design its FUQ Reports to provide only a narrow and targeted slice of patient data in each report. This limited data in the FUQ Reports requires that Real Time and other care partners generate between 200 and 300 FUQ Reports per Nursing Facility each day in order to access all of the data required to generate alerts and protect patients.

37.     Generating this volume of FUQ Reports manually would be infeasible, as it would require Nursing Facility staff to submit the hundreds of necessary inquiries manually. Thus, to save nurses and other medical professionals hours of time that would otherwise be used for patient care, Real Time and the Nursing Facility create an automated user, which generates the requisite FUQ Reports. Once an FUQ Report is generated, Real Time merges the patient health and medical data it has compiled and uses the resulting collection to monitor patients' health and alert medical professionals of dangerous conditions. This level of demand execution for accessing patient data is not exceptional or particularly onerous for modern technology. PCC claims that its platform "is supported by a robust infrastructure that has the capacity to process large volumes of transactions, which enables [ ] users to safely and efficiently submit millions of assessments annually."

38.     For roughly a decade Real Time routinely retrieved patient health and medical data in consistent volumes and with a frequency of up to four cycles per day from the PCC Electronic Medical Records System. Further, PCC's competitors routinely make this information available to care partners, including Real Time.

### Contracts Between Nursing Facilities and Real Time, and Between Nursing Facilities and PCC

39.     In order to outline each parties' obligations with regard to data use, privacy, and security, Real Time enters into agreements with its Nursing Facility partners. As these agreements make clear, it is imperative that these data be handled confidentially and securely. But in order to provide the best possible care, it is also important that these data be quickly and effectively shared among the people and entities that are collaborating to provide that care—be it caretakers, care partners like Real Time, or other medical professionals and services.

40.     To this end, Real Time executes two agreements with each Nursing Facility:

i.     A "Subscription Agreement," which outlines the parties' rights and obligations regarding patient-data confidentiality and access, and specifies requirements as to interoperability between the parties' technologies. For example, Nursing Facilities "acknowledge[] that Real Time must have access to and use of [the Nursing Facility's] Data for [Real Time's] System to function as documented," and grant Real Time a "license to use, modify, copy, process, display and prepare derivative works of [that] Data." Without these capabilities, Real Time's life-saving software cannot function.

ii.     A "Business Associate Agreement," in which Real Time agrees to handle patient data with confidentiality and in accordance with federal and local

law. This agreement is also required for HIPAA compliance, and allows Real Time to access patient data without violating HIPAA.

41.     PCC enters into its own Subscription Agreements and Business Associate Agreements with its Nursing Facility clients.

42.     For example, in PCC's Master Service Agreement with Real Time–client Southampton Manor Nursing and Rehabilitation Center, LP, it expressly acknowledges that PCC:

    i.    provides its products "in accordance with applicable laws and government regulations" (Section 1.1);

    ii.    will "allow[] third-party vendors, service providers, software developers and information systems"—like Real Time—"to provide their proprietary applications . . . via the PCC [Medical Record System] software platform" (Section 3.1);

    iii.    agrees to provide access by third-party vendors, either through licensing the third-party's technology, or "establishing a connection with a third party's software platform or information system and PCC's [Medical Record System] software platform" (Section 3.1);

    iv.    "acquires no right, title, or interest from [the Nursing Facility] or [its] Data," and the Nursing Facility owns all data stored with PCC (Section 5.2); and

    v.    warrants that the Nursing Facility "has the right to use any embedded third-party software" on PCC's system, and that "the functionality of the Services [rendered by PCC] shall not be decreased materially during the Term" of the Service Agreement (Section 7.3).

43.     PCC's Service Agreements also include a prohibition on accessing its Medical Record System using "any automated or other process such as screen scraping, by using robots, web-crawlers, spiders or any other sort of bot or tool, for the purpose of extracting data." *Id.* at § 2.2. However, in the event that PCC wishes to enforce this provision, it is first required to "establish[] a connection" with the third-party software that it seeks to prohibit. *Id.* at § 3.1.

44.     On information and belief, many of PCC's Subscription Agreements contain similar or identical provisions to the Southampton Service Agreement. Specifically, in many of PCC's other Subscription Agreements PCC similarly agrees (i) to comply with applicable laws and regulations; (ii) to allow third-party vendors (like Real Time) to access patients health and medical data; (iii) that Nursing Facilities maintain ownership of all data stored on PCC's Medical Record System; and (iv) that PCC will not impede third-party vendors' use of automated systems to access Nursing Facilities' patient data without first providing an alternative method of access.

***Alongside a Competing Product Launch,***
***PCC Throttles Competitors' Access to Patient Data***

45.     The arrangement described in the PCC Subscription Agreements—whereby Nursing Facilities have the right to connect third-parties to the Medical Record System, and subsequently exercise that right by granting access to data, including through Data Relay and FUQ Reports, was in place for almost a decade without PCC limiting Real Time's access, during which time Real Time's software helped medical professionals save lives and limit patients' suffering.

