**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

REAL TIME MEDICAL SYSTEMS, INC.

       Plaintiff,

   v.

POINTCLICKCARE TECHNOLOGIES INC.
d/b/a POINTCLICKCARE

       Defendant.

Civil Action No.8:24-CV-00313-PX

**REDACTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**POINTCLICKCARE'S MOTION TO DISMISS**

Brian T. Burgess (D. Md. Bar No. 19251)
William C. Jackson (Admitted *Pro Hac Vice*)
Ashley M. Drake (Admitted *Pro Hac Vice*)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Tel.: +1 202 346 4215
Fax: +1 202 204 7265
BBurgess@goodwinlaw.com
WJackson@goodwinlaw.com
Amdrake@goodwinlaw.com

Rod J. Rosenstein (D. Md. Bar No. 14793)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
RRosenstein@kslaw.com

*Attorneys for Defendant PointClickCare*
*Technologies Inc*

Dated: March 15, 2024

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD................................................................................................. 7

ARGUMENT ............................................................................................................. 8

I.      Count I: RTMS Fails to State a Claim Under the Maryland Act or the
        Cures Act. ....................................................................................................... 8

        A.      RTMS has not identified any private right of action. ........................... 8

        B.      PointClickCare is in full compliance with the relevant statutes. ........... 9

II.     Count II: RTMS's Unfair Competition Claim Must Be Dismissed................. 11

III.    Count III: RTMS Fails to Allege an Unlawful Tying Arrangement................ 15

IV.     Count IV: RTMS Fails To Plausibly Allege A Tortious Interference
        Claim............................................................................................................... 22

        A.      RTMS fails to allege that PointClickCare induced a third-party
                breach. ............................................................................................... 23

        B.      RTMS failed to allege any interference was without justification. ...... 25

V.      Count V: RTMS Fails to Allege It Was an Intended Beneficiary of
        PointClickCare's Agreements............................................................................ 26

VI.     Count VI: RTMS Fails To State A Breach of Contract Claim. ...................... 29

VII.    Count VII: RTMS's Defective Claims Do Not Merit Injunctive Relief........... 30

CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acciai Speciali Terni USA, Inc. v. M/V BERANE*,
181 F. Supp. 2d 458 (D. Md. 2002) .......................................................28

*Advanced Comput. Serv. of Mich., Inc. v. MAI Sys. Corp.*,
845 F. Supp. 356 (E.D. Va. 1994) .......................................................15

*Amaya v. DGS Constr., LLC*,
No. CV TDC-16-3350, 2019 WL 3945933 (D. Md. Aug. 21, 2019) .....................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................7, 27

*Barr v. Flagstar Bank, FSB*,
303 F. Supp. 3d 400 (D. Md. 2018) .......................................................13

*Beasley v. Bernard*,
No. CV DKC 23-3133, 2024 WL 326952 (D. Md. Jan. 29, 2024).....................28

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
223 F. Supp. 2d 718 (D. Md. 2002) .......................................13, 14, 18

*Brass Metal Prod., Inc. v. E-J Enters., Inc.*,
984 A.2d 361 (Md. Ct. Spec. App. 2009) ...............................................22

*Brennan v. Cannella*,
No. 14-CV-1560, 2015 WL 2236706 (E.D. Pa. May 12, 2015)........................11

*Brown Goldstein Levy LLP v. Fed. Ins. Co.*,
68 F.4th 169 (4th Cir. 2023) ...........................................................13

*Cal. Chamber of Com. v. Becerra*,
No. 219-CV-02019-KJM-EFB, 2020 WL 1030980 (E.D. Cal. Mar. 3, 2020) .......................30

*CCBN.Com, Inc. v. Thomson Financial, Inc.*,
270 F. Supp. 2d 146 (D. Mass. 2003) .......................................20, 21

*Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*,
752 A.2d 265 (Md. Ct. Spec. App. 2000) ...............................................28

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ...........................................................14

*Devil's Advoc., LLC v. Zurich Am. Ins. Co.*,
  666 F. App'x 256 (4th Cir. 2016) .................................................................2

*Dream Big Media, Inc. v. Alphabet, Inc.*,
  No. 22-CV-02314-JSW, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022)) .............19

*Driver Opportunity Partners I, LP v. First United Corp.*,
  No. CV RDB-20-2575, 2021 WL 82864 (D. Md. Jan. 8, 2021) ................12, 13, 14

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998) ..............................................................................10

*E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ...................................................................18

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) .......................................................11

*Edmondson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) ...............................................................14, 15

*Edmondson Vill. Theatre v. Einbinder*,
  116 A.2d 377 (Md. 1955) ........................................................................14

*Ellicott Dredges, LLC v. DSC Dredges, LLC*,
  280 F. Supp. 3d 724 (D. Md. 2017) ............................................................12

*Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*,
  86 F. Supp. 3d 464 (E.D. Va. 2015) .............................................................8

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ..............................................................................10

*Frazier v. Experian Info. Sols.*,
  No. CV GLR-18-68, 2018 WL 6726311 (D. Md. Dec. 21, 2018) ...................23, 29

*G.W. Aru, LLC v. W.R. Grace & Co.-Conn.*,
  344 F.R.D. 446 (D. Md. 2023) ..................................................................12

*Ghatt v. Seiler*,
  No. CV TDC-16-3445, 2017 WL 3088373 (D. Md. July 20, 2017) ....................25

*Hamilton v. McAuliffe*,
  353 A.2d 634 (Md. 1976) .........................................................................8

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ................................................................................10

*Honeywell Intl. Inc. v. MEK Chem. Corp.*,
No. 3:17-CV-1390-M, 2018 WL 6737514 (N.D. Tex. July 5, 2018) .................................... 16

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ................................................................................................................ 10

*Hyland v. Navient Corp.*,
No. 18-CV-9031(DLC), 2019 WL 2918238 (S.D.N.Y. July 8, 2019) ................................... 25

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................................................................. 17

*It's My Party, Inc. v. Live Nation, Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015) .......................................................................................... 15

*Jones v. Bank of Am. Corp.*,
No. 4:09-CV-162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) ........................................... 30

*Kadow v. First Federal Bank*,
No. 8:19-CV-00566-PWG, 2020 WL 5230560 (D. Md. Sept. 2, 2020) ................................. 21

*Lazarou v. Am. Board of Psychiatry and Neurology*,
No. 19-CV-01614, 2020 WL 5518476 (N.D. Ill. Sept. 11, 2020) .......................................... 17

*Lee v. Life Ins. Co. of N. Am.*,
829 F. Supp. 529 (D.R.I. 1993) .............................................................................................. 17

*Loren Data Corp. v. GXS, Inc.*,
No. CIV.A. DKC 10-3474, 2011 WL 3511003 (D. Md. Aug. 9, 2011) ........................... 18, 19

*Md. Indus. Grp., LLC v. Bluegrass Materials Co., LLC*,
No. 924, Sept. Term, 2017, 2018 WL 3006354 (Md. Ct. Spec. App. June 15,
2018) ........................................................................................................................................ 25

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*,
571 U.S. 191 (2014) .................................................................................................................. 8

*Montgomery County Ass'n of Realtors v. Realty Photo Master, Inc.*,
783 F Supp. 952 (D. Md. 1992) ............................................................................................. 16

*Moye v. Avis Budget Grp.*,
No. CIV.A. TDC-14-2714, 2015 WL 410515 (D. Md. Jan. 27, 2015) ................................... 28

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
833 F.2d 1342 (9th Cir. 1987) ............................................................................................... 22

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*,
889 F.2d 524 (4th Cir. 1989) .................................................................................................. 18

*Parlette v. Parlette*,
   596 A.2d 665 (Md. Ct. Spec. App. 1991) .......................................................................26, 27

*Patriot Constr., LLC v. VK Elec. Servs., LLC*,
   290 A.3d 1108 (Md. App. Ct. 2023) ...................................................................................24

*Phillips v. Crown Cent. Petroleum Corp.*,
   395 F. Supp. 735 (D. Md. 1975) .........................................................................................21

*Pillar to Post, Inc. v. Md. Home Inspectors, Inc.*,
   No. CV DKC 18-3761, 2020 WL 1158583 (D. Md. Mar. 10, 2020) ...................................25

*HavePOWER, LLC v. Gen. Elec. Co.*,
   183 F. Supp. 2d 779 (D. Md. 2002) ....................................................................................26

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)................................................................................................11

*Reilly v. Apple, Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................19, 20, 21

*Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*,
   511 A.2d 492 (Md. 1986) ....................................................................................................26

*RRC Ne., LLC v. BAA Md., Inc.*,
   994 A.2d 430 (Md. 2010) ...............................................................................................24, 25

*S. Volkswagen, Inc. v. Centrix Fin, LLC*,
   357 F. Supp. 2d 837 (D. Md. 2005).................................................................................13, 14