46.     However, at least as early as 2020, PCC began developing and marketing products to compete with Real Time in the fields of patient-data analyses, medical alerts, and Value-Based Care software. For example, PCC has purchased a number of companies that provide analytics

capabilities in competition with Real Time, including Collective Medical in December 2020 and Patient Pattern in March 2023.

47.     PCC also began to develop and implement a variety of techniques to force its soon-to-be competitors like Real Time to abandon the market, or to otherwise hamstring their products.

48.     PCC's assault first began in July 2020, when PCC made a number of alterations to its Medical Record System. Following these alterations, two things were immediately apparent: (1) the overall speed and performance of PCC's Medical Record System had degraded across the platform, and (2) the time to generate FUQ Reports had jumped tenfold, for some executions now taking as long as 15 minutes per each report. The latter of these changes had a particularly acute impact on Real Time's system, as Real Time is a dependent user of FUQ Reports on behalf of the Nursing Facility Partners.

49.     On information and belief, by increasing tenfold the time to generate FUQ Reports, PCC intended to render Real Time's product ineffective, and thus force Nursing Facilities to (i) breach their contracts with Real Time, and (ii) use PCC's new competing products in lieu of Real Time.

50.     In response to PCC's 2020 system changes, and in order to continue providing as much support to Nursing Facilities as remained possible, Real Time made its own system changes. For example, Real Time revised the procedures by which it accessed patient data, including generating reports late at night and with less frequency.

51.     By November 2022, Real Time became aware that PCC had begun introducing Completely Automated Public Turing Test to Tell Computers and Humans Apart ("CAPTCHA") walls into its Medical Record System. These CAPTCHA walls are designed to prevent automated access to the Medical Record System and to FUQ Reports specifically, by requiring that a user

periodically decipher and input a code in order to generate FUQ Reports and to access the Nursing Facilities' patient records and data. At that time, a Real Time user was required to decipher one CAPTCHA prompt before signing into the Nursing Facility's account, and another before executing its first FUQ Report in each session.

52.     The following are representative of the CAPTCHA images that PCC introduced in November 2022:



53.     These CAPTCHA walls were implemented for the purpose of hindering authorized access to Nursing Facilities' patient records and data, including Real Time's access.

54.     In addition to introducing CAPTCHA walls, PCC also demanded that Real Time reduce its report execution.

55.     Once again, in response to PCC's November 2022 system changes and in order to continue providing as much support to Nursing Facilities as remained possible, Real Time modified its own systems to accommodate. For example, Real Time further revised the procedures and frequency by which it accessed patient data.

### PCC Implements More Blocking CAPTCHA Images on October 11, 2023

56.     On October 11, 2023, Real Time became aware that PCC had instituted changes to the format of the CAPTCHA images that it had introduced the previous year.

57. The following are representative of the re-formatted CAPTCHA images that PCC began introducing on October 11, 2023:



58. These new CAPTCHA images are, with rare exceptions, indecipherable and illegible.

59. After a number of failed attempts to solve these CAPTCHA images, PCC locks or deactivates the account used by Real Time, which is accessed with the Nursing Facility's authorization.

60. Given the number of reports Real Time must execute to provide its analyses, and the high rate of illegible CAPTCHA images, the introduction of PCC's new images resulted in Real Time being unable to retrieve any patient data for dozens of Nursing Facilities. In Maryland alone, Real Time identified 87 separate Nursing Facilities that were impacted by PCC's new CAPTCHA images.

61. Real Time immediately warned PCC about the harm that the CAPTCHA images were causing. PCC ignored Real Time's warnings and has allowed the new CAPTCHA images to remain.

62. At the same time, PCC began outright deactivating or locking accounts that it suspected were being used by Real Time.

63. In the early-morning hours of November 8, 2023, PCC redoubled its attack, introducing thousands of new CAPTCHA walls across Nursing Facilities' accounts. The

CAPTCHA walls were introduced to block Real Time's access to its care partner Nursing Facilities' patients' health and medical data.

64.     Between 12:01 am to 6:00 am that day, **six-thousand and fifty-four (6,054)** illegible and undecipherable CAPTCHA walls were introduced impeding the ability of Real Time to access Nursing Facility (and other) accounts to retrieve patient data. A few examples of these illegible and undecipherable CAPTCHA walls are as follows:



65.     To date, PCC has severed, partially or completely, Real Time's access to approximately 700 Nursing Facilities, which are owned by 33 different Real Time customers.

66.     Of these inaccessible accounts, at least 87 belong to Nursing Facilities located within Maryland (the "Maryland Nursing Facilities"), and at least 6 are specifically located within Montgomery County.

67.     Further, in October 2023, PCC, through Mr. Marino Cherubin, PCC's VP of Partnerships, told Tim Buono, Real Time's Chief Strategy and Development Officer, that electronic medical records including patient charts at the Nursing Facilities are PCC's data and thus belong to PCC.

68.    Under HIPAA, patients have certain rights to their data, and Nursing Facilities, as HIPAA Covered Entities, have direct patient data use and disclosure obligations. In receiving patient data through Business Associate Agreements with Nursing Facilities, PCC generally must use and disclose the data in compliance with HIPAA and as directed by the Nursing Facilities. PCC does not have any independent rights to use or determine access to the patient data. 45 C.F.R. § 164.524; 45 C.F.R. § 164.526; 45 C.F.R. § 164.528; 45 C.F.R. § 164.502; and 45 C.F.R. § 164.504.