*ScanSource, Inc. v. Thurston Grp., LLC*,
   No. CIV.A. DKC 11-0380, 2011 WL 1884775 (D. Md. May 18, 2011) .........................29, 30

*Shillman v. Hobstetter*,
   241 A.2d 570 (Md. 1968) ....................................................................................................27

*Sidibe v. Sutter Health*,
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ..................................................................................21

*Silkworth v. Cedar Hill Cemetery*,
   No. 694, 1993 WL 122104 (Md. App. Feb. 11, 1993) ..............................................15, 18, 19

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
   903 F.2d 988 (4th Cir. 1990) ..............................................................................................17

*Taylor v. NationsBank, N.A.*,
   776 A.2d 645 (Md. 2001) ....................................................................................................29

*Terry v. Corp. Am. Fam. Credit Union*,
No. CV JKB-19-1065, 2019 WL 5065183 (D. Md. Oct. 9, 2019) .......................................26

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
No. CV DLB-23-672, 2023 WL 8545228 (D. Md. Dec. 11, 2023).......................................23

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
32 A.3d 456 (Md. Ct. Spec. App. 2011) ................................................................................27

*United Bank v. Buckingham*,
761 F. App'x 185 (4th Cir. 2019) ...........................................................................................8

*United States v. Loew's, Inc.*,
371 U.S. 38 (1962).................................................................................................................20

*United States v. Payne*,
54 F.4th 748 (4th Cir. 2022) ...................................................................................................9

*Verbal v. Giant of Md., LLC*,
204 F. Supp. 3d 837 (D. Md. 2016)................................................................8, 23, 25, 30

*Wag More Dogs Liab. Corp. v. Cozart*,
680 F.3d 359 (4th Cir. 2012) ................................................................................7, 8, 27

*White v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
913 F.2d 165 (4th Cir. 1990) ..................................................................................................8

*WM. T. Burnett Holding LLC v. Berg Bros. Co.*,
175 A.3d 876 (Md. Ct. Spec. App. 2017) .............................................................................28

**Statutes**

42 U.S.C. § 300jj-52 ..........................................................................................................3, 10

2023 Md. Laws Ch. 333 (S.B. 648) ...........................................................................................4

21st Century Cures Act, Pub. L. No. 114-255, 130 Stat. 1037.............................................. *passim*

Md. Code Ann., Cts. & Jud. Proc. § 3-414 ...............................................................................8

Md. Code Ann., Health-Gen. § 4-302.6......................................................................4, 9, 10

**Other Authorities**

45 C.F.R. § 160.103 ...................................................................................................................4

45 C.F.R. § 170.213 ...................................................................................................................3

45 C.F.R. § 171.201 ........................................................................................................3, 10, 14

45 C.F.R. § 171.202 ...................................................................................3, 10, 14

45 C.F.R. § 171.203 ...................................................................................3, 10, 14

45 C.F.R. § 171.204 ...................................................................................3, 10, 14

45 C.F.R. § 171.205 ...................................................................................3, 10, 14

45 C.F.R. § 171.301 ...............................................................................3, 9, 10, 14

45 C.F.R. § 171.302 ....................................................................................3, 10 14

45 C.F.R. § 171.303 ...................................................................................3, 10, 14

85 Fed. Reg. 25,642 (May 1, 2020) ..........................................................3, 10, 14

Fed. R. Civ. P. 8 ................................................................................................1, 15

Fed. R. Civ. P. 9(b) ...............................................................................................14

Fed. R. Civ. P. 12(b)(6)...........................................................................................7

Restatement (Second) of Contracts § 302 (1981) ................................................27

*Unfair Competition—Generally*, Md. Civ. Pattern Jury Instructions (5th ed. 2023),
    MPJI-Cv 7:7 ......................................................................................................13

## INTRODUCTION

Plaintiff Real Time Medical Systems, Inc. ("RTMS") filed this litigation, complaining that its automated tools have been unable to screen-scrape[1] data from systems run by defendant PointClickCare Technologies Inc. As RTMS acknowledges, its screen-scraping degrades PointClickCare's services to—and violates PointClickCare's contracts with—its Nursing Facility customers. RTMS nevertheless asserts that it is entitled to unfettered cost-free access to PointClickCare's platform, that it must be allowed to retrieve that data in whatever manner it prefers, without regard to PointClickCare's legitimate interest in protecting the security, privacy, and functionality of its systems, and that PointClickCare should not be allowed to restrict that access. RTMS's seven-count complaint is nothing more than a collection of frivolous claims that do not withstand even limited scrutiny.

RTMS's claims rest on conclusory and insufficient factual allegations that fail to satisfy Rule 8's pleading standard. First, RTMS's claim for a declaratory judgment that PointClickCare has violated the Cures Act and Maryland's Nursing Home Records Act (Count I) fails because RTMS fails to identify any private right of action for either statutory claim, and, in any event, PointClickCare is in full compliance with both statutes. RTMS likewise fails to state a claim for unfair competition (Count II) because RTMS has failed to allege any fraud, deceit, trickery or unfair methods by PointClickCare. RTMS's unlawful tying claim (Count III) also fails because RTMS cannot satisfy any of the three essential elements of the claim, including, most notably, that customers are coerced into purchasing a tied product.

RTMS's contract-related claims fare no better. RTMS's Complaint lacks factual

---

[1] Screen-scraping is a process of programmatically extracting display information on a web screen and translating it for use or display on another application.

allegations sufficient to plead either that PointClickCare induced a third-party breach of RTMS's contracts or that any purported conduct by PointClickCare was without justification—two essential elements of RTMS's tortious interference claim (Count IV). In fact, RTMS's complaint itself shows that PointClickCare's actions were entirely justified based on PointClickCare's own contractual rights. To be clear, PointClickCare's contracts with its nursing facilities expressly prohibit the automated screen-scraping RTMS conducts. RTMS's claim that PointClickCare is tortiously interfering with RTMS's contracts by blocking those screen-scraping efforts thus makes no sense. Moreover, RTMS fails to plead that it was an intended beneficiary of PointClickCare's contracts, which is fatal to RTMS's third-party-beneficiary breach of contract claim (Count V). And RTMS likewise fails to sufficiently allege any breach ██████████████████████████ ████████████████████████ (Count VI). Finally, because RTMS's claim for injunctive relief (Count VII) depends on its other deficient claims, it likewise fails. PointClickCare therefore moves this Court to dismiss RTMS's Complaint in its entirety.

RTMS's fundamental problem is that its business model—screen-scraping information from PointClickCare's systems—is inconsistent with PointClickCare's contracts and with federal and state law regarding access to that information. RTMS's claims should be dismissed.[2]

## BACKGROUND

***Federal regulation of Electronic Health Information (EHI) interoperability.*** As the switchover from paper to electronic health records accelerated, vendors proliferated in the field of electronic health information ("EHI"). In order to encourage electronic data exchange and interoperability, Congress enacted the 21st Century Cures Act in 2016. Pub. L. No. 114-255, 130

---

[2] This court should dismiss the Complaint with prejudice because any amendment would be futile. *See Devil's Advoc., LLC v. Zurich Am. Ins. Co.*, 666 F. App'x 256, 267 (4th Cir. 2016) (affirming denial of request for leave to amend where amending the complaint would not cure the deficiencies).

Stat. 1037 (the "Cures Act"). The Cures Act bars "information blocking," which is any practice "likely to interfere with, prevent, or materially discourage access, exchange, or use of [EHI]" so long as the entity "knows, or should know, that such practice is likely to interfere with, prevent, or materially discourage the access, exchange, or use of [EHI]." *Id.* § 4004(a)(1), 130 Stat. at 1176. Congress, however, understood that some activities that fit this broad definition are necessary to a well-functioning, innovative, secure, and interoperable exchange of EHI. The Cures Act accordingly commanded that the Secretary of HHS "shall identify reasonable and necessary activities that do not constitute information blocking." *Id.* § 4004(a)(3), 130 Stat. at 1177 (emphasis added), 42 U.S.C. § 300jj-52(a)(3). In 2020, HHS promulgated regulations identifying certain "necessary activities" that do not constitute information blocking. *See 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program*, 85 Fed. Reg. 25,642 (May 1, 2020) (codified at 45 C.F.R. pts. 170 & 171).