69.    Chris Beekman, Director, Marketplace of PCC, told Real Time that the data Real Time needs to provide life-saving information to the Nursing Facilities can be exported and is exported to other third-parties. Mr. Cherubin told Mr. Buono that despite PCC's ability to export this data to third parties, PCC is refusing to provide the information to Real Time.

70.    PCC stated it was unwilling to provide Real Time access to the patient data extracted directly from the patients' electronic medical record, despite Nursing Facilities expressly granting permission to Real Time to access the data on behalf of their patients.

### *Maryland Law Specifically Prohibits PCC's Conduct*

71.    On May 3, 2023, Governor Moore signed Senate Bill 648 (the "Medical Records Act," codified at Maryland Health-General Code Section 4-302.6).

72.    The Medical Records Act was enacted "for the purpose of authorizing a nursing home that contracts with or uses an electronic health network or electronic medical record vendor to direct the network or vendor to release electronic medical records . . . to a business associate of the nursing home."

73.    As the Act's sponsor, Senator Rosapepe, further explained in a Finance Committee Hearing before the Maryland General Assembly:

> The more we can have folks safe and healthy in a nursing home and not in a hospital, it's better for them and its better for our whole healthcare system. One of the ways the State [of Maryland] has been working on trying to advance that cause is by getting patients' medical records more usable by the healthcare providers. Electronic medical records given the scale of our healthcare system are incredibly important and we made a lot of progress with medical records over the years. So basically what the State [of Maryland] has done is tested whether use of these records on folks in nursing homes if provided in real-time can reduce hospitalizations. And the tests have been run . . . have reduced hospitalization significantly and reduced costs significantly. So basically what this bill does is make sure that the patient's medical records are available to help the patient.

Senator Rosapepe, March 1, 2023 Finance Committee Hearing, Maryland General Assembly, Bill SB0648.

74.     In furtherance of these purposes, effective July 1, 2023, the Medical Records Act allows that a "nursing home . . . may direct the electronic health network or electronic medical record vendor to release patient medical records . . . held by the electronic health network or electronic medical record vendor to a business associate of the nursing home."

75.     The Medical Records Act further provides that once an electronic health network or electronic medical record vendor receives a request to release patient medical records, the electronic health network or electronic medical record vendor:

> i.      "shall release the patient medical records . . . in an electronic format that conforms [with certain specifications]";
>
> ii.     "shall make the patient medical records . . . available on a regular basis and release the information in a timely manner to support patient care and monitoring"; and
>
> iii.    "may not restrict, limit, or charge a fee for the release of the patient medical records."

76.     As defined under the Medical Records Act, Real Time's Nursing Facility customers are "nursing homes;" PCC is an "electronic medical record vendor;" and PCC's Medical Record System is an "electronic health network."

77.     Each of the Maryland Nursing Facilities has directed PCC to release to Real Time the patient medical records that PCC houses on its Medical Record System.

78.     By locking patient medical records behind indecipherable CAPTCHA walls, PCC has obstructed, and in effect outright denied, Real Time's access to such patient medical records.

79.     Even prior to PCC's introduction of the indecipherable CAPTCHA images, PCC's other efforts to confine Real Time to irregular, untimely, and limited access of patient medical records impermissibly "restrict[ed]" and "limit[ed]" Real Time's access to such patient medical records under the Medical Records Act.

### *Federal Law Specifically Prohibits PCC's Conduct*

80.     Congress passed the 21st Century Cures Act (the "CURES Act"), 130 Stat. 1037, in 2016, to "accelerate the discovery, development, and delivery of 21st century cures." One way that the CURES Act accomplishes this is by prohibiting health information technology developers, like PCC, from "information blocking."

81.     The Cures Act also protects the rights of a patient to designate where a patient's medical data goes, who can access the medical data and how that medical data can be used.

82.     "Information blocking" is defined as any practices that are "likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information," and which a health information technology developer "knows, or should know . . . is likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information." 42 USC § 300jj-52(a)(1).

83.    The statute provides demonstrative examples of information blocking activities, including:

      i.    "practices that restrict authorized access, exchange, or use . . . of such information for treatment and other permitted purposes;"

      ii.    "implementing health information technology in nonstandard ways that are likely to substantially increase the complexity or burden of accessing, exchanging, or using electronic health information;" and

      iii.    "implementing health information technology in ways that are likely to . . . lead to fraud, waste, or abuse, or impede innovations and advancements in health information access, exchange, and use, including care delivery enabled by health information technology."

84.    Information blocking is punishable by a penalty of up to $1,000,000 per violation.

85.    PCC is a health information technology developer, whose denial of access to patient data will prevent Real Time from using patients' electronic health information. PCC's conduct therefore resembles all three information-blocking examples, as PCC (i) has restricted, and now denied, Real Time's access and use of data for the purpose of assisting patients' treatment, (ii) has not allowed Real Time to access patient data using standard login credentials and reports, thus substantially increasing the complexity of accessing this electronic health information, and (iii) has implemented its technology in such a way as to impede Real Time's attempts to improve the delivery of patient care.