The exception for "necessary activities" allows custodians like PointClickCare to limit responses to data requests when necessary to protect system security and system integrity or to prevent harm. *See* 45 C.F.R. §§ 171.201–205 & 45 C.F.R. §§ 171.301–303; *see also* 85 Fed. Reg. at 25,649. The "content and manner exception," also allows an EHI custodian to limit the manner in which it fulfills a request if it "is technically unable to fulfill the request" or if it "cannot reach agreeable terms with the requestor." 45 C.F.R. § 171.301(b). This exception allows EHI custodians to enter into mutually agreeable arrangements for sharing EHI with third parties. If the parties cannot agree, then the custodian is required to share only basic health information, and may use a federally recognized standard to do so. *Id.* § 171.301(b). One such federally recognized standard is United States Core Data for Interoperability (USCDI). 45 C.F.R. § 170.213. The Cures Act also includes a "fees exception," 45 C.F.R. § 171.302, which states that a custodian may charge

reasonable fees for accessing, exchanging, or using EHI, and may recover a reasonable profit.

***Maryland's Nursing Homes Act.*** In 2023, the Maryland General Assembly, under heavy lobbying from RTMS, a Maryland company, enacted legislation requiring EHI providers to give nursing home patients' medical records to third parties upon request for free. 2023 Md. Laws Ch. 333 (S.B. 648) ("Maryland Act"). RTMS's purpose in lobbying for the law was to obtain full access, at no cost, to the health IT systems of PointClickCare, a foreign corporation. Under the Maryland Act, a "nursing home may direct the electronic health network or electronic medical record vendor to release patient medical records or electronic health care transactions … to a business associate[3] of the nursing home." Md. Code Ann., Health-Gen. § 4-302.6(b)(1); Compl. ¶¶ 120–21. If a nursing facility makes a request, the network must release the requested records or transactions in a "format that conforms to the specifications of the Office of the National Coordinator of Health Information Technology or another form required by the State-designated health information exchange." *Id.* § 4-302.6(b)(2)(i). The Maryland Act requires networks to make that data "available on a regular basis and release the information in a timely manner to support patient care and monitoring" and prohibits networks from "restrict[ing], limit[ing], or charg[ing] a fee for the release" of the data. *Id.* § 4-302.6(b)(2)(ii), (iii). Accordingly, the Maryland Act conflicts with the Cures Act by prohibiting custodians from charging reasonable fees. Any Maryland Act prohibition of conduct that the Cures Act deems "necessary activities" would raise a similar conflict.

***PointClickCare's numerous data-sharing systems.*** PointClickCare—a leading provider of comprehensive software solutions for the senior care industry—offers a variety of services including an electronic Medical Record System that provides nursing facilities, including many in

---

[3] A "business associate" is a person or entity that performs certain functions or activities that involve access to protected health information. 45 C.F.R. § 160.103.

Maryland, a secure, cloud-based means to organize, analyze, track, store, share, and exchange residents' EHI. *See* Compl. ¶¶ 20–21. One such service is PointClickCare's "Data Relay" solution, which automatically delivers regularly scheduled extracts of electronic health record data. *Id.* ¶¶ 20, 30. Nursing facilities can choose to use Data Relay to export patients' EHI and then share the data with business associates like RTMS. Compl. ¶ 31. RTMS alleges that it has obtained data indirectly from PointClickCare through the Data Relay service and that it runs reports on PointClickCare's system using nursing facilities' user identifications and passwords. Compl. ¶¶ 31–32. PointClickCare users may also access "Follow Up Questions" or "FUQ" reports, which provide collections of patient data from the Medical Record System. *Id.* ¶¶ 28–29. These reports are generated on demand by the user. *Id.* ¶ 32.

PointClickCare and its nursing facility clients enter into agreements that dictate the terms of their relationship and the use of PointClickCare's System by the nursing facilities and their business associates. *Id.* ¶ 42. For example, the Complaint alleges that PointClickCare allows third-party vendors to provide their applications via the PointClickCare platform, and that PointClickCare agrees to provide system access to third-party vendors. *Id.* To do so, PointClickCare will "establish[] a connection" with the third-party software. *Id.* ¶ 43. Although PointClickCare permits vetted third-party vendors to access its System once that connection is established, RTMS alleges that PointClickCare's agreements with its nursing-facility clients prohibit "any automated or other process such as screen-scraping, by using robots, … or any other sort of bot or tool, for the purpose of extracting data." *Id.*

***RTMS's business.*** RTMS has predicated its business model on siphoning data from EHI data custodians like PointClickCare at no cost. To that end, RTMS contends that it must be granted cost-free access to PointClickCare's proprietary systems in ways that violate the nursing facilities'

contracts and federal law. RTMS does not contract with PointClickCare to access the data PointClickCare manages and stores. *See id.* ¶¶ 39–41. Instead, RTMS alleges that it is entitled to cost-free access as a purported third-party beneficiary of PointClickCare's contracts with its nursing-facility clients, and that as a result RTMS should be allowed to use automated means to screen-scrape as much data as it wants from PointClickCare's service at any time. *Id.* ¶¶ 160–72.

RTMS's value-based care software "monitors patients' electronic medical records in real time and identifies certain dangerous patient information and data patterns that busy doctors and nurses may otherwise overlook," and sends the information through an alert system to caretakers. *Id.* ¶¶ 13–19. To obtain access to this software, nursing facilities execute a "Subscription Agreement" and a "Business Associate Agreement" with RTMS, through which they "acknowledge" RTMS's need to access their data and grant RTMS licenses to use that data. *Id.* ¶ 40; *see also id.* ¶ 151 (framing the supposed contractual provision as "requir[ing] Nursing Facilities to provide [RTMS] with access to their patient data").

***RTMS alleges that PointClickCare made RTMS's screen-scraping difficult.*** RTMS alleges that "at least as early as 2020, [PointClickCare] began developing and marketing products to compete with" RTMS. *Id.* ¶ 46. RTMS further alleges that around this time, PointClickCare made "alterations" that essentially sabotaged its own Medical Record System and increased the time to generate FUQ reports. *Id.* ¶ 48. RTMS argues that this purported self-sabotage was done with the intent to have nursing facilities "breach their contracts with" RTMS and instead use PointClickCare's new products. *Id.* ¶ 49. RTMS then alleges that PointClickCare sought to blame the degradation of its system's performance on RTMS. *Id.* ¶ 114.

About two years after PointClickCare's unspecified "alterations" to its Medical Record System, PointClickCare introduced Completely Automated Public Turing Test to Tell Computers

and Humans Apart ("CAPTCHA") walls into its System, which RTMS alleges became increasingly illegible, to prevent automated access of its System consistent with PointClickCare's contractual prohibition on "automated or other process[es] such as screen scraping[.]" *Id.* ¶¶ 43, 51, 56–58. Because PointClickCare may lock or deactivate accounts that repeatedly fail to pass the CAPTCHA wall, RTMS was unable to retrieve certain patient data. *Id.* ¶ 60.

 ***leading to this lawsuit.*** PointClickCare and RTMS have been in communication regarding their dispute over RTMS's screen-scraping practices. *Id.* ¶¶ 54, 86–95. In December 2023, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 96. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 98–113. ▮▮▮▮▮▮ *Id.* ¶¶ 103–06. RTMS alleges that ▮▮▮▮▮▮▮▮▮▮▮ PointClickCare told RTMS it intended to become the sole provider of Value-Based Care software and that it would not provide data to RTMS because PointClickCare viewed RTMS as a competitor. *Id.* ¶¶ 108–10.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While this court must accept well-pleaded factual allegations as true, the facts alleged must amount to "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, this court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Wag More Dogs Liab. Corp. v. Cozart*, 680

F.3d 359, 365 (4th Cir. 2012) (quotation marks and citations omitted). "Conclusory factual allegations devoid of any reference to actual events" are likewise insufficient. *Verbal v. Giant of Md., LLC*, 204 F. Supp. 3d 837, 844 (D. Md. 2016).

## ARGUMENT

## I.    Count I: RTMS Fails to State a Claim Under the Maryland Act or the Cures Act.

RTMS seeks a declaratory judgment that PointClickCare has violated the Maryland Act and the Cures Act. *See* Compl. ¶¶ 115–128. This claim fails. *First*, RTMS has not identified any private right of action under either of those Acts. *Second*, RTMS's allegations establish that PointClickCare is actually complying with both laws.

### A.    RTMS has not identified any private right of action.

RTMS has not identified a private right of action. "Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even [if] the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.2d 165, 167 (4th Cir. 1990).[4] The Supreme Court has "long considered the operation of the Declaratory Judgment Act to be only procedural, leaving substantive rights unchanged." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (cleaned up). For declaratory judgment to be appropriate, "[a plaintiff] must first identify an underlying right." *Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464, 471 (E.D. Va. 2015). If a plaintiff could not receive substantive relief on the underlying claim, then its claim for a declaratory judgment "must fail." *United Bank v. Buckingham*, 761 F. App'x 185, 193 n.7 (4th Cir. 2019). Because RTMS has failed to identify any private right of action or right to receive substantive relief on its statutory

---

[4] In any event, there should be no conflict between the federal and Maryland declaratory judgment act because Maryland's act "shall be interpreted and construed … to harmonize, as far as possible, with federal laws … on the subject of declaratory judgments and decrees." Md. Code Ann., Cts. & Jud. Proc. § 3-414; *see also Hamilton v. McAuliffe*, 353 A.2d 634, 637 n.2 (Md. 1976).

claims, they must be dismissed. *United States v. Payne*, 54 F.4th 748, 753–54 (4th Cir. 2022).