### *Since Developing its Competing Products, PCC*
### *Has Spurned Real Time's Attempts at Cooperation*

86.    In response to PCC's targeted attacks and statutory violations, Real Time first contacted PCC's in-house legal counsel in December 2020, shortly after PCC's July 2020 introduction of the tenfold slowdown in delivery of patient records.

87.    At that time, Real Time requested that PCC:

      i.     Restore Real Time's timely access to patient data contained in the FUQ Reports;

      ii.    Work with Real Time to ensure that it is able to access the data through effective and efficient connections to PCC's system going forward; and

      iii.   Cooperate with Real Time in identifying or establishing an avenue through which Real Time can access data without degrading the performance of Nursing Facilities' health information systems, as Real Time had done for much of the previous decade.

88.    PCC refused. In response, Real Time once again reached out to PCC, this time with a proposal to "maintain the technical solution [developed by Real Time] . . . across all affected facilities while the parties promptly craft a business resolution which benefits both sides, complies with the CURES Act and most importantly, allows caregivers and their patients to continue to receive the benefits of both parties' services." PCC also spurned this offer.

89.    Real Time contacted PCC again in an April 2023 letter, this time warning PCC of the harm that its actions (including the then-newly-introduced CAPTCHA walls) would cause to hundreds of thousands of patients, and to over a thousand of Real Time's Nursing Facility partners.

90.    In this letter, Real Time also offered to "reimburse PCC for its reasonable costs" associated with engineering a solution to the numerous limitations that PCC had, over the past

three years, injected into the data retrieval. At the time, Real Time estimated that developing a comprehensive solution to these limitations would take as little as three weeks.

91.     Yet again, PCC refused to address the increasingly onerous barriers that Real Time confronted, and Real Time's access to patient data.

92.     Once more, on October 12, 2023, Real Time attempted to parlay with PCC after it began introducing the indecipherable CAPTCHA images. In that communication, Real Time described three easily-implemented avenues through which the new CAPTCHA problems could be immediately resolved, and once again invited PCC to cooperate on developing a long-term, comprehensive solution.

93.     On October 24, 2023, Real Time followed up on the suggestions made in its October 12 communication. Notwithstanding Real Time's warnings and explanations concerning the dire impact that PCC's CAPTCHA images will have on Nursing Facilities, and patients, PCC has refused to remove the indecipherable CAPTCHA images.

94.     Real Time's efforts continued in the months that followed. For example, on December 8, 2023, Real Time's Chief Strategy and Development Officer, Tim Buono, spoke with PCC's VP of Partnerships, Marino Cherubin, concerning potential solutions for access to patients' records.

95.     Similarly, on December 14, 2023, Mr. Buono spoke with Mr. Cherubin about a meeting that Mr. Cherubin had with PCC's Chief Strategy Officer (Keri Hall), and three PCC Vice Presidents (Travis Palmquist, Brian Drozdowicz, and Moss Amer). Throughout this call, Real Time offered to affirmatively assist PCC in fulfilling PCC's obligations to Real Time and Nursing Facilities, but PCC repeatedly rejected Real Time's offers. By way of explanation, PCC explained to Mr. Buono that it views itself as a competitor of Real Time within the market for "Value-Based

Care" software, and thus was refusing to cooperate with Real Time to permit access to patients' health and medical data. PCC further explained that it was PCC's ambition to become the sole provider of Value-Based Care software across PCC's customers.

### PCC Attempts to Eliminate Its Competitor by Pretending to Be Interested in Acquiring Real Time

96.     December 2023 was not the first time that PCC indicated its desire to eliminate Real Time as a potential competitor. Rather, following Real Time's April 2023 letter explaining the dire consequences of PCC's obstruction, PCC leveraged the hardship it had created in order to ███████████████████████████

97.     Specifically, PCC indicated that it ████████████████████████ ████████████████████████████████████████████ ██████████████████████

98.     █████████████████████████████████████
          ▮  ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████
              ██████████████████████
          ▮  ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████
              ████████████████████████████████



99.

100.

101.

102.

103.

104. 

105.

106. 

107.

108.     PCC then specifically told Real Time that it was PCC's ambition to become the sole provider of Value-Based Care software across PCC's customers, which is a software product that directly competes with Real Time's services and product offerings.

109.     PCC then specifically told Real Time that because it is a competitor, it will not provide Real Time the electronic patient records Real Time needs to provide the critical medical reports to the Nursing Facilities, even though the Nursing Facilities have specifically granted Real Time access to the data.

110.     PCC, through Mr. Cherubin, informed Real Time that PCC has "the ability and right to win" in the marketplace and to be the "only VBC Technology provider in the long-term care space" providing the same services that Real Time currently provides to its customer Nursing Facilities.

111. 

112.

113.     Upon information and belief, PCC is using and will use Real Time's Confidential Information and Technical Information to build, support and/or bolster its own software, services

and product offerings to Real Time's customers and to compete with Real Time's products.