**B.      PointClickCare is in full compliance with the relevant statutes.**

The Complaint fails to allege a violation of the Maryland Act or the Cures Act. RTMS's allegations amount to a protest that PointClickCare uses CAPTCHA walls to prevent RTMS's automated processes from repeatedly accessing PointClickCare's system through its nursing facility clients' logins to download thousands of "Follow Up Questions" Reports each day. *See* Compl. ¶¶ 51, 64, 123–124, 126, 164, 187. PointClickCare's alleged conduct does not violate either law for at least two reasons.

*First*, neither law requires PointClickCare to transmit "Follow Up Questions" Reports. These reports, which RTMS alleges are "generated on-demand" and consist of "point-of-care data," Compl. ¶ 32, differ from the USCDI data that federal and state law require PointClickCare to share. Both the Cures Act and the Maryland Act require the transmission of a uniform set of data (like USCDI data) when parties are unable to reach a data-sharing agreement. 45 C.F.R. § 171.301(a)(1); Md. Code Ann., Health-Gen. § 4-302.6(b)(2)(i). As RTMS alleges, no agreement has been reached by the parties here. *See* Compl. ¶¶ 87–88. RTMS does not allege that PointClickCare fails to send USCDI data upon a nursing home's request. In fact, RTMS concedes that it *can* access data through Data Relay (apparently at no cost to RTMS); it just argues it is entitled to unlimited access to PointClickCare's proprietary systems and *more* data—whatever it wants, whenever it wants, and in whatever format it chooses, for free. *See* Compl. ¶ 36 (demanding between 200 and 300 FUQ reports per nursing facility each day); ¶ 37 (noting that the RTMS cannot obtain the volume of information it seeks manually and must use an "automated user"—*i.e.*, a bot). Neither the Cures Act nor the Maryland Act requires PointClickCare to provide unfettered, cost-free access to more data than the uniform USCDI data—nor could they.

*Second*, neither of these laws prohibits electronic health networks from protecting the

9

security, privacy, and functionality of their systems. To the contrary, the Cures Act expressly acknowledges that such protection is "necessary." 42 U.S.C. § 300jj-52(a)(3). Indeed, HIPAA requires PointClickCare to secure the sensitive information in its systems. HHS regulations provide that custodians like PointClickCare may limit responses to data requests where necessary to protect system security and system integrity or to prevent harm. *See* 45 C.F.R. §§ 171.201–205 & 45 C.F.R. §§ 171.301–303 (describing exceptions to information-blocking prohibition); *see also* 85 Fed. Reg. at 25,649 (these "reasonable and necessary" activities "promote the privacy and security of EHI" and "promote the performance of health IT").

The Maryland Act does not disclaim these exceptions. Md. Code Ann., Health-Gen. § 4-302.6. Nor could it. To the extent the Maryland Act could be interpreted to prohibit electronic healthcare networks from engaging in the activities federal law deems "necessary," the Act is preempted. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (a state law is preempted when it "limit[s] the availability of an option the [federal agency] considers essential"); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (state laws are preempted to the extent that they impede "the accomplishment and execution of the full purposes and objectives of Congress"). And construing the Maryland Act to require PointClickCare to give RTMS unfettered, cost-free access to its proprietary system would violate the Takings Clause. *See, e.g.*, *E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998) (noting a taking can occur through legislation and regulation that sufficiently deprives a user of its property rights); *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015) (finding the Takings Clause not limited to real property).

Moreover, RTMS's own allegations prove that its "automated user[s]" are using nursing home credentials to run a high volume of requests on PointClickCare's system every day—a volume so high that RTMS alleges it *has to* use "automated user[s]" (also known as bots) because

humans could not keep up. Compl. ¶¶ 36–37. The use of bots performing a high frequency of queries to PointClickCare's system not only violates the nursing facilities' contracts with PointClickCare, *id.* ¶ 43, but also causes system degradation—functionally operating as a denial-of-service attack.[5] *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404–05 (2d Cir. 2004) (affirming preliminary injunction against defendant's automated query operation because such bot operations constituted trespass to chattels and could lead to the plaintiff's website crashing); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1071–72 (N.D. Cal. 2000) (granting preliminary injunction to eBay for its trespass claim that defendant's automated query operations "appropriat[e] eBay's personal property by using valuable bandwidth and capacity, and necessarily compromise[e] eBay's ability to use that capacity for its own purposes."). These cases underscore the constitutional problems with RTMS asking this Court to grant its "automated user[s]" an unlimited right to trespass on PointClickCare's proprietary system. PointClickCare's data-security measures in response to that barrage of automated queries are "necessary and reasonable" under federal and state law and constitutionally protected in any case.[6]

## II.    Count II: RTMS's Unfair Competition Claim Must Be Dismissed.

RTMS's unfair competition claim asserts that the same allegations that constitute violations of the Maryland Act and the Cures Act also constitute unfair competition: in RTMS's view, it is unfair that PointClickCare has not provided RTMS with unfettered access to EHI stored on PointClickCare's platform. Compl. ¶¶ 131-134. Because PointClickCare has not violated either the Maryland Act or the Cures Act, RTMS's unfair competition claim fails.

---

[5] "A denial-of-service attack is an unlawful method of attacking a website in order to prevent legitimate users from accessing it" and "[t]he most common form of this attack is where an attacker floods the target site's servers with requests to view the page; this can overload the server and prevent legitimate access to the site." *Brennan v. Cannella*, 2015 WL 2236706, at *2 n.2 (E.D. Pa. May 12, 2015).

[6] To the degree the Maryland Act claim is not dismissed, PointClickCare will have no other choice than to join Maryland in this action and ask this Court to strike down the Act as preempted and unconstitutional.

Under Maryland law, the tort of unfair competition is defined as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Ellicott Dredges, LLC v. DSC Dredges*, *LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017) (internal quotations and citation omitted). Since "[t]here are no specific elements required to establish unfair competition," courts have recognized that the tort is susceptible to broad interpretation *G.W. Aru, LLC v. W.R. Grace & Co.-Conn.*, 344 F.R.D. 446, 450 (D. Md. 2023). Courts, however, "must be careful to guard against extending" the claim to cover acts that are not illegal. *Ellicott Dredges, LLC*, 280 F. Supp. 3d at 732. "[O]nly acts which substantially interfere with the ability of others to compete on the merits of their products or acts that conflict with accepted principles of public policy can serve as the grounds of an unfair competition claim." *Id.* (cleaned up).

First, RTMS's unfair competition claim fails because RTMS and PointClickCare are not competitors in the analytics and value-based software space. Although RTMS and PointClickCare are passingly referred to as "competitors," in one section of the Complaint (Compl. ¶¶ 145–46), and RTMS alleges that PointClickCare sought to become a competitor in the value-based software space (*id*. ¶ 108), there is no allegation that PointClickCare has actually developed a competing analytics or value-based software product that is available for consumers to purchase. In other words, there is no allegation that RTMS and PointClickCare *actually* compete for nursing facilities' business in the relevant space. If RTMS and PointClickCare are not competitors, there can be no unfair competition claim. *See Driver Opportunity Partners I, LP v. First United Corp.*, 2021 WL 82864, at *11 (D. Md. Jan. 8, 2021).

Second, the conduct about which RTMS complains is not of the type that Maryland courts typically deem unfair competition—which is focused on "harm relat[ing] to deceptive marketing, trademark infringement, appropriation of trade secrets, or acts prohibited under federal or state

statutes." *Id.* (quoting Restatement (Third) of Unfair Competition § 1); *see also S. Volkswagen, Inc. v. Centrix Fin.*, *LLC*, 357 F. Supp. 2d 837, 853 (D. Md. 2005) (limiting "traditional common law unfair competition cause of action" to conduct listed in the Restatement); *Unfair Competition—Generally*, Md. Civ. Pattern Jury Instructions (5th ed. 2023), MPJI-Cv 7:7 (describing Maryland law as limiting unfair competition primarily to "misappropriation" and stating "[t]he Committee has not proposed an instruction for unfair competition because the tort appears to be limited in scope and infrequent in occurrence"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 738 (D. Md. 2002) (noting that the majority of Maryland unfair competition cases deal with trade confusion).