***PCC Blames Real Time for PCC's System Performance***

114.     Rather than accepting any one of Real Time's repeated offers to assist in solving PCC's purported system problems, PCC has attempted to shift blame from PCC's inadequate system to Real Time's lifesaving product. For example:

      i.      In November 2019, PCC told a representative of California-based Nursing Facility Aspen Skilled Health that allowing Real Time to access the Nursing Facility's data would violate HIPAA and the PCC–Aspen Subscription Agreement, and that Real Time routinely violated HIPAA in its dealings with other Nursing Facilities.

      ii.      In November 2020, PCC told a representative of Texas-based Nursing Facility Focused Post Acute Care Partners that allowing Real Time to access the Nursing Facility's data caused "performance issues" within PCC's system, and that these supposed "performance issues" would render PCC's system inaccessible.

      iii.      In September 2023, while presenting at an industry conference in Washington D.C., a PCC representative told a group of approximately 200 industry professionals that companies who pull automated reports "slow[] down bandwidth" on PCC's system, have caused medical orders not to process, and have "directly impact[ed] patient care." When a Real Time representative spoke with PCC after the presentation, the representative explained that these allegations were levied with Real Time in mind.

      iv.      In October 2023, after PCC disabled Real Time's access at VITA

Informatics, primarily located in Maryland, PCC told a representative of VITA Informatics that PCC had disabled access because Real Time was "causing [PCC's] system to run subpar." PCC also told VITA Informatics that PCC has no relationship with Real Time, and that PCC intended to continue disabling any accounts that appeared to be used by Real Time.

## CLAIMS

### COUNT I: Declaratory Judgment That PCC Has Violated The Medical Records Act (Md. Health-General Code § 4-302.6) And CURES Act (130 Stat. 1037)

115.    All Paragraphs in the Complaint are incorporated as if set forth herein.

116.    A court may grant a declaratory judgment in a civil case if it "will serve to terminate the uncertainty or controversy giving rise to the proceeding," and if either: (1) "an actual controversy exists" between the parties, or (2) "antagonistic claims are present between the parties . . . which indicate imminent and inevitable litigation." Md. Cts. & Jud. Proc., § 3-409 (subsection (3) omitted).

117.    An actual controversy exists as to whether PCC's actions surrounding Real Time's access to Nursing Facilities' patient medical records violate the Medical Records Act, Maryland Health-General Code Section 4-302.6.

118.    An actual controversy exists as to whether PCC's actions surrounding Real Time's access to Nursing Facilities' patient medical records violate the CURES Act, 130 Stat. 1037.

119.    Real Time's claims against PCC, including those involving the Medical Records Act and CURES Act, will be the subject of imminent and inevitable litigation between Real Time and PCC.

120.    Effective July 1, 2023, the Medical Records Act requires that, when a "nursing home" asks its "electronic medical record vendor" to release patient records to a "business

associate" of the nursing home, the vendor must: (i) "release the patient medical records"; (ii) "release the information in a timely manner"; and (iii) "not restrict [or] limit . . . the release of the patient medical records."

121.   As used in the Medical Records Act:

    i.     The Maryland Nursing Facilities are "nursing homes;"

    ii.    PCC is an "electronic medical record vendor;" and

    iii.   Real Time is the "business associate" of the Maryland Nursing Facilities.

122.   Each of the Maryland Nursing Facilities has directed PCC to release patient medical records to Real Time.

123.   PCC has rendered the requested patient medical records inaccessible to Real Time, by locking those records behind indecipherable CAPTCHA walls and by deactivating or locking user accounts for the Maryland Nursing Facilities.

124.   By rendering the requested patient medical records inaccessible, PCC has violated the Medical Records Act by refusing to release the records to Real Time, failing to release the records in a timely manner, and impermissibly restricting and limiting the records' release.

125.   The CURES Act prohibits "health information technology developers" from any practices that constitute "information blocking." In turn, "information blocking" is defined as practices that are "likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information," and which a health information technology developer "knows, or should know . . . is likely to interfere with, prevent, or materially discourage the access, exchange, or use of electronic health information." 42 U.S.C. § 300jj-52(a)(1).

126.   By rendering the requested patient medical records inaccessible, PCC has violated the CURES Act by preventing and otherwise materially discouraging Real Time's access to

Nursing Facilities' records; interfering with the exchange of records between Real Time and its Nursing Facility customers; and interfering with Nursing Facilities' use of their records.

127.    The health of Maryland Nursing Facilities' patients is put at increased risk for every minute that PCC persists in its violations of the Medical Records Act and CURES Act, as these patients are being denied the benefits of Real Time's lifesaving analytics. This will result, and likely already has resulted, in unnecessary patient hospitalizations and deaths.

128.    Real Time suffers ever-increasing harm while PCC persists in its violations of the Medical Records Act and CURES Act. Most importantly, such harm includes the patient hospitalizations, suffering, and deaths that Real Time could have prevented but-for PCC's violations. Real Time also suffers damages to its customer relationships and goodwill, and PCC's violations prohibit Real Time from completing its contractual obligations to the affected Maryland Nursing Facilities.