Here, as described in Section I.B, *supra*, nothing about PointClickCare's alleged conduct concerning access to the data it stores for its customers is illegal or otherwise unfair. PointClickCare provides an electronic medical records system and allows third parties that "establish a connection" with PointClickCare to access that system. Compl. ¶ 42. But PointClickCare prohibits "automated or other process such as screen scraping, by using robots … or any other sort of bot or tool, for the purpose of extracting data." *Id.* ¶ 43. In fact, the contract between PointClickCare and its customers further provides that (a) PointClickCare's clients may not "interfere with, or disrupt the integrity or performance of" PointClickCare's systems, and (b) those customers may not "access [PointClickCare's system] in such a way that adversely impacts the performance of" the system. Agreement, § 2.2, attached hereto as Exhibit 1.[7]

RTMS seeks unfettered automated electronic access to data on PointClickCare's systems,

---

[7] As RTMS relies on and quotes PointClickCare's contract in the Complaint, PointClickCare is entitled to rely on the contract's full contents, attached as Exhibit 1. *See Brown Goldstein Levy LLP v. Fed. Ins. Co.*, 68 F.4th 169, 174, 176 n.5 (4th Cir. 2023) (explaining that a court may consider a document attached to a motion to dismiss where it was integral to and explicitly relied on in the complaint and the plaintiff does not challenge the document's authenticity); *see also Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 411 (D. Md. 2018) (concluding that court could consider a contract attached to a motion to dismiss where plaintiffs referred to its terms and relied on it).

but RTMS is neither legally nor contractually entitled to that access. At bottom, RTMS is upset that PointClickCare's business is contrary to RTMS's financial interests. But that is just competition—not *unfair* competition, "[t]he essential element of [which] is deception." *Edmondson Vill. Theatre v. Einbinder*, 116 A.2d 377, 380 (Md. 1955). Courts dismiss claims alleging merely that defendant "excluded and restrained Plaintiff[]" by "not … deal[ing] with" the plaintiff in the way the plaintiff wants. *S. Volkswagen*, 357 F. Supp. 2d at 852–53. Indeed, far from being violative, federal law deems PointClickCare's protection of its system's integrity, performance, and data privacy *necessary*. *See* Section I.B, *supra*; 45 C.F.R. §§ 171.201–205, 171.301–303. The Cures Act's regulatory exemptions protect activities that "are important to the successful functioning of the U.S. health care system, including … supporting the privacy and security of EHI, and protecting patient safety." 85 Fed. Reg. at 25,649. RTMS's attempt to cast these legitimate business actions as illegal does not make them so. Because RTMS's unfair competition claim is premised on its deficient claim alleging violations of the Maryland Act and Cures Act (Count I), this unfair competition claim must be dismissed. *Berlyn,* 223 F. Supp. 2d at 738 (dismissing unfair competition claim premised on a deficient antitrust claim).

Finally, RTMS alleges that PointClickCare has engaged in "fraudulent business practices," Compl. ¶ 130, but RTMS's allegations fail to meet the heightened standard for pleading fraud. *See* Fed. R. Civ. P. 9(b). Rule 9(b) applies whenever "a plaintiff makes an allegation that has the substance of fraud[.]" *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *see also Driver Opportunity Partners*, 2021 WL 82864, at *5, 11 (Rule 9(b) governed unfair competition claim that alleged "fraud, deceit, trickery or unfair methods"). To plead fraud, a plaintiff must "state with particularity the circumstances constituting fraud or mistake." *See Edmondson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (a plaintiff "must plead 'the

time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation, and what he obtained thereby.'" (citation omitted)). RTMS has not even attempted to do so here. Its unfair competition claim fails to even to meet the lower Rule 8 standard of a "short and plain statement … showing that the pleader is entitled to relief." Count II should be dismissed.

## III.   Count III: RTMS Fails to Allege an Unlawful Tying Arrangement.

RTMS also alleges that PointClickCare's use of CAPTCHA images and practice of locking and deactivating accounts associated with automated users constitute an unlawful tying arrangement in violation of the Maryland Antitrust Act. This claim fails because RTMS does not sufficiently allege any unlawful tying arrangement. By definition, tying is "[c]onditioning the sale of one product—the tying product—on the sale of a separate and distinct product—the tied product." *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 489 (D. Md. 2015). To successfully allege a per se illegal[8] tying arrangement under Maryland law, a plaintiff must establish: "(1) the existence of a tie between two products and/or services; (2) that the defendants possess significant market power in the tying' product; and (3) a not insubstantial amount of affected tied product." *Silkworth v. Cedar Hill Cemetery*, 1993 WL 122104, at *3 (Md. App. Feb. 11, 1993) (cleaned up). In interpreting the Maryland Antitrust Act, courts are guided by the analogous federal statute—in this case, Section 1 of the Sherman Act. *See id.* RTMS cannot satisfy any of the three requisite elements. Therefore, RTMS's unlawful tying claim must be dismissed.

---

[8] The Complaint does not state whether RTMS is asserting a per se or rule-of-reason claim. PointClickCare analyzes RTMS's claim as a per se violation. However, for many of the reasons that RTMS fails to establish a per se tying claim, it cannot establish unlawful tying under a rule-of-reason analysis. Most notably, a rule-of-reason claim fails because RTMS cannot establish that there is a tying arrangement when nursing facilities are free to purchase analysis and value-based care software from whomever they choose. *See Advanced Comput. Serv. of Mich., Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 367–68 (E.D. Va. 1994) (tying claim failed under both per se and rule of reason theories where the owners of MAI computers were free to purchase the tied product from whomever they chose); *see also It's My Party, Inc.*, 88 F. Supp. 3d at 490 n.11 (noting that courts sometimes distinguish between per se tying arrangements and those analyzed under the rule of reason, but the analyses are "substantially similar").

**A. RTMS fails to allege a tying arrangement.**

By definition, an unlawful tying arrangement requires two distinct products or services being linked or sold together. Indeed, courts have noted that "[t]he identification of two distinct products or services is often the greatest stumbling block for antitrust plaintiffs." *Montgomery County Ass'n of Realtors v. Realty Photo Master, Inc.*, 783 F Supp. 952, 959 (D. Md. 1992) (internal quotations omitted). Just so here.

RTMS alleges that PointClickCare's policies concerning CAPTCHA walls and automated user accounts "effectively condition[] the purchase of medical records hosting software on the purchase of analytics software" and value-based software from PointClickCare. Compl. ¶¶ 142, 144. RTMS's tying claim fails because, according to its own allegations, the nursing facilities that purchase PointClickCare's hosting software are free to (and do) purchase analytics and value-based software from any vendor of their choosing.[9] Compl. ¶¶ 142, 144. PointClickCare "allow[s] third-party vendors, service providers, software developers and information systems—like RTMS—to provide their proprietary applications … via the [PointClickCare ] software platform," and "agrees to provide access by third-party vendors, either through licensing the third-party's technology, or establishing a connection with a third party's software platform or information system and [PointClickCare's ] software platform." Compl. ¶ 42. Nor is that all: RTMS alleges that of the nursing facilities that purchase PointClickCare's hosting software, "over 1,000 have chosen [RTMS]'s analytics software." Compl. ¶ 142; *see also id.* ¶ 23.

---

[9] In addition, RTMS does not allege that any nursing facility has bought analysis or value-based care software from PointClickCare, or that PointClickCare has such products available on the market. RTMS alleges that "as early as 2020, [PointClickCare] began developing and marketing products to compete with [RTMS] in the fields of patient data analyses, medical alerts, and Value-Based Care software," Compl. ¶ 46, and that "upon information and belief [PointClickCare] has developed, and is marketing, patient-data analytics software and value-based care software," *id.* ¶ 141. But there can be no tying arrangement if the tied product is not on the market. *Honeywell Intl. Inc. v. MEK Chem. Corp.*, 2018 WL 6737514, at *7 (N.D. Tex. July 5, 2018) (dismissing tying claim based on fourth generation product that was in development, but not yet on the commercial market).

If a "buyer is free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). That is precisely what RTMS has alleged here—an arrangement in which consumers are free to decline the allegedly tied product. Courts routinely dismiss tying claims premised on similarly deficient allegations. For example, a court dismissed a claimed tying arrangement in which a certification board offered certifications for medical professionals and third parties allegedly required participation in a new certification-maintenance program, because the complaint made clear that customers "remain[ed] free to purchase initial certification" without participating in the new program. *Lazarou v. Am. Board of Psychiatry and Neurology*, 2020 WL 5518476, at *9 (N.D. Ill. Sept. 11, 2020). Likewise, in *Lee v. Life Insurance Co. of North America*, there was no tying arrangement between a university's education (the tying product) and an insurance plan (the tied product), where the complaint stated that students could choose between the insurance plan and a comparable plan. 829 F. Supp. 529, 536–37 (D.R.I. 1993).