**COUNT II: Unfair Competition**

129.    All Paragraphs in the Complaint are incorporated as if set forth herein.

130.    By the acts described herein, PCC has engaged in unlawful and/or fraudulent business practices that have injured, and will continue to injure, Real Time and its business.

131.    PCC has violated Maryland's Medical Records Act through its campaign to restrict, and ultimately sever, Real Time's access to Nursing Facilities' patient data.

132.    PCC has violated the federal CURES Act through its campaign to restrict, and ultimately sever, Real Time's access to Nursing Facilities' patient data.

133.    PCC's campaign to restrict, and ultimately sever, Real Time's access to Nursing Facilities' patient data is against public policy, as embodied in Maryland's Medical Records Act.

134.    PCC's campaign to restrict, and ultimately sever, Real Time's access to Nursing Facilities' patient data is against public policy, as embodied in the federal CURES Act.

135.    PCC has engaged in unfair and deceptive trade practices by utilizing illegal methods to attack the business of a competitor, Real Time.

136.    PCC has engaged in unfair and deceptive trade practices by utilizing methods that violate public policy to attack the business of a competitor, Real Time.

137.    Upon information and belief, PCC's unfair acts have been committed in bad faith, and with unlawful intent.

138.    As a direct result of PCC's actions, Real Time has been, and will continue to be, substantially injured in its business. Such injuries include harm to Real Time's client relationships, goodwill, and reputation, and loss of revenues and profits.

### COUNT III: Unlawful Tying Under Maryland Code, Commercial Law, Section 11-204(a)

139.    All Paragraphs in the Complaint are incorporated as if set forth herein.

140.    PCC has approximately 60% of the market share of electronic medical records platforms used by Nursing Facilities.

141.    PCC offers software for hosting electronic health information. Upon information and belief, PCC has developed, and is marketing, patient-data analytics software and value-based care software, which are distinct products from its hosting software.

142.    Although PCC facially allows Nursing Facilities to purchase medical records hosting software without also purchasing analytics software that competes with Real Time, PCC has effectively conditioned the purchase of medical records hosting software on the purchase of analytics software. Nursing Facilities need to purchase the analytics software to provide their patients with the highest level of care; without analytics software, like Real Time's or PCC's

substitute product, patients die. While a Nursing Facility can choose to use PCC's analytics software, over 1000 Nursing Facilities have chosen to use Real Time's analytics software.

143.    KLAS Research, an independent reviewer of healthcare industry software categories, has graded Real Time's platform as far exceeding PCC's platform.

144.    Although PCC facially allows Nursing Facilities to purchase hosting software without also purchasing value-based care software that competes with Real Time, PCC has effectively conditioned the purchase of hosting software on the purchase of value-based care software, because Nursing Facilities need to purchase this software in order to effectively obtain Medicare value-based reimbursement of the services that they provide to patients.

145.    By disallowing competitors, including Real Time, to properly access the electronic Medical Record System, PCC has ensured that, should Nursing Facilities wish to save lives and properly care for patients, those customers must purchase PCC's analytics software in conjunction with PCC's hosting software.

146.    By disallowing competitors, including Real Time, to properly access the electronic Medical Record System, PCC has ensured that should Nursing Facilities wish to obtain Medicare value-based reimbursements, those customers must purchase PCC's value-based care software in conjunction with PCC's hosting software.

147.    On information and belief, PCC provides a majority (approximately 60%) of Nursing Facilities with hosting software within the United States. PCC's effective conditioning of the use of its Medical Record System on the attendant purchase of PCC's analytics and value-based care software has the effect of substantially lessening competition, and creates a monopoly in the market for such software.

**COUNT IV: Tortious Interference With Contractual Relations**

148.    All Paragraphs in the Complaint are incorporated as if set forth herein.

149.    Real Time has hundreds of contracts, called Subscription Agreements, with Nursing Facilities across the country, including Nursing Facilities in Maryland.

150.    In the Subscription Agreements, Real Time grants Nursing Facilities access to Real Time's software, which provides the Nursing Facilities with insights into their patient data, in exchange for a fee paid to Real Time.

151.    The Subscription Agreements require Nursing Facilities to provide Real Time with access to their patient data, and access to the licenses needed for Real Time to use and modify that patient data.

152.    PCC has full knowledge of these Subscription Agreements and the parties' relevant obligations contained therein. Such knowledge stems from, among other sources:

      i.     Requests made by Nursing Facilities to PCC, in which Nursing Facilities request that PCC enable Real Time to access the Medical Record System;

      ii.    Requests by Real Time to make the Medical Record System accessible;

      iii.   Other communications between PCC and the over-a-thousand Nursing Facilities that are clients of both PCC and Real Time; and

      iv.   Other sources and industry-knowledge developed over the past decade during which Real Time has routinely accessed PCC's Medical Record System.

153.    PCC has knowingly, intentionally, and willfully prevented Nursing Facilities and Real Time from performing their respective obligations under the Subscription Agreements, and induced the parties to breach the Subscription Agreements, by: (i) Making it impossible for

Nursing Facilities to provide Real Time with timely and effective access to patient data; and (ii) Severing Real Time's access to certain patient data starting on October 12, 2023.