Assuming arguendo that nursing facilities have purchased analytics and value-based software from PointClickCare, a host of independent and procompetitive reasons could motivate those purchases. *See It's My Party*, 811 F.3d at 685–86. As the Fourth Circuit explained in *It's My Party*, holding that such conduct constitutes a tying arrangement in violation of the antitrust laws would "strip the doctrine of its core element of coercion," and "allow tying doctrine to swell to the point of prohibiting such legitimate means of competition [which] would make antitrust law its own worst enemy." *Id.* at 684–85 (granting summary judgment where the facts revealed that the alleged tying product (artist promotion services) was sometimes sold without the alleged tied product (a required performance at a certain concert venue)); *see also Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990) ("For a tying arrangement . . . to exist,

17

the seller must coerce the buyer into purchasing the tied product.").

**B. RTMS fails to sufficiently allege market power.**

Even if RTMS could identify two distinct products, its tying claim must be dismissed for failure to properly allege market power, which is an element of this cause of action. *Silkworth*, 1993 WL 122104, at *3. Market power is established if the defendant has a substantial share of the relevant market. *Id.* Antitrust "plaintiffs bear the burden of proving a relevant market within which the consequences of the defendants' anticompetitive acts can be measured." *Berlyn,* 223 F. Supp. 2d at 742. "The market definition has two components—the relevant product market and the relevant geographic market." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). RTMS attempts to satisfy its market power burden with one conclusory allegation: PointClickCare "has approximately 60% of the market share of electronic medical records." Compl. ¶ 140.[10] But this allegation does not sufficiently define the relevant product market and makes no mention of the geographic market.

The relevant product market "is defined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 (4th Cir. 1989). Here, it is unclear what RTMS alleges the relevant product market to be. RTMS refers to PointClickCare as a "technology provider," (Compl. ¶ 19); refers broadly to the healthcare software industry, (*id*. ¶ 143); says that PointClickCare is in the business of "electronic medical records storage," (*id*. ¶ 20); and then more narrowly describes PointClickCare as a provider of "electronic medical records platforms used by Nursing Facilities" (*id*. ¶ 140). From these allegations, it is unclear how

---

[10] Although not an element of an unlawful tying claim under Maryland law, RTMS alleges that PointClickCare provides approximately 60% of nursing facilities with hosting software and has created a monopoly in the market for analytics and value-based software. Compl. ¶ 147. Courts, however, have held that 60% market share is insufficient to demonstrate monopoly power. *See Loren Data Corp. v. GXS, Inc.,* 2011 WL 3511003, at *7 (D. Md. Aug. 9, 2011).

RTMS defines the relevant product market.

RTMS also does not allege a range of substitutable products to be included in the relevant product market. For example, in *Dream Big Media, Inc. v. Alphabet, Inc.*, the court dismissed a tying claim where plaintiff alleged that the relevant product markets were APIs, Route APIs, and Places APIs—which are digital mapping services offered by Google—but did not allege any facts "to support a finding that the markets for any of the services encompass[ ] the product at issue as well as all economic substitutes for the product." 2022 WL 16579322, at *5 (N.D. Cal. Nov. 1, 2022) (internal quotations and citation omitted). Here, RTMS uses a range of terms to describe PointClickCare and its products. Without more, including identifying any alternative substitute products, it is unclear what exactly the relevant product market encompasses.

Likewise, the Complaint fails to allege a relevant geographic market. The Fourth Circuit has explained that the relevant geographic market "should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies." *Loren Data Corp. v. GXS, Inc.*, 2011 WL 3511003, at *7 (D. Md. Aug. 9, 2011) (internal quotations and citation omitted). In order to survive a motion to dismiss, plaintiff must identify a geographic market that could meet these criteria. *Id.* RTMS's one-sentence allegation of market power does not even mention any geographic market. And elsewhere in the Complaint, RTMS refers to operations in the United States as a whole, and Maryland, where RTMS is based. *See* Compl. ¶¶ 16, 60, 147. Without a clearly defined geographic market, the tying claim cannot proceed. *See Silkworth*, 1993 WL 122104, at *3, n.2 (dismissing tying claim and raising issue with complaint's failure to identify the relevant geographic market). Nor is merely defining a geographic market enough; an antitrust plaintiff must also allege facts supporting that market's proposed geographic scope. *See Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022). For example, a

plaintiff failed to sufficiently allege a relevant geographic market for the App Store when the complaint alleged a worldwide geographic scope but made no allegations that users in every country access the same App Store storefront or can download the same apps. *Id.* RTMS fails this test too. Because RTMS has not sufficiently alleged either a relevant product market or a geographic market, its tying claims fails to satisfy the second element—market power.

### C. RTMS has not alleged anticompetitive effects of a tying arrangement.

RTMS's tying claim must also be dismissed because it has not alleged any anticompetitive effects. In discussing tying claims under analogous federal law, courts have made clear that tying is "an object of antitrust concern" because it "may force buyers into giving up the purchase of substitutes for the tied product … and … may destroy the free access of competing suppliers of the tied product to the consuming market." *United States v. Loew's, Inc.*, 371 U.S. 38, 44-45 (1962), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). In other words, there must be some non-conclusory allegation that the tying arrangement has limited competition or otherwise restrained trade.

RTMS has done nothing of the sort here. There is no allegation that RTMS has been foreclosed from the market encompassing analytics and value-based software, or even that its sales of either product have decreased. To the contrary, RTMS alleges that despite PointClickCare's alleged tying arrangement, more than 1,000 nursing facilities currently use RTMS's software. Compl. ¶¶ 23, 142. RTMS's allegation that PointClickCare's "effective conditioning of the use of its Medical Record System on the attendant purchase of [PointClickCare]'s analytics and value based care software has the effect of substantially lessening competition, and creates a monopoly in the market for such software," cannot save its claim. Compl. ¶ 147. Such a conclusory allegation of antitrust injury is insufficient, and courts routinely dismiss tying claims based on similar allegations. *See, e.g.*, *CCBN.Com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146, 156 (D.

Mass. 2003) (dismissing tying claim under the Sherman Act where plaintiff alleged that the arrangement "has had and will continue to have anticompetitive effects in the market for Aggregated Calendar services"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (dismissing federal tying claim because allegation that defendants' operations "resulted in consolidation of its control over that market" was insufficient and too conclusory to show a negative impact on competition); *Reilly*, 578 F. Supp. 3d at 1110 (allegation that defendant's "conduct has substantial ani-competitive effects, including increased prices and costs, reduced innovation and quality of service" was conclusory and insufficient to establish anti-competitive effects). This conclusory allegation likewise does not erase RTMS's allegations that PointClickCare's contracts with its clients allow third party vendors access to PointClickCare's systems, so long as they do not use automated tools or screen-scraping to do so. Compl. ¶¶ 42–43. RTMS's own allegations that it has been able to generate a substantial client base undercuts any allegation of lessening competition or creating a monopoly for value-based software. Compl. ¶¶ 13, 23, 142.

### D. Even if there is a tying arrangement, it serves a legitimate business purpose.

Even if RTMS could satisfy all three elements of an unlawful tying claim under Maryland law, the claim would still fail because any actions PointClickCare took to restrict access to data hosted on its platform serve a legitimate business purpose. "[T]ying arrangements are not necessarily unlawful and may even be pro-competitive." *Kadow v. First Federal Bank*, 2020 WL 5230560, at *7 (D. Md. Sept. 2, 2020). "A tying arrangement which serves a legitimate business purpose is valid." *Phillips v. Crown Cent. Petroleum Corp.*, 395 F. Supp. 735, 766 (D. Md. 1975). For example, there was no unlawful tying arrangement where the sales of tie-in products were designed to enhance defendant's image and foster a "discount marketing concept." *Id.* at 766–67. Courts have also found the decision to bundle or package products to be a legitimate means of

competition, as "[b]uyers often find package sales attractive." *Serv. & Training, Inc. Data General Corp.*, 963 F.2d 680, 687-88 (4th Cir. 1992) (citation omitted).

Likewise, the conduct that RTMS points to as the basis of an unlawful tying arrangement— PointClickCare's use of CAPTCHA walls and restrictions for automated user accounts—serves a legitimate business purpose. As discussed in Section I.B, *supra*, the policies prevent screen-scraping, a practice that degrades PointClickCare's services and is prohibited in PointClickCare's contracts with nursing facilities. Compl. ¶ 43. Just as enhancing a company's image is a legitimate business purpose, so too are policies aimed at protecting the performance of one's products. *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1350-51(9th Cir. 1987) (affirming judgement that tying arrangement was not illegal because defendant had a legitimate business interest in the quality control of its products). RTMS's tying claim (Count III) should be dismissed.