154.   PCC has also knowingly, intentionally, and willfully violated state and federal law in its attempts to interfere in the Subscription Agreements, by employing techniques that are outlawed under Maryland's Medical Records Act and the federal CURES Act.

155.   PCC's actions were calculated to harm Real Time's lawfully-conducted business activities, namely identifying and alerting medical professionals to life-threatening medical data.

156.   PCC's conduct constitutes an intentional interference with Nursing Facilities' contractual obligations to Real Time, was done through improper means, and was driven by an improper motive.

157.   PCC's conduct constitutes an intentional interference with Real Time's contractual obligations to Nursing Facilities, was done through improper means, and was driven by an improper motive.

158.   As a direct result of PCC's intentional interference with the contractual obligations laid out in the Subscription Agreements, Real Time has suffered and continues to suffer damages.

**COUNT V: Breach Of Contracts To Which Real Time Is An Intended Beneficiary**

159.   All Paragraphs in the Complaint are incorporated as if set forth herein.

160.   Nursing Facilities have contracts with PCC, called Subscription Agreements. These Subscription Agreements specifically allow Nursing Facilities to provide patient-data access to their care partners, including Real Time, and require PCC to facilitate such access.

161.   These rights and requirements in the Subscription Agreements are intended to benefit Real Time, by granting Real Time and other care-partners access to the patient data on which Real Time's entire business—and patients' lives—relies.

162.     As PCC is fully aware, Real Time's Subscription Agreements with Nursing Facilities rely entirely on the patient-data access rights and requirements described in the Subscription Agreements between Nursing Facilities and PCC.

163.     Real Time is an intended beneficiary of the Subscription Agreements between Nursing Facilities and PCC.

164.     PCC has breached the Subscription Agreements by refusing to grant Real Time proper and timely access to patient data, by:

> i.     Changing its Medical Record System in such a way as to make it effectively impossible for Real Time to timely and consistently access patient data;
>
> ii.     Implementing CAPTCHA walls to block access to patient data by Real Time's automated users;
>
> iii.     Severing Real Time's access to Nursing Facilities' patient data by transitioning to indecipherable CAPTCHA images; and
>
> iv.     Deactivating and locking Nursing Facilities' user accounts.

165.     When Real Time is unable to timely and consistently access patient data, it is unable to provide the same level of high-quality, up-to-date analytics to Nursing Facilities.

166.     When Real Time's access to patient data is severed, Real Time is unable to provide entire categories of life-saving alerts to Nursing Facilities.

167.     PCC's breaches are material to the Subscription Agreements, as those agreements' overarching purpose is to provide for the hosting and sharing of patient data. By restricting and ultimately severing Real Time's access, PCC has refused to effectively host and share patient data.

168.     As a result of PCC's breach of its contractual duties to Nursing Facilities and intended-beneficiary Real Time, Real Time has suffered and continues to suffer damages and irreparable harm.

169.     In addition to monetary damages, PCC's breaches of its contractual duties in the Subscription Agreements will cause Real Time to suffer irreparable injury such that no remedy at law will afford it complete and adequate compensation for its injury.

170.     A monetary remedy will not make Real Time whole in light of PCC's breaches of the Subscription Agreements.

171.     The Subscription Agreements are not contracts for personal services, and specific performance is not in violation of any public policy under the facts and circumstances.

172.     Accordingly, PCC must be ordered to specifically perform under the Subscription Agreements, and ordered to grant Real Time proper and timely access to patient data.

**COUNT VI: Breach Of Contract And Specific Performance** ██████████████

173.     All Paragraphs in the Complaint are incorporated as if set forth herein.

174.     ███████████████████████████████████████████

175.     ████████████████████████████████████████████
██████████████████████████████████

176.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

177.     ████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

178.    Based on information and belief, PCC has used ████████████████████ ████████████████ in violation of ████████.

179.    ████████████████████████████

180.    ████████████████████████ Real Time has suffered and will continue to suffer harm.

181.    PCC's use ████████████████████████████████████████ will cause Real Time to suffer irreparable injury such that no remedy at law will afford it complete and adequate compensation for its injury.

182.    A monetary remedy will not make Real Time whole ████████████████████ ████████

183.    In anticipation of this damages issue, the parties agreed to the remedy of specific performance. ████████████████████████████████████

184.    ████████████████████████████ specific performance is not in violation of any public policy under the facts and circumstances.

185.    Accordingly, PCC must be ordered to specifically perform ████████████, and ordered not to ████████████████████████████████████████

### COUNT VII: Preliminary And Permanent Injunction

#### *First Preliminary and Permanent Injunction*

186.    All Paragraphs in the Complaint are incorporated as if set forth herein.

187.     Real Time seeks a preliminary and permanent injunction prohibiting PCC from implementing the indecipherable CAPTCHA images; prohibiting PCC from deactivating and locking Nursing Facilities accounts; prohibiting PCC from denying or otherwise interfering with Real Time's access to patient data, which data is accessed with the permission of the Nursing Facility, that is stored on PCC's Medical Record System; and requiring PCC to make good faith efforts, in conjunction with Real Time, to establish and maintain an efficient and effective connection between Real Time and its customer Nursing Facilities' patients' health and medical data stored on PCC's Medical Record System.