## IV. Count IV: RTMS Fails To Plausibly Allege A Tortious Interference Claim.

This Court should dismiss RTMS's tortious interference claim because RTMS fails to plead sufficient facts to support several elements of this claim. Under Maryland law a claim for tortious interference with contractual relations requires: "(1) [t]he existence of a contract or a legally protected interest between [RTMS] and a third party;" (2) PointClickCare's knowledge of the contract; (3) PointClickCare's "intentional inducement of the third party to breach or otherwise render [performance] impossible …; (4) without justification …; (5) the subsequent breach by the third party; and (6) damages." *Brass Metal Prod., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 383 (Md. Ct. Spec. App. 2009). RTMS goes to great lengths in its Complaint to allege details regarding its services and the alleged necessity of using automated means to access data on PointClickCare's system. But noticeably absent from its Complaint are allegations that PointClickCare intentionally induced a third-party breach or that any such purported conduct was without justification. Failure to sufficiently plead either of these essential elements would justify dismissal here, and RTMS

fails to plead both.[11]

### A.    RTMS fails to allege that PointClickCare induced a third-party breach.

RTMS has failed to plausibly allege inducement of a third-party breach. RTMS alleges "[o]n information and belief, by increasing tenfold the time to generate FUQ Reports, [PointClickCare] intended to render [RTMS]'s product ineffective, and thus force Nursing Facilities to … breach their contracts with [RTMS]." Compl. ¶ 49. Such a conclusory allegation is insufficient. *See Frazier v. Experian Info. Sols.*, 2018 WL 6726311, at *6–7 (D. Md. Dec. 21, 2018) (granting a defendant's motion to dismiss and explaining that claims wholly based "upon information and belief" are "insufficient to defeat a motion to dismiss"); *see also Verbal*, 204 F. Supp. 3d at 844 (conclusory allegations are insufficient to survive dismissal). Nowhere does that allegation—or any other allegation in the Complaint—allege how the nursing facilities breached their contracts with RTMS.

The only allegations that even tangentially relate to a third-party breach are the allegations that RTMS's nursing-facility customers must "acknowledge" that RTMS "must have access to and use of [the Nursing Facility's] Data for [RTMS]'s System to function as documented." Compl. ¶ 40; *see also id.* ¶ 151. RTMS's access was hampered, RTMS alleges, by PointClickCare's "alterations to its Medical Record System" that supposedly impacted "overall speed and performance" and increased the time "to generate FUQ reports." *Id.* ¶ 48. RTMS also alleges that other PointClickCare actions, like implementing CAPTCHA walls and deactivating accounts that fail PointClickCare's security protocols, hampered RTMS's ability to access data on

---

[11] While there is some question about the continued viability of the principle in Maryland caselaw, a minority of cases have found that plaintiffs can pursue interference with contractual relations claims if the alleged conduct sufficiently hindered performance to cause cancellation or termination of a contract. *See Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 2023 WL 8545228, at *3–4 (D. Md. Dec. 11, 2023) (discussing cases). Even assuming the principle remains viable, however, RTMS's claim fails because it does not allege that PointClickCare's conduct sufficiently hindered RTMS's performance to cause any nursing facilities to terminate or cancel any contract with RTMS.

PointClickCare's System. *See, e.g., id.* ¶¶ 56–65, 114. And RTMS alleges that PointClickCare "induced … breach [of] the Subscription Agreements" through that conduct. *Id.* ¶ 153. These allegations are likewise insufficient to plausibly allege that PointClickCare induced third parties—the nursing facilities—to breach their agreements with RTMS.

*First*, RTMS fails to identify a definite contractual obligation owed by any nursing facility that was actually breached. The facilities' alleged obligation is that certain unspecified nursing facilities must "acknowledge" that RTMS needs access to data on PointClickCare's system. Compl. ¶ 40. Such an "acknowledgment" by itself, however, does not necessarily create an obligation by the nursing facility to guarantee unfettered access to that data, let alone that RTMS have a specific type of access. *See RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 440–42 (Md. 2010) (explaining that a complaint must allege a contractual obligation with certainty and definiteness and affirming dismissal of breach claim in part for failure to allege "an explicit or implicit [binding] promise"). Again, RTMS recognizes that it *does* have access to nursing facilities' data, but that it needs "access to more patient data," including "access to FUQ Reports," which "are generated on-demand by a nurse or other Medical Record System authorized user." Compl. ¶ 32. The facilities' "acknowledge[ment]" is entirely consistent with the fact that RTMS does have access to PointClickCare systems—just not to perform the automated screen-scraping RTMS prefers. *See id.* ¶ 37. Nothing in that "acknowledg[ment]" identifies the form of access nursing facilities must provide as a condition precedent to RTMS's performance of *its own* obligation. *See RRC Ne.*, 994 A.2d at 440; *see also Patriot Constr., LLC v. VK Elec. Servs., LLC*, 290 A.3d 1108, 1117 (Md. App. Ct. 2023) (defining conditions precedent under Maryland law). RTMS's reframing of the acknowledgement as a "require[ment]" of a particular type and level of access, Compl. ¶ 151, does not avoid this issue. Such allegations fall short of the required "certain[]"

24

and definite[] facts showing [nursing facilities owed] a contractual obligation" to RTMS that
nursing facilities breached. *RRC Ne.*, 994 A.2d at 440; *see also Pillar to Post, Inc. v. Md. Home
Inspectors, Inc.*, 2020 WL 1158583, at *6 (D. Md. Mar. 10, 2020) (dismissing interference claim
where plaintiffs failed to specify which contractual obligation the defendant caused the third party
to breach of or how defendants induced breach).

    *Second*, apart from failing to show any specific contractual obligation, RTMS has also
failed to show PointClickCare induced conduct that constituted a breach. "A claim for tortious
interference with contract must fail in the absence of a breach by the third party." *Md. Indus. Grp.,
LLC v. Bluegrass Materials Co., LLC*, 2018 WL 3006354, at *7 (Md. Ct. Spec. App. June 15,
2018) (affirming dismissal of tortious interference claim). RTMS cannot survive dismissal by
making vague reference to nursing facilities' "acknowledgements" and then simply asserting that
they breached those supposedly binding acknowledgments. *See Verbal*, 204 F. Supp. 3d at 844.
That RTMS fails to cite any breach of contract by any nursing facility is fatal here. *See Hyland v.
Navient Corp.*, 2019 WL 2918238, at *9–10 (S.D.N.Y. July 8, 2019) (applying Maryland law to
tortious interference claim and dismissing claim where plaintiff pointed to sections of agreements
supposedly interfered with but failed to sufficiently allege actual third party breach of a contractual
obligation). Indeed, RTMS's tortious interference-related allegations plead nothing about nursing
facilities' conduct at all, and thus necessarily fail to show that nursing facilities breached their
contracts with RTMS. Absent such allegations, RTMS's claims must be dismissed. *See, e.g., id.*;
*Pillar to Post*, 2020 WL 1158583, at *6; *Ghatt v. Seiler*, 2017 WL 3088373, at *6 (D. Md. July
20, 2017) (dismissing interference claim for failure to sufficiently allege third parties breached the
contracts).

    **B.**    **RTMS failed to allege any interference was without justification.**

    RTMS's tortious interference claim separately fails to sufficiently allege that

PointClickCare's conduct was without justification. In fact, RTMS pleads the opposite. RTMS alleges that PointClickCare's "Service Agreements … include a prohibition on accessing its Medical Record System using 'any automated or other process such as screen scraping, by using robots, web-crawlers, spiders or any other sort of bot or tool, for the purpose of extracting data'" Compl. ¶ 43, and that PointClickCare explained that these automated processes degrade PointClickCare's System, *id.* ¶ 114. RTMS alleges that it nevertheless chose to base its business on precisely such prohibited automated processes. *See* Compl. ¶ 37 (alleging that RTMS created an "automated user" to access PointClickCare's FUQ Reports). In other words, the terms of PointClickCare's contracts based on PointClickCare's legitimate business interest in protecting its system against degradation justified the conduct about which RTMS now complains. *See Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 498 (Md. 1986) (explaining that a tortious interference claim fails where the defendant has a "right to cause the breach"). At the very least, RTMS does not plead sufficient factual basis to support an inference that PointClickCare acted without justification. *See, e.g.*, *Terry v. Corp. Am. Fam. Credit Union*, 2019 WL 5065183, at *7 (D. Md. Oct. 9, 2019) (dismissing interference claim for failure to plead sufficient factual support of any inference that the defendant acted without justification); *HavePOWER, LLC v. Gen. Elec. Co.*, 183 F. Supp. 2d 779, 784 (D. Md. 2002) (dismissing claim for failure to allege wrongful interference where complaint evidenced that defendant's conduct was motivated by a non-wrongful economic justification). This Court should dismiss RTMS's tortious interference claim.