188.     Real Time further seeks a preliminary and permanent injunction prohibiting PCC from interfering in Real Time's existing and prospective contracts with Nursing Facilities.

189.     As set forth in the above Counts, Real Time will likely succeed on the merits of its claims.

190.     Absent an injunction, Real Time, Nursing Facilities, and patients will suffer substantial and irreparable harm.

191.     Without the proven results of Real Time's analytics, patients will die.

192.     Real Time's business and relationships with Nursing Facilities will also suffer substantial and irreparable harm. Without access to PCC's Medical Record System, Real Time's entire function is largely prevented, and its benefit to Nursing Facilities and other customers is largely rendered null. These damages risk causing Real Time to cease conducting business entirely.

193.     Absent an injunction, Real Time is, and will continue to be, prevented from performing its contractual obligations to Nursing Facilities, which require Real Time to provide real-time preventative analytics and alerts to Nursing Facilities.

194.     An injunction serves the public interest, as it will preserve lives, prevent needless

patient suffering, and promote and ensure in-state and out-of-state entities' compliance with state and federal law.

195.    The injury that Real Time would suffer if an injunction were not granted outweighs the potential harm, if any, which PCC would incur were the injunction granted.

196.    If the injunction is not granted, Real Time will be forced to cease operations and innocent patients will suffer and die. If the injunction is not granted, PCC will have been allowed to profit at the expense of ignoring patients' rights, and federal and state law.

***Second Preliminary and Permanent Injunction***

197.    Real Time further seeks a preliminary and permanent injunction to prohibit PCC from ███████████████████████████████████████ it received from Real Time ██████████

198.    ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████

199.    ███████████████████████████████████████
██████████

200.    ███████████████████████████████████████
███████████████████████████████████████

201.    Absent an injunction, Real Time will suffer substantial and irreparable harm – as PCC ███████████████████████████████████████
██████████ that will impact Real Time's business and ultimately force Real Time to lose its market share, competitive edge and product, and result in a cessation of its business operations.

202.   An injunction ████████████████████████████████████

serves the public interest, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

203.   PCC will not be harmed if an injunction is granted; but Real Time will be harmed

if an injunction is not granted. Accordingly, the injury that Real Time would suffer if an injunction

were not granted outweighs the potential harm, if any, which PCC would incur were the injunction

granted.

<div align="center">

**PRAYER FOR RELIEF**

</div>

**WHEREFORE**, Plaintiff Real Time Medical Systems, LLC respectfully requests that this

Honorable Court enter judgment in its favor and against Defendant PCC as follows:

(i)      Declare that PCC has violated the Medical Records Act, Md. Health-General Code
         § 4-302.6, and/or the CURES Act, 130 Stat. 1037;

(ii)     Damages and restitution greater than $75,000, in an amount to be determined at trial;

(iii)    Punitive and exemplary damages in an amount to be determined at trial;

(iv)     Pre-judgment and post-judgment interest;

(v)      Injunctive relief prohibiting PCC from employing the indecipherable CAPTCHA
         images;

(vi)     Injunctive relief prohibiting PCC from denying or otherwise interfering with Real
         Time's access to Nursing Facilities' data stored on PCC's Medical Record System;

(vii)    Injunctive relief requiring PCC to make good faith efforts, in conjunction with Real
         Time, to establish and maintain an efficient and effective connection between Real
         Time and its client Nursing Facilities' data stored on PCC's Medical Record System;

(viii)    Injunctive relief prohibiting PCC from interfering in Real Time's contracts with Nursing Facilities;

(ix)    Injunctive relief prohibiting PCC from using any of Real Time's information and data provided to PCC █████████;

(x)    An order that PCC specifically perform under the terms and conditions of the contracts it entered into with Real Time, and the contracts to which Real Time is an intended beneficiary;

(xi)    Damages allowed by statute to be determined at trial; and

(xii)    Such other and further relief as may be just, equitable, and proper.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury on all claims so triable.

Dated January 9, 2024                    Respectfully submitted,

                                         RIFKIN, WEINER, LIVINGSTON LLC

                                         /s/ M. Celeste Bruce, Esquire
                                         M. Celeste Bruce, Esq. (CPF# 9212150085)
                                         Madelaine K. Katz, Esq. (CPF# 1312180112)
                                         RIFKIN WEINER LIVINGSTON, LLC
                                         4800 Hampden Lane, Suite 820
                                         Bethesda, Maryland 28104
                                         (301) 951-0150 (phone)
                                         (301) 951-0172 (facsimile)
                                         cbruce@rwllaw.com
                                         mkatz@rwllaw.com


                                         Peter A. Biagetti, BBO # 042310
                                             *Pro hac vice application forthcoming*
                                         Aaron R. Fenton, BBO # 705337
                                             *Pro hac vice application forthcoming*
                                         MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
                                         POPEO, P.C.
                                         One Financial Center
                                         Boston, MA 02111
                                         Phone: 617.542.6000
                                         Fax: 617.542.2241
                                         PABiagetti@mintz.com

                                         *Counsel for Plaintiff Real Time Medical Systems*