**V.    Count V: RTMS Fails to Allege It Was an Intended Beneficiary of PointClickCare's Agreements.**

In order to recover for breach of contract under an intended-beneficiary theory, a plaintiff must show "that the parties to the contract clearly intended that the third party benefit from it."

*Parlette v. Parlette*, 596 A.2d 665, 670 (Md. Ct. Spec. App. 1991). Count V should be dismissed because RTMS has failed to plead facts showing that PointClickCare and its nursing-facility customers clearly intended that RTMS benefit from their agreements. RTMS has not, and cannot, plead such clear intent here. RTMS does not identify any contractual provision showing such clear intent, and there is none. Instead, RTMS simply asserts that PointClickCare's agreements with nursing facilities "are intended to benefit [RTMS], by granting [RTMS] and other care partners access to … patient data" and maintains that RTMS therefore "is an intended beneficiary of the [a]greements between Nursing Facilities" and PointClickCare. Compl. ¶¶ 161, 163. More than RTMS's *ipse dixit* legal conclusion is required. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("[M]ere conclusory statements, do not suffice."); *Cozart*, 680 F.3d at 365 (explaining that courts "need not accept legal conclusions couched as facts").

Under Maryland law it is not enough that a third party may benefit incidentally from a contract. Instead, the alleged third-party beneficiary must show "the promise [was] made to him in fact, though not in form." *Shillman v. Hobstetter*, 241 A.2d 570, 575 (Md. 1968); *see also, e.g.*, Restatement (Second) of Contracts § 302 (1981) ("[A] beneficiary … is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the" parties' intent "and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."); *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 483 (Md. Ct. Spec. App. 2011) (explaining that Maryland follows the Restatement). Maryland law is "quite restrictive on th[is] issue," and considers whether the third party is named in the contract, whether pertinent provisions were inserted particularly for the third party's benefit, whether the portions creating a third-party interest are central rather than merely

peripheral, and whether the contract gives the third party enforcement power. *Amaya v. DGS Constr., LLC*, 2019 WL 3945933, at *4–5 (D. Md. Aug. 21, 2019). To be an intended beneficiary, "[i]t must clearly appear that the parties intend to recognize [the third party] as the primary party in interest and as privy to the promise." *WM. T. Burnett Holding LLC v. Berg Bros. Co.*, 175 A.3d 876, 882 (Md. Ct. Spec. App. 2017) (cleaned up).

RTMS fails to point to any express language in any agreement showing that PointClickCare and the nursing facilities clearly and expressly intended for RTMS to be the "primary party in interest" of the contract, rather than potentially and incidentally benefit from it. *Id.*; *see also Moye v. Avis Budget Grp.*, 2015 WL 410515, at *5 (D. Md. Jan. 27, 2015) (rejecting intended beneficiary theory and dismissing claim where plaintiff did not allege the agreement was expressly made for her benefit); *Beasley v. Bernard*, 2024 WL 326952, at *7 (D. Md. Jan. 29, 2024) (dismissing claim where plaintiff failed to allege she was a "primary party in interest" or "privy to the promise").

In addition, even if it were an intended third party beneficiary (and it is not), RTMS cannot demand that, as a third party beneficiary, it can require PointClickCare take steps that are inconsistent with the contract's express terms. *See Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 752 A.2d 265, 276 (Md. Ct. Spec. App. 2000) (stating that a third party beneficiary is "bound by the contract provisions"); *see also Acciai Speciali Terni USA, Inc. v. M/V BERANE*, 181 F. Supp. 2d 458, 465 (D. Md. 2002) (noting that "[t]he beneficiary 'cannot accept the benefits and avoid the burdens or limitations' of the contract" (citation omitted)). As RTMS acknowledges, PointClickCare's Service Agreements prohibit the use of "any automated or other process such as screen scraping, by using robots, … or any other sort of bot or tool, for the purpose of extracting data." Compl. ¶ 43. That is precisely what RTMS seeks to do here. *Id.* ¶ 37. Whether or not RTMS is an intended third-party beneficiary, it cannot demand that PointClickCare permit

activities that contravene the express terms of the agreement. The Court should dismiss Count V of the Complaint.

## VI.    Count VI: RTMS Fails To State A Breach of Contract Claim.

RTMS's breach of contract claim, ███████████████████████████████████

███████████████, is also deficient and should be dismissed. To state a breach of contract claim under Maryland law, a plaintiff must show that the defendant owed the plaintiff a contractual obligation and breached such obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Here RTMS alleges "upon information and belief, [PointClickCare] is using and will use [RTMS]'s Confidential Information and Technical Information to build, support and/or bolster its own software services." Compl. ¶ 113. But RTMS does not identify any use of that information by PointClickCare, or even raise an inference of such use. Such a speculative conclusion devoid of any "specific factual allegations" supporting RTMS's "belief" is insufficient. *Frazier*, 2018 WL 6726311, at *6–7 (granting a defendant's motion to dismiss a complaint for this reason); *see also ScanSource, Inc. v. Thurston Grp., LLC*, 2011 WL 1884775, at *4 (D. Md. May 18, 2011) (dismissing breach of contract claim where the complaint failed to allege specific facts sufficient to state breach of any contractual provision).

The Complaint alleges that PointClickCare breached ████████████████████████

██████████████████████████████████████████████Compl. ¶¶ 111–12.

But RTMS alleges ████████████████████████████████████████████

██████████████████████████████████Compl. ¶ 177. RTMS alleges no facts

indicating an ████████████████████████████████████████████████

██████████████████████████████████████████████████████In

fact, RTMS fails to allege any ████████████████████████████████████

███████████████████████Instead, RTMS once again relies on speculation and asks this

Court to leap to impermissible conclusions without the necessary facts. *See Verbal*, 204 F. Supp. 3d at 844 (explaining this court need not entertain conclusory factual allegations); *see also Thurston Grp.*, 2011 WL 1884775, at *4 (dismissing breach of contract claim for failure to state a breach of any contractual provision).

In any event, on January 22—the day before RTMS sent PointClickCare the Complaint filed in Maryland state court—PointClickCare confirmed that ████████████████████████ ████████████████████████████████████ As a result, RTMS has no legitimate basis for this cause of action.

Given these deficiencies, this Court should dismiss RTMS's breach of contract claim.

## VII.    Count VII: RTMS's Defective Claims Do Not Merit Injunctive Relief.

Finally, RTMS's claim for preliminary and permanent injunctions should likewise be denied. Count VII seeks injunctive relief based on RTMS's other underlying claims including its claims under the Maryland Act and Cures Act, interference, and contract claims. *See* Compl. ¶¶ 186–203. Because its injunctive relief claim is premised on RTMS's other deficient claims, Count VII fails with them. *See Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *9 (E.D. Va. Aug. 24, 2010) (granting motion to dismiss request for temporary injunction based in part on dismissal of "each of the [plaintiff's] claims"); *see also Cal. Chamber of Com. v. Becerra*, 2020 WL 1030980, at *6 (E.D. Cal. Mar. 3, 2020) (citing cases for proposition that dismissal of motion for preliminary injunction is appropriate where related claims are subject to dismissal).

## CONCLUSION

For the foregoing reasons, PointClickCare respectfully requests that the Complaint be dismissed with prejudice.

Dated: March 15, 2024.

Respectfully submitted,

*/s/ Brian T. Burgess*
Brian T. Burgess (D. Md. Bar No. 19251)
William C. Jackson (Admitted *Pro Hac Vice*)
Ashley M. Drake (Admitted *Pro Hac Vice*)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Tel.: +1 202 346 4215
Fax: +1 202 204 7265
BBurgess@goodwinlaw.com
WJackson@goodwinlaw.com
Amdrake@goodwinlaw.com

Rod J. Rosenstein (D. Md. Bar No. 14793)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
RRosenstein@kslaw.com

*Attorneys for Defendant PointClickCare Technologies Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2024, I electronically filed a true and accurate copy of the foregoing with the Clerk of Court using the CM/ECF System.  A copy was also served by United States mail, postage prepaid and by email on the following recipients:

M. Celeste Bruce, Esq.
Madelaine K. Katz, Esq.
Rifkin Weiner Livingston, LLC
4800 Hampden Lane, Suite 820
Bethesda, Maryland 28104
cbruce@rwllaw.com
Mkatz@rwllaw.com
*Attorneys for Plaintiff*

Peter A. Biagetti
Aaron R. Fenton
Mintz, Levin, Cohen, Ferris, Glovsky And Popeo, P.C.
One Financial Center
Boston, MA 0211
PABiagetti@mintz.com
ARFenton@mintz.com
*Attorneys for Plaintiff*

*/s/ Brian T. Burgess*
Brian T. Burgess