**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

REAL TIME MEDICAL SYSTEMS, INC.

               Plaintiff,

    v.

POINTCLICKCARE TECHNOLOGIES,
INC. d/b/a POINTCLICKCARE

               Defendant.

REDACTED VERSION

Case No. 8:24-cv-00313-PX

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

M. Celeste Bruce (Bar No. 10710)
Madelaine Kramer Katz (Bar No. 19760)
Rifkin Weiner Livingston LLC
7700 Wisconsin Ave, Suite 320
Bethesda, Maryland 20814
cbruce@rwllaw.com
mkatz@rwllaw.com
301.951.0150 (p)
301.951.0172 (f)

*Counsel for Plaintiff, Real Time Medical Systems, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................3

    A.  Legal Standard ........................................................................................................3

    B.  Count I Alleges A Cognizable Claim To Declare That PCC Has Violated The CURES Act And Maryland Medical Records Act .................................................4

        1.   Real Time Sufficiently States a Declaratory Judgment Claim ........................4

        2.   A Declaration is Warranted Because Real Time Plausibly Alleges PCC Violated the CURES Act and Medical Records Act .......................................6

    C.  Real Time Has Alleged A Plausible Claim For Unfair Competition In Count II .................................................................................................................10

    D.  Real Time Has Sufficiently Pled An Unlawful Tying Arrangement In Count III ................................................................................................................14

        1.  Real Time Sufficiently Alleges the Tying of Two Products Through Coercion .......................................................................................................15

        2.  Real Time Sufficiently Alleges Market Power ..............................................16

        3.  Real Time Sufficiently Alleges Anticompetitive Effects, and that PCC's Tying Arrangement Restrains a "Not Insubstantial" Amount of Commerce............18

    E.  Real Time Pled Sufficient Facts To Support Its Tortious Interference With Contractual Relations Claim In Count IV...............................................................19

    F.  Real Time Has Alleged A Plausible Claim For Breach Of Contract To Which Real Time Is A Third-Party Beneficiary In Count V .....................................................22

    G.  Real Time Has Sufficiently Alleged A Plausible Claim For Breach Of Contract And Specific Performance Of The Parties' Mutual Non-Disclosure Agreement In Count VI..................................................................................................................24

    H.  Real Time Has Alleged A Plausible Claim In Count VII For Injunctive Relief.....................................................................................................................27

CONCLUSION .................................................................................................................28

REQUEST FOR HEARING ..............................................................................................29

## TABLE OF CITATIONS

**CASES:**

*Advance Bus. Sys. & Supply Co. v. SCM Corp.*, 287 F. Supp. 143 (D. Md. 1968) .......... 15, 16

*Aleman v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*,
Civil Action No. 8:19-cv-00591-PX, 2020 U.S. Dist. LEXIS 159013
(D. Md. Aug. 31, 2020) ................................................................ 3, 10, 18, 19, 20, 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ..................................................... 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 3

*Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501 (D. Md. 2007) ....................................... 20

*Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115 (D. Md. 2020) ............................... 12, 13

*Boykin v. Keycorp*, 521 F.3d 202 (2d Cir. 2008) ...................................................................... 26

*Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464
(E.D. Va. 2015), ......................................................................................................... 6

*Century Metal Recycling Private Ltd. v. Metal Worldwide, Inc.*, Civ. No. JKB-12-2650,
2013 WL 4851696, (D. Md. Sept. 10, 2013) ........................................................... 26

*Crawford v. LVNV Funding, LLC*, 758 F.3d 1254 (11th Cir. 2014) .......................................... 6

*CR-RSC Tower I, LLC v. RSC Tower 1, LLC*, 429 Md. 387, 56 A.3d 170 (2012) ................. 23

*Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F.Supp.2d 729
(D. Md. 2002) ............................................................................................................ 10

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015) .................................................... 26

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) .............. 16

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) .............................. 16, 17, 18

*Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 732 A.2d 980 (1999) ........................ 14

*Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724 (D. Md. 2017) ................. 12

*Fare Deals Ltd. v. Glorioso*, 217 F. Supp. 2d 670 (D. Md. 2002) ........................................... 14

*Farm Fresh Direct Direct By A Cut Above, LLC v. Downey*, Civil Action No.
ELH-17-1760, 2017 U.S. Dist. LEXIS 178190 (D. Md. Oct. 26, 2017) ................. 10

*Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495 (1969) ....................................................... 16

*Fowler v. Printers II, Inc.*, 89 Md. App. 448, 598 A.2d 794 (1991) ................................. 19, 21

*FTC v. AbbVie,* 976 F.3d 327 (3d Cir. 2020) ........................................................................... 17

*Furniture Rentors of America, Inc. v. Ingram Industrial Sales Co.*, No. HAR-89-3419,
1990 U.S. Dist. LEXIS 5909, (D. Md. May 14, 1990) ....................................... 23, 24

*Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md. App. 42, 436 A.2d 394
(1981) ........................................................................................................................ 14

*Hare v. Family Publications Service, Inc.*, 334 F. Supp. 953 (D. Md. 1971) ......................... 22

*Hughes Automotive, Inc. v. Mid-Atlantic Toyota Distributors, Inc.*, 543 F. Supp. 1056 (D. Md. 1982) ...................................................................................................................... 14

*Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997) .............................................. 3, 16, 18, 19

*Jefferson Parish Hosp. Dis. No. 2 v. Hyde*, 466 U.S. 2 (1984) ......................................... 14, 16

*Jien v. Perdue Farms, Inc.*, 2020 U.S. Dist. LEXIS 169582 (D. Md September 16, 2020) ... 17

*Lake Shore Invs. v. Rite Aid Corp.*, 67 Md. App. 743, 509 A.2d 727 (1986) .................... 19, 20

*Loren Data Corp. v. GXS, Inc.*, 2011 U.S. Dist. LEXIS 88222 (D. Md. Aug. 9, 2011) ........ 17

*Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112 (1994) ............................. 19, 22

*Mascaro v. Snelling & Snelling of Balt., Inc.*, 250 Md. 215, 243 A.2d 1 (1968) ............. 12, 13

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033 (4th Cir. 1987) ..................................................................................................................... 19

*Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538 (D. Md. 2013) ...................................................................................................................... 12

*Orfanos v. Athenian Inc.*, 66 Md. App. 507, 505 A.2d 131 (1986) ........................................ 21

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675 (D. Md. 2012) ......................................................................................................... 12, 13, 21, 22

*Palmer v. Audi of Am., Inc.*, No. GJH-14-03189, 2015 U.S. Dist. LEXIS 3788 (D. Md. Jan. 13, 2015) ....................................................................................................... 4

*Penn-America Ins. Co. v. Coffey*, 368 F.3d 409 (4th Cir. 2004) ............................................. 5

*Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654 (D. Md. 2011) .............................................. 3

*RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 994 A.2d 430 (2010) .................................... 23

*Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977) ....................... 15

*Sharrow v. State Farm Mutual Automobile Ins. Co.*, 306 Md. 754, 511 A.2d 492 (1986) .... 21

*Terry v. Corp. Am. Fam. Credit Union*, 2019 WL 5065183 (D. Md. Oct. 9, 2019) ............... 21

*Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 115 A.3d 125 (2015) .................... 14

*Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013) ....................................................................... 10

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, No. DLB-23-672, __ F.Supp.3d __ , 2023 U.S. Dist. LEXIS 219620 (D. Md. Dec. 11, 2023) ........................................................ 20

*Travelers Indem. Co. v. Merling*, 326 Md. 329, 605 A.2d 83 (1992) ................................... 21

*Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885 (4th Cir. 1992) ....................................... 12

*United Bank v. Buckingham*, 761 F. App'x 185 (4th Cir. 2019) .............................................. 6

*United States v. Loew's, Inc.*, 371 U.S. 38 (1962) ................................................................. 18

*United States v. Payne*, 54 F.4th 748 (4th Cir. 2022) ............................................................. 6

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581 (4th Cir. 2004) ............. 5

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................................27, 28

*Yaffe v. Scarlett Place Residential Condo.*, 205 Md. App. 429, 45 A.3d 844 (2012) ............ 26

*Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015) ..................................... 9

**RULES:**

Fed. R. Civ. P. 11(b) .................................................................................................25, 26

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 6

**STATUTES:**

21st Century Cures Act, Pub. L. No. 114-255, 130 Stat. 1037 ........................................*passim*

28 U.S.C. § 2201(a) ............................................................................................................. 6

42 U.S.C. § 300jj(4) ............................................................................................................. 7

42 U.S.C. § 300jj-52(a)(1) ............................................................................................. 6, 7, 8

42 U.S.C. § 1320d(4) ........................................................................................................... 7

Md. Code Ann., Comm. Law § 11-204(a) .......................................................................... 14

Md. Code Ann., Health-Gen. § 4-302.6 ........................................................................*passim*

Md. Code Ann., Health-Gen. § 4-302.9 .............................................................................. 6

**OTHER AUTHORITIES:**

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224 (3d ed.) ...............................................................................................................................25

45 C.F.R. § 160.103 ............................................................................................................. 7

45 C.F.R. § 171.102 ....................................................................................................... 6, 7, 9

45 C.F.R. § 171-301(a)(1) ..................................................................................................... 9

85 Fed. Reg. 25,642 (May 1, 2020) ................................................................................. 7, 8

*Black's Law Dictionary* (7th ed.) ...................................................................................... 11

*Merriam-Webster Dictionary* .............................................................................................. 11

Prosser, Law of Torts § 129, at 991 (5ᵗʰ ed. 1971) ............................................................ 21

Restatement 2d of Contracts, § 302 .................................................................................... 23

Restatement 2d of Torts, § 766, Comment k ...................................................................... 21

Restatement 2d of Torts, § 768(2) ...................................................................................... 22

Restatement 3d of Unfair Competition, § 1 (1995) ............................................................ 11

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Given the critical importance of lawful access to patient healthcare records and data to ensure better outcomes of patients' healthcare, and the corresponding importance of ensuring and maintaining access to patient records to support the care of a vulnerable population, Plaintiff Real Time Medical Systems, Inc. ("Real Time") opposes PointClickCare Technologies, Inc.'s ("PCC") motion to dismiss. Real Time fills an integral role on a patient's healthcare team. To that end—that is, appropriate medical care—skilled nursing facilities ("Nursing Facilities") have expressly and properly granted access to Real Time to patient healthcare records and data stored on PCC's electronic medical records platform. PCC's blocking unlawfully interferes with that access, and its actions as identified in the Complaint negate the potentially life-saving alerts and information sent by Real Time to other members of the patient healthcare team. Accordingly, PCC's motion to dismiss must be denied.

**INTRODUCTION**

As an initial matter, PCC's conclusory assertions of affirmative defenses must be rejected: they cannot be considered on a motion to dismiss. Further, PCC's attempt to insert alleged facts not appearing in the Complaint, and its misstatements of the law also fail to support its motion to dismiss.

PCC bases its motion on the legally incorrect premise that it owns patient healthcare records and data, and therefore, PCC can block Real Time, a member of the patient's care-team, from accessing, reviewing, or obtaining those healthcare records and data. PCC's presumption, however, is defied not only by the prohibitions against information blocking set out in the federal CURES Act, 130 Stat. 1037, and the Maryland Medical Records Act, Md. Code Ann., Health-Gen. § 4-302.6 ("Medical Records Act"), but also by the very contractual representations that PCC

1

makes to Nursing Facilities in its typical Master Subscription Agreement ("MSA").[1] Not surprisingly, PCC contests Real Time's construction of these statutes; rejects the Complaint's particularization of PCC's escalating obstruction and unfair competition; and insists on its ostensible right to exercise its "reasonable discretion" to restrict or deny access to patient healthcare records and data. Each of these contentions is baseless, but as important, all of them pivot on factual questions or inferences that this Honorable Court may not resolve or draw in PCC's favor on a motion to dismiss.

Thousands of Nursing Facilities contract with PCC to store their patient healthcare records and data —records that when kept as paper were stored in metal filing cabinets. That the paper records have been digitized to satisfy federal (and state) electronic medical records requirements does not extend PCC's status beyond that of a digital filing cabinet. Complaint ("Complaint" or "Compl.") at ¶¶ 19-21. Over 1,000 of these Nursing Facilities have granted their rightful access into the filing cabinet to Real Time as a member of the healthcare team. Real Time monitors patient health information in "real time," identifies patterns in signs and symptoms potentially dangerous to their patients in "real time," and alerts the on-site medical team to intervene, treat, or avert significant and often life-threatening complications, all to improve outcomes. *Id.* at ¶¶ 13, 14, 23.

Real Time's access to patient healthcare records and data stored on the PCC platform was unobstructed for 10 years. *Id.* at ¶¶ 15, 45. Beginning in 2020, however, PCC degraded Real Time's authorized access to advance its newly developed analytical tool thus functionally disabling Real Time's ability to compete. *Id.* at ¶¶ 46-48, 108-110. Since 2020, PCC has rejected six proposals by Real Time to address PCC's purported system-integrity concerns, severed Real Time's access in

---

[1] PCC's MSA at § 2.1, attached as Exhibit 1 to Defendant's Memorandum in Support of Motion to Dismiss, ECF 6 (the "Motion").

certain instances, and wrongly acquired Real Time's Confidential and Technical Information, because, as PCC expressly stated, it is Real Time's competitor and it intends to be the sole source provider of this aspect of patient care. *Id.* at ¶¶ 86-95.

Every argument mustered by PCC seeks to justify PCC's elimination of Real Time because "such access may have an adverse effect . . . with respect to PCC's business or services," and in doing so, ignores that it does not own the patient healthcare records and data it stores. PCC also ignores, as the multiple claims in the Complaint make clear, that the federal and state statutes and common law cannot countenance the improper usurpation of control over patient healthcare records and data for the express and conceded purpose of squeezing out a current market participant from a market PCC had decided to enter and monopolize.

## ARGUMENT

### A.    Legal Standard.

As this Court has emphasized, "[t]he purpose of a motion to dismiss is to test the sufficiency of the complaint, not to address 'contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Aleman v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*, Civil Action No. 8:19-cv-00591-PX, 2020 U.S. Dist. LEXIS 159013, at *6 (D. Md. Aug. 31, 2020) (quoting *Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654, 660 (D. Md. 2011)). Accordingly, in reviewing a motion to dismiss, this Court must accept as true all the complaint's well-pled allegations and construe all facts and reasonable inferences in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Where those well-pled allegations render the plaintiff's claims facially plausible – or simply permit the inference that plaintiff is entitled to relief – the motion to dismiss must be denied. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

**B.**     **Count I Alleges A Cognizable Claim To Declare That PCC Has Violated The CURES Act And Maryland Medical Records Act.**

PCC's assertion that it decides who on a patient care team can access patient healthcare records and data is legally wrong: that patient information belongs to the patients, who provide permission to the Nursing Facilities to access, use and share. *See* Compl., ¶¶ 4, 34–35.[2] PCC's unilateral decision is nothing more than exploitative practices of information blocking[3] that are illegal. The CURES Act and the Maryland Medical Records Act ("Medical Records Act") prohibit this type of opportunistic intrusion into Nursing Facilities' patient-healthcare decisions in which Real Time has an indispensable role. In seeking dismissal of Count I (Real Time's request for declaratory judgment), PCC offers three unsupportable responses: (1) "Procedurally, there's nothing Real Time can do about PCC's misconduct;" (2) "PCC's actions aren't illegal because it only blocked most – but not quite all – of Real Time's access to data;" and (3) "These statutes actually *protect* PCC's obstruction of patient-care and attendant attacks on Real Time's business." Each of these responses relies, however, on mischaracterizations of the law, asserts facts not alleged in the Complaint, or is directly contradicted by the law and factual allegations (or their reasonable inferences).

**1.   Real Time Sufficiently States a Declaratory Judgment Claim.**

To begin, "a motion to dismiss 'is rarely appropriate in a declaratory judgment action.'"

*Palmer v. Audi of Am., Inc.*, No. GJH-14-03189, 2015 U.S. Dist. LEXIS 3788, at * 2 (D. Md. Jan.

---

[2]   *See also* 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 Fed. Reg. 25,642, at *25,821 (May 1, 2020), wherein the U.S. Department of Human and Health Services ("HHS") explained that patients "hav[e] an overwhelming interest in [medical record information] about themselves" and MSA, §§ 1.3, 2.1 (referring to the data as "Customers' Resident/Patient Data" or "Customers' Data"); § 1.1(i) (PCC agrees to "make the Services" – *i.e.*, access to PCC's digital warehouse – "available to [Nursing Facilities] and Users" – *i.e.*, those who "are authorized by [the Nursing Facility] to use and access the Services").
[3]   These exploitative practices are wrongful for a variety of contractual and anti-competitive reasons, as set out in Counts II–III and IV–VI of the Complaint and demonstrated *infra* at Sections C, D, E, F and G.

13, 2015). PCC nevertheless contends that Real Time has not met the requisite procedural requirements. A valid declaratory judgment claim has three requirements: (1) an actual controversy between the parties; (2) an independent basis for federal jurisdiction; and (3) a demonstration that a declaration is warranted. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004). Real Time plausibly alleges all three.

*First*, actual controversies exist as to whether PCC is improperly blocking Real Time's proper access to patient healthcare records and data, improperly leveraging that blocking to substitute its analytical products and services to Real Time's customers and is tortiously interfering with Real Time's contracts with Nursing Facilities to assist with patient care and treatment. The illegality of PCC's actions vis-à-vis federal and state statutes sits at the heart of each of those disputes. *See* Compl. at ¶¶ 7–8, 135, 154–57, 164; *Volvo*, 386 F.3d at 593 (a plaintiff "need not present a federal cause of action" to establish an actual controversy).[4] *Second*, this Court has federal jurisdiction via diversity, as PCC acknowledged in its removal papers. *See* Notice of Removal, ECF 1. *Third*, a declaration is warranted not only because the illegality of PCC's actions is integral to Real Time's claims against PCC, but also because the requested declaration will resolve ongoing uncertainty concerning the parties' rights and access to critical patient healthcare records and data. *See* Compl. at ¶¶ 7-8, 131–36, 154. *Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412-15 (4th Cir. 2004) (declaratory judgments appropriate where they "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.").

---

[4] An actual controversy independently exists because, absent a judicial declaration, PCC will continue to violate the law and Real Time's contractual rights in the future. *See* Compl., ¶ 127–28, 138; *Volvo*, 386 F.3d at 593 (an actual controversy exists when declaratory relief would avoid future damages due to uncertainty regarding the parties' rights) (citation omitted).

Rather than addressing the three requirements, PCC contrives a fourth:[5] that a statute discussed in a declaratory judgment count must provide an independent "private right of action or right to receive substantive relief." Motion at 8–9. The Declaratory Judgment Act rejects this proposition on its face, authorizing courts to issue declaratory judgments "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). [6]

### 2. A Declaration is Warranted Because Real Time Plausibly Alleges PCC Violated the CURES Act and Medical Records Act.

Real Time alleges, and PCC does not contest, that PCC is an entity subject to the CURES Act and the Medical Records Act.[7] Both Acts plainly prohibit PCC's alleged conduct. By statutorily prohibiting "information blocking," the CURES Act bars data-storage companies (under the rubric of "health information technology developer[s]") from exploiting the privileged position that they hold over the "keys" to Nursing Facilities' data. *See* 42 U.S.C. § 300jj-52(a)(1).

---

[5] The cases PCC cites for the contrived fourth element do not address the standard for pleading a declaratory judgment claim under Rule 12(b)(6). *See United States v. Payne*, 54 F.4th 748 (4th Cir. 2022) (discussing post-conviction remedies); *United Bank v. Buckingham*, 761 F. App'x 185 (4th Cir. 2019) (summary judgment). The Eastern District of Virginia in *Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464 (E.D. Va. 2015), held that a declaratory judgment count in a complaint does not give rise to federal question jurisdiction, nor can a plaintiff seek a declaration without alleging a violation of a statutory provision. Real Time has satisfied this requirement.

[6] Count I nevertheless satisfies PCC's contrived fourth element because Real Time *does* possess an underlying right of action upon which it could seek a declaration that PCC has violated Maryland's Medical Records Act. Courts find that private rights of action exist where statutes permit the recovery of "actual damages." *See, e.g.*, *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1258 (11th Cir. 2014) (finding FDCPA equipped debtors with private right of action where Act stated, "debt collectors who violate the Act [are] liable for actual damages."). Here, the Maryland legislature expressly provided for the recovery of "actual damages" for any knowing violation of Subtitle Three of Title Four of the Health-General Code. *See* Md. Code Ann., Health-Gen. § 4-302.9. The Medical Records Act is codified within Subtitle Three: Confidentiality of Medical Records. *See* § 4-302.6. Real Time, therefore, possesses a right of action because it may seek actual damages for PCC's knowing violation of the Medical Records Act. *See* § 4-302.9; *see also Crawford*, 758 F.3d at 1258.

[7] PCC is a "health information technology developer" for information blocking purposes because it had one or more Health IT Modules certified under the ONC Health IT Certification Program. *See* Compl., ¶ 85; 45 CFR § 171.102. Consistent with the Medical Records Act, Real Time alleges the Nursing Facilities are "nursing homes" (Compl., ¶¶ 76, 121) PCC operates an "electronic health network," and PCC is an "electronic medical record vendor," *id.*; Real Time is a "business associate" of the Nursing Facilities, *id.* at ¶ 121; and the Nursing Facilities have directed PCC to release medical records to Real Time, *id.* at ¶¶ 77, 122.

"Information blocking" is any practice that such a company "knows" or "should know" is "likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information." *Id.* at § 300jj-52(a)(1); *id.* at §§ 300jj(4), 1320d(4) (together, defining "health information"). Indeed, HHS sought "to advance interoperability [and] support the *access, exchange,* and use" of electronic health information by *all* members of a patient-healthcare team to maximize the coordination and efficacy of that care. 85 Fed. Reg. 25,642, at *25,651 (emphasis added). Similarly, the Medical Records Act provides that if (a) a "nursing home" directs an "electronic health network or electronic medical record vendor" to release records to a "business associate,[8]" then (b) the network or vendor cannot "restrict," "limit," or delay the release of those records. Md. Code Ann., Health-Gen. § 4-302.6.

The Complaint specifies PCC's prohibited conduct in restricting Real Time's access to Nursing Facilities' patient healthcare records and data:

- PCC initiated a large-scale campaign to sever Real Time's access using indecipherable CAPTCHA walls in October 2023, which succeeded in disabling access for "dozens of Nursing Facilities" and interfered with access for at least 87 Nursing Facilities in Maryland alone. *See* Compl. at ¶¶ 56, 60, 63, 78, 123.

- PCC targeted Real Time with a second wave of indecipherable CAPTCHA walls in November 2023 and combined with the October 2023 attack severed, whole or part, Real Time's access to "approximately 700 Nursing Facilities" owned by 33 different customers. *Id.* at ¶¶ 64–65.

---

[8] Real Time enters into Business Associate Agreements with the Nursing Facilities, thus Real Time is a Business Associate of the Nursing Facilities. *See* Compl. ¶40.ii; 45 C.F.R. § 171.102 (citing to 45 C.F.R. § 160.103).

- To increase the effectiveness of blocking Real Time's access, PCC "deactivat[ed] or lock[ed]" accounts used by Real Time and accessed with the Nursing Facilities' express authorization. *Id.* at ¶¶ 59, 123. PCC sometimes abandoned the CAPTCHA pretext entirely, simply "locking accounts that [PCC] suspected were being used by Real Time." *Id.* at ¶ 62.

- Prior to the 2023 CAPTCHA attacks, PCC launched a precursor CAPTCHA attack against Real Time, substantially restricting Real Time's access to data. *Id.* at ¶¶ 51-53.

- As early as July 2020, PCC implemented changes to its Medical Records System that degraded the System's overall speed and increased – in some instances by as much as tenfold – the time to generate the healthcare data Real Time needs to inform Nursing Facilities' delivery of patient healthcare, causing Real Time to reduce the timeliness and frequency of its data requests. *Id.* at ¶¶ 48–50, 79. In or about November 2022, PCC demanded that Real Time again reduce the timeliness[9] and frequency of its data requests. *Id.* at ¶¶ 54–55.[10]

Significantly, PCC's violations of the CURES Act require only that PCC *should have known* that its actions impede access to data. *See* 42 U.S.C. § 300jj-52(a)(1). However, Real Time alleges that (i) PCC *actually knew* that its actions materially impeded Real Time's access, because Real Time repeatedly told PCC as much, *see* Compl. at ¶¶ 86–88 (communications regarding "tenfold" increase); *id* at ¶¶ 61, 89–90 (communications regarding early CAPTCHA walls); *id.* at

---

[9] Practices that "create unnecessary delays or response times, or that otherwise limit the timeliness of EHI" are quintessential violations of the CURES Act. 85 Fed. Reg. 25,642, at *25,812.

[10] The MSA further demonstrates that PCC continues to violate the CURES Act and Medical Records Act in contracts with Nursing Facilities. Twice in the MSA, PCC claims a right to deny data access if it would benefit PCC's business, by: (i) prohibiting Nursing Facilities from granting access to any "health information technology company (or an affiliate, agent, or consultant thereof) or [which] otherwise has a business interest in, is creating or developing, or is planning the creation or development of, a health information technology service, product, or system *in any way competitive with the Services,*" MSA § 2.2.; and (ii) reserving the right to "restrict or terminate a User's access to Services *if [PCC] determines in its reasonable discretion that such access has or may have an adverse effect to [PCC],* including, without limitation, with respect to [PCC]'s business or Services," MSA, § 2.1. (emphasis added).

8

¶¶ 92–95 (communications following October 2023 CAPTCHA walls); and (ii) interfering with Real Time's access was *the single goal* of PCC's attacks, *see id.* at ¶ 49 ("tenfold" increase was "intended to render Real Time's product ineffective"); *id.* at ¶ 53 (CAPTCHAs were implemented "for the purpose of hindering . . . Real Time's access" to patient healthcare records and data).

The only element of a violation which PCC actively contests in its Motion is Real Time's allegation that PCC's actions blocked – and in fact targeted – precisely the sort of "health information" and "medical records" covered under the CURES and Medical Records Acts. *See* Compl. at ¶¶ 77–79, 85, 122–24, 126. PCC argues these statutes address only "USCDI data."[11] *See* Motion at 9. On the law[12], PCC is wrong, as neither Act is limited to "USCDI data." Further, the Medical Records Act is broader, covering all "medical records." Md. Code Ann., Health-Gen. § 4-302.6. Thus, PCC's arguments with respect to USCDI data are not relevant to the distinct issue of its information-blocking conduct. *See* 45 C.F.R. §171.102. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-607 (4th Cir. 2015) (court's consideration of "extrinsic" facts not set forth in the complaint "improperly converts the motion to dismiss into a motion for summary judgment").

Finally, PCC's absurd argument that the CURES Act *sanctions* PCC's misconduct cannot be decided at the motion to dismiss stage. No exceptions exist or apply to PCC's information-blocking. PCC has not identified any facts from the Complaint or any law that supports an information blocking exception that would apply under the facts alleged in the Complaint. Indeed,

---

[11] However, PCC's CURES Act citation indicates that, although data was initially limited to "USCDI data," as of October 6, 2022, that regulation no longer limits "heath information" to USCDI data, *see* 45 C.F.R. § 171.301(a)(1), and PCC's Medical Records Act citation concerns only the *format* in which medical records are transmitted, not the *type of data* that must be transmitted. Md. Code Ann., Health-Gen. § 4-302.6(b)(2)(i).

[12] Moreover, PCC is also wrong on the facts, because it assumes myriad facts that are not alleged in, or reasonably inferable from the Complaint.  For example, PCC never explains what types of data are included within the "USCDI data" purportedly accessible by Real Time, nor does PCC cite any factual allegations to support its position that PCC's CAPTCHA and other attacks equally affected Real Time's access to such "USCDI data."

any exception, including the determination of "reasonableness" and "necessity," are quintessential "contests" of fact. *See Tobey v. Jones*, 706 F.3d 379, 389 (4th Cir. 2013) (affirming denial of appellant's qualified-immunity based motion to dismiss because "the question of reasonableness is a fact-intensive inquiry, going directly to the heart of the case"); *see also Aleman*, 2020 U.S. Dist. LEXIS 159013 at *6. PCC's motion to dismiss as to Count I must be denied.

**C.      Real Time Has Alleged A Plausible Claim For Unfair Competition In Count II.**

Real Time has stated a plausible claim against PCC for unfair competition.[13] Ignoring the factual allegations of the Complaint, PCC's motion to dismiss surprisingly argues that PCC is not actually a competitor of Real Time. Mot. p. 12. For example, PCC ignores paragraph 16 of the Complaint:

> The State of Maryland, which funds the Chesapeake Regional Information Systems for our Patients, Inc. ("CRISP"), competitively selected Real Time's platform to assist the State in reducing hospitalizations and costs, and to protect Maryland's unique Medicare Hospital Waiver, for all of Maryland's 225 Nursing Facilities. To date, approximately 150 Maryland Nursing Facilities have voluntarily chosen to participate and are active in the program. PCC also competed for this contract but was not selected.

and paragraph 46 of the Complaint:

> However, at least as early as 2020, PCC began developing and marketing products to compete with Real Time in the fields of patient-data analytics, medical alerts, and Value-Based Care Software. For example, PCC has purchased a number of companies that provide analytics capabilities in competition with Real Time, including Collective Medical in December 2020 and Patient Pattern in March in 2023.

as well as the balance of the Complaint, which specifically alleges that PCC's motivation in denying Real Time access is to bolster its competitive products. *See e.g.*, Compl. ¶¶ 15-18; 45-

---

[13]   *Farm Fresh Direct Direct By A Cut Above, LLC v. Downey,* Civil Action Non. ELH-17-1760, 2017 U.S. Dist. LEXIS 178190, at *10 (D. Md. Oct. 16, 2017) (citing *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F.Supp.2d 729, 733 (D. Md. 2002)).

70; 86-95. As alleged, PCC is blocking Real Time's access to critical patient healthcare records and data even though the Nursing Facilities specifically granted such access to Real Time *because* PCC sees itself as Real Time's competitor:

> PCC explained to [Real Time] that it views itself as a competitor of Real Time within the market for "Value-Based Care" Software, and thus was refusing to cooperate with Real Time to permit access to patients' health and medical data. PCC further explained that it was PCC's ambition to become the sole provider of Value-Based Care software across PCC's customers.

and

> PCC then specifically told Real Time that because it is a competitor, it will not provide Real Time the electronic patient records Real Time needs to provide the critical medical reports to the Nursing Facilities even though the Nursing Facilities have specifically granted Real Time access to the data.

Compl. ¶¶ 95, 109

PCC's second argument—that PCC's conduct is not unfair competition (Mot. pp. 12) again turns a blind eye to factual allegations in the Complaint. PCC also ignores the law of unfair competition upon which PCC purports to rely. Surprisingly, PCC cites the Restatement 3d of Unfair Competition, § 1 (1995) but fails to grasp the obvious meaning of the last phrase, "harm [that] relates to acts prohibited under federal or state statutes," as conduct that equates to unfair competition. The Complaint is replete with factual allegations of multiple violations of federal and state statutes in connection with both the CURES Act (Compl. ¶¶ 80-85) and the Medical Records Act (*id.* at ¶¶ 71-79) [14] that allege PCC's illegality in its plainest sense: PCC's actions are not authorized by law or are forbidden by law. *See Merriam-Webster Dictionary*[15] *and Black's Law Dictionary* (7th ed.).

---

[14] For those alleged violations of both federal and state law, see Section B, *infra*.
[15] https://www.merriam-webster.com/dictionary/illegal (last visited April 17, 2024).

The caution in *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724 (D. Md. 2017) that unfair competition should only embrace illegal acts is unpersuasive and PCC's reliance on this opinion is misplaced.[16] The court in *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115 (D. Md. 2020) addressed the opinion three years later:

> At the same time, however, "Maryland case law has never required an unlawful act as an essential element of an unfair competition claim." *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992).

*Brightview Grp.*, 441 F. Supp. 3d at 134.

Just as a valid unfair competition claim does not require an unlawful act, a valid claim does not require misleading or deceptive conduct either. *Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 564-65 (D. Md. 2013) (citing *Mascaro v. Snelling & Snelling of Balt., Inc.*, 250 Md. 215, 243 A.2d 1, 10 (1968)). Instead, a valid claim turns just as much on "unfair methods of any sort" as it does on any deceit, trickery, or fraud. *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012) (explaining that "[t]he Court disagrees that misleading or deceptive conduct is a necessary element of every unfair competition claim;" "Maryland courts' description of the tort is not so narrowly drawn;" and that "key treatises recognize the necessarily open-ended nature of the tort of unfair competition"). One would be hard pressed to view PCC's exploitation of patient healthcare records and data that PCC does not own as something other than an unfair method of competition. What PCC is attempting by excluding

---

[16] Despite the caution that the court in *Ellicott Dredge* wanted to emphasize, that court acknowledged, as it had to, that unfair competition equals an act that: (1) "substantially interferes with the ability of [Real Time] to compete on the merits of their products" and (2) "conflicts with accepted principles of public policy." 280 F. Supp. 3d at 732. Neither of these two elements of interference and public policy connote illegality. Regardless, Real Time has alleged that PCC's violative conduct of federal and state statutes was unlawful.

Real Time from the market to secure its data analytics product to be purchased and used by the Nursing Facilities is the eradication of any competition from Real Time.

As alleged, PCC has acted to exclude Real Time from the market to make room for PCC's newly developed, competitive data analytics product through multiple wrongful means: PCC has (i) violated the CURES Act (Compl. ¶¶ 80-85) and the Medical Records Act (*Id.* ¶¶ 71-79); (ii) adversely possessed patient health information (*Id.* ¶¶ 67-69); (iii) imposed increasingly impassible barriers to access patient healthcare records and data upon Real Time (*Id.* ¶¶ 45-70; 86-95); (iv) fraudulently and deceptively sought a merger, ███████████ to acquire Real Time's Confidential and Technical Information to build, support, and bolster its own competitive products and services (*Id.* ¶¶ 96-113); and (v) materially and falsely misrepresented to Real Time customers Real Time's culpability in PCC's degradation of its health records storage platform. (*Id.* ¶¶ 114(i)-(iv)). It is inconceivable that PCC's alleged conduct does not, at a minimum, fall under "unfair methods of any sort" category of acts that pleads a plausible unfair competition claim.

PCC's final argument—that Real Time has not pleaded fraud with any particularity—is irrelevant and demonstrates a fundamental misunderstanding of the law of unfair competition. Mot. pp. 14-15. A showing of fraud is not required and has not been for over 50 years in Maryland. *Mascaro*, 250 Md. at 232, 243 A.2d at 10 ("As the law [of unfair competition] developed, proof of fraudulent deception was no longer essential for relief, and this is the Maryland rule."). Instead, an unfair competition claim is grounded upon "[a]cts . . . that 'substantially interfere[] with the ability to compete ... or conflict [] with accepted principles of public policy.'" *Brightview Grp.*, 441 F. Supp. 3d at 134-35 (quoting *Paccar Inc*, 905 F. Supp. 2d at 691). In the end, the allegations of PCC's conduct state a plausible claim and satisfy each of these two alternatives. As such, PCC's

motion as to Count II must be denied. *Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 406-407, 732 A.2d 980, 991 (1999).[17]

**D.    Real Time Has Sufficiently Pled An Unlawful Tying Arrangement In Count III.**

Dismissals on the pleadings are especially disfavored in antitrust cases, including unlawful tying claims, due to their fact-intensive nature. *Fare Deals Ltd. v. Glorioso*, 217 F. Supp. 2d 670, 673 (D. Md. 2002)[18] (citations omitted); *Hughes Automotive, Inc. v. Mid-Atlantic Toyota Distributors, Inc.*, 543 F. Supp. 1056, 1058 (D. Md. 1982) (denying motion to dismiss because market share and other elements were "a matter for trial"). Even so, Real Time has adequately pled each element of an unlawful tying claim. A business "may not . . . by contract, combination, or conspiracy . . . unreasonably restrain trade or commerce." Md. Code Ann., Comm. Law § 11-204(a). A business unreasonably restrains trade or commerce if it sells one product "only on the condition that the buyer also purchases a different (or tied) product." *Greenbelt Homes, Inc.*, 48 Md. App. at 48, 426 A.2d. at 398. "[T]ie-ins are among the practices which are unreasonable *per se*." *Greenbelt Homes*, 48 Md. App. at 48, 426 A.2d at 399. Absent intervention "tying arrangements" could completely shut out competitors. *Jefferson Parish Hosp. Dis. No. 2 v. Hyde*, 466 U.S. 2, 11 n.15 (1984). To establish a *per se* violation, a plaintiff need only plead: (1) the tying of two products; (2) the seller has sufficient market power in the market for the tying product to restrain competition in the market for the tied product; and (3) the tying arrangement restrains a "not insubstantial" amount of commerce. *Greenbelt Homes*, 48 Md. at 48-49, 426 A.2d at 399.

---

[17] *See also Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 60, 115 A.3d 125, 133 (2015) (reaffirming the rule).

[18] This Court may draw from federal precedent interpreting § 1 of the Sherman Act because Md. Code Ann., Comm. Law § 11-204(a) is modeled after that Act. *Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md. App. 42, 48, 436 A.2d 394, 398 (1981).

**1. Real Time Sufficiently Alleges the Tying of Two Products Through Coercion.**

The Complaint specifies that PCC offers two separate products: (1) "software for hosting electronic health information" ("Hosting Software"), *i.e.*, the tying product; and (2) "patient-data analytics software and value-based care software" ("Analytics Software"), *i.e.*, the tied product. Compl. at ¶ 141. PCC does not dispute that the Hosting Software and the Analytics Software are separate products.[19] In alleging that a defendant tied two separate products together, a plaintiff need not plead that the defendant "expressly require[d] the buyer to purchase the tied product" because, most often, defendants enforce these arrangements through more discrete "coercive practices." *Advance Bus. Sys. & Supply Co. v. SCM Corp.*, 287 F. Supp. 143, 155 (D. Md. 1968); *see Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709 (7th Cir. 1977) ("Of course, the [tying] agreement or understanding need not be express but may be inferred from the circumstances."). Real Time alleges that PCC conditions the sale of the Hosting Software on the purchase of Analytics Software through coercive practices. *See* Compl. ¶¶ 145–46. Specifically, Real Time alleges that by disallowing competing providers of the Analytics Software from accessing its dominant Hosting Software, PCC ensures that its affected customers *must* purchase PCC's Analytics Software. *Id.* ¶¶ 55-66, 144-46.

In response, PCC argues that there is no tying arrangement because Nursing Facilities that purchase PCC's Hosting Software are afforded two alternatives to purchasing PCC's Analytics Software: (1) they allegedly "are free to . . . purchase [alternative software] from any vendor of their choosing;" or (2) they can do without. Mot. at 16–17. Neither of these alternatives is palatable given the healthcare ramifications to patients. PCC's denials of the facts alleged in the Complaint

---

[19] Contrary to PCC's contention at footnote 9 of its Motion, Real Time does allege that PCC actively sells its Analytics Software – a separate product – to Nursing Facilities. Compl. at ¶¶ 95, 113.

are irrelevant at this stage.[20] Because this Court must construe all facts in Real Time's favor, this Court must reject PCC's blatant attempts to rewrite the facts alleged in Real Time's Complaint in its favor. *Ibarra*, 120 F.3d at 474. At bottom, Real Time sufficiently pleads the first element of its tying claim because PCC's weaponization of CAPTCHA walls to prevent Real Time from providing its life-saving data and analytics to Nursing Facilities constitutes precisely the kind of "coercive practice" that establishes a tying arrangement. *See Advance Bus. Sys. & Supply Co.*, 287 F. Supp. At 155.

### 2. Real Time Sufficiently Alleges Market Power.

"Market power is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464 (1992) (quotations omitted). Market power is established when the defendant has a large enough market share in the tying product to coerce buyers to purchase the tied product. *Jefferson Parish*, 466 U.S. at 13. Satisfying this element does not require full monopoly-like market share, but rather, only "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 499 (1969). Defining the market for the tying product and ascertaining the defendant's share of that market are "deeply fact-intensive inquir[ies]," which generally require discovery. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (quotations omitted).

---

[20] Notwithstanding, PCC's assertion that Nursing Facilities are "free" to purchase Real Time's life-saving alerts and data disregards the crux of Real Time's factual allegations: that PCC has implemented illegible CAPTCHAs—and, in some instances, outright deactivated or locked accounts it suspected were being used by Real Time—to prevent Real Time from providing its life-saving alerts and data to approximately 700 Nursing Facilities. *See* Compl. ¶¶ 56-66. PCC's second assertion, that Nursing Facilities can simply "do without" the life-saving alerts and data, runs contrary to another of Real Time's factual contentions: the need to provide optimal patient care, prevent patient deaths, and effectively obtain Medicare reimbursement compels Nursing Facilities to contract for such life-saving alerts and data. *Id.* at ¶ 144. PCC is intruding into healthcare choices by arrogating to itself whether life-saving alerts and data are provided to the healthcare team.

Therefore, courts "hesitate to grant motions to dismiss" for failure to plead market power. *Id.*; *see Eastman Kodak Co.*, 504 U.S. at 465 (denying motion to dismiss because plaintiffs were "entitle[d] . . . to a trial on their claim of market power").

Here, however, Real Time alleges that PCC represents "approximately 60% of the market share" in the market for "electronic medical records platforms used by Nursing Facilities [i.e., Hosting Software]" and that "97 percent of all hospitals [in the US] discharge patients to [Nursing Facilities] using [PCC]." Compl. at ¶¶ 21, 140. PCC's minimum 60% market share in the tying product is sufficient to support a tying claim. *See, e.g., FTC v. AbbVie,* 976 F.3d 327, 373-74 (3d Cir. 2020) (holding 60% market share sufficient to establish market power); *Loren Data Corp. v. GXS, Inc.*, 2011 U.S. Dist. LEXIS 88222 (D. Md. Aug. 9, 2011) (finding that 50% market share was sufficient for full blown monopoly power).[21] Whether it be 60 or 97%, such a market share is sufficiently large for a tying claim.

Further, PCC's absurd contention that Real Time has failed to sufficiently define a relevant product market or geographic market is also unsupportable. Mot. at 18. In its Complaint, Real Time has specifically defined a relevant product market (the market for "electronic medical records platforms used by Nursing Facilities," aka the market for the Hosting Software), Compl. at ¶ 140, and a geographic market of the United States. *Id*. at 147; *Jien v. Perdue Farms, Inc.*, 2020 U.S. Dist. LEXIS 169582, at *39-40 (D. Md Sept. 16, 2020) (finding "the continental United States" a proper geographic market). Real Time has therefore sufficiently pled the second element of its tying claim.

---

[21] PCC cites *Loren Data* for the proposition that courts "have held that 60% market share is insufficient to demonstrate monopoly power." Mot. at 18 n.10. Far from finding that the plaintiff failed to allege sufficient market share, *Loren Data* stated, "[plaintiff's monopoly claim] cannot be dismissed based on [a] failure to allege a market share greater than 60%." *Id.* at 23-24. What's more, plaintiff in *Loren Data* alleged a fifty-percent market share. If controlling 50% of the market share was sufficient to establish monopoly power in *Loren Data*, alleging 60% market share is certainly sufficient to establish market power for Real Time's tying claim.

### 3. Real Time Sufficiently Alleges Anticompetitive Effects, and that PCC's Tying Arrangement Restrains a "Not Insubstantial" Amount of Commerce.

PCC's last two arguments addressing the third element of a *per se* violation are also unfounded. First, Real Time alleges that PCC's tying arrangement produces "anticompetitive effects." Anticompetitive effects exist where a defendant's conduct "may destroy the *free access of competing suppliers* of the tied product to the consuming market." *United States v. Loew's, Inc.*, 371 U.S. 38, 44-45 (1962) (emphasis added). PCC asserts that "there is no allegation that [Real Time] has been foreclosed from [the Software Analytics] market." Mot. at 20. In making this statement, PCC disregarded Compl. paragraphs 56-66, 78-79, 92-93, 123, and 164 wherein Real Time alleges in detail that PCC weaponized illegible CAPTCHAs to prevent Real Time from providing its life-saving alerts and data to Nursing Facilities – all substantial restraints to commerce. Real Time alleges that in some instances PCC *deactivated or locked* accounts it suspected Real Time of using, thereby completely foreclosing Real Time from accessing patient healthcare records and data to provide life-saving alerts and data to the affected Nursing Facilities. Compl. ¶¶ 59-62, 123, 164; *see also Eastman Kodak Co.*, 504 U.S. at 478 ("market foreclosure [] is facially anticompetitive and exactly the harm that antitrust laws aim to prevent").

Although PCC may wish to substitute the facts alleged in the Complaint with the narrative it has created out of whole cloth, it cannot. *See Ibarra*, 120 F.3d at 474; *Aleman*, 2020 U.S. Dist. LEXIS 159013, at *6. Rather, the Complaint sufficiently alleges anticompetitive effects because PCC's tying arrangement "substantially lessen[s] competition[] and creates a monopoly in the market for [Analytics] software." Compl. at ¶ 147.

Second, PCC insists that its actions "served a legitimate business purpose" and therefore cannot be unlawful. Mot. at 21–22. The Complaint alleges the exact opposite. Compl. at ¶¶ 49, 53, 95 (PCC has intentionally "hinder[ed]" Real Time and rendered its product "ineffective"). PCC

cannot ask this Court to disregard Real Time's well-plead factual allegations based on PCC's purported denials or defenses. *See Ibarra*, 120 F.3d at 474. Indeed, PCC's business justification defense simply cannot be considered at this stage.[22] *See Aleman*, 2020 U.S. Dist. LEXIS 159013, at *6. As Real Time has sufficiently pleaded each of the elements of its *per se* unlawful tying claim, PCC's motion to dismiss Count III must be denied.

**E.      Real Time Pled Sufficient Facts To Support Its Tortious Interference With Contractual Relations Claim In Count IV.**

PCC moves to dismiss Count IV on grounds that Real Time failed to allege "the nursing facilities breached their contracts with RTMS," an "inducement of a third-party breach," or that PCC's "conduct was without justification." Mot. p. 22-26. To support its Motion, as with the other Counts, PCC simply ignores the allegations in the Complaint.

Five elements are necessary to state a claim for tortious interference with contractual relations: (1) a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages. *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991); *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 301, 639 A.2d 112, 119 (1994); *Lake Shore Invs. V. Rite Aid Corp.*, 67 Md. App. 743, 753, 509 A.2d 727, 732 (1986).

PCC's contention that Count IV fails because no "actual breach" is alleged is misplaced. First, Real Time adequately alleges a contract between itself and a third party. Those contracts are

---

[22] In any event, PCC's purported business justification defense also fails as a matter of law. *See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1040 (4th Cir. 1987) ("An asserted business justification cannot salvage a tying arrangement that is otherwise per se unlawful without proof that means less restrictive than the tie-in were not feasible to achieve the desired protection."); *see also* Compl. at ¶ 69 (alleging PCC had feasible alternatives, such as exporting the requisite data to Real Time).

healthcare Subscription Agreements, and the third parties' (i.e., Nursing Facilities) obligations to Real Time under those contracts are described at Compl. paragraphs 39-42 and 149-51. *See e.g.,* Compl. ¶ 151 ("The Subscription Agreements require Nursing Facilities to provide Real Time with access to their patient data, and access to the licenses needed for Real Time to use and modify that patient data."). Second, Real Time pled that its contracts with the third-party Nursing Facilities were breached by failing to provide Real Time access to patient healthcare records and data, a material term of Subscription Agreements. Compl. ¶ 153 (breach); *id.* ¶ 151 (duty). At the motion to dismiss stage, this Court does not resolve contests surrounding the facts. Thus, even PCC's *ipsit dixit* that there was no contractual obligation breached by a third party must be rejected because Real Time was not required to plead a breach. *See Aleman*, 2020 U.S. Dist. LEXIS 159013 at *6.

"[A] person who intentionally and wrongfully hinders contract performance … is liable to the injured party even if there is no breach of the contract." *Lake Shore*, 67 Md. App. At 753, 509 A.2d at 732 ("Wrongfully inducing a breach is surely one way of committing this tort … [but] not the only way."); *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 524 (D. Md. 2007) ("proof of breach of contract is not an essential element of the tort of intentional interference with contractual relations"). As this Court recently explained, "allegations of 'intentional interference with a party's rights under a contract or inducing a termination without breach' are adequate to state a claim for a tortious interference with contract cause of action." *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, No. DLB-23-672, __ F.Supp.3d __ , 2023 U.S. Dist. LEXIS 219620, at *7 (D. Md. Dec. 11, 2023) (Judge Boardman) (quotation omitted).

PCC's next assertion—that Real Time failed to allege "inducement" of a third-party breach—also fails. Allegations of actual inducement are not required to state a claim. It is PCC's wrongful interference with contract, *i.e.*, that PCC engaged in conduct to induce a third party to

breach, or intentionally interfered with the rights of a party to a contract that must be pled and has been pled. *Orfanos v. Athenian Inc.*, 66 Md. App. 507, 519-520, 505 A.2d 131, 138 (1986); *Sharrow v. State Farm Mutual Automobile Ins. Co.*, 306 Md. 754, 766-767, 511 A.2d 492 (1986) ("any purposeful conduct, however subtle" was sufficient); *Fowler*, 89 Md. App. at 470, 511 A.2d at 804 (quoting Prosser, Law of Torts § 129, at 991 (5th ed. 1971)); Restatement 2d of Torts, § 766, Comment k ("any conduct conveying to the third person the actor's desire to influence him not to deal with the other"). The Complaint alleges PCC systematically engaged in wrongful behavior to induce the Nursing Facilities to not perform their contracts and not to continue their business relationship with Real Time. *See* Compl. ¶¶ 7, 8, 48, 49, 51-54, 55-70, 71-85, 109-13, 123, 124, 126, 135, 136, 144-46, 153-58. PCC actively engaged in information blocking in violation of the CURES Act and the Medical Records Act, and knowingly conditioned the purchase of its medical records hosting software on the purchase of analytics software, creating an unlawful tying agreement. *See* Sections B and D, *supra*. Real Time specifically alleges that PCC has taken affirmative actions to prevent the Nursing Facilities from providing certain information to Real Time, which the Nursing Facilities are required to do under contract with Real Time. *Id.* Nothing more is required to be pled.

Finally, PCC's position that Real Time failed to allege PCC's interference was without justification is nonsensical. To establish the third element of an intentional interference claim, the interference must be alleged to have been wrongful or unlawful. *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90 (1992).[23] "[W]hat is wrongful conduct is 'incapable of precise definition,' and must be determined based on the facts and circumstances at hand." *Paccar Inc. v.*

---

[23] PCC cites to *Terry v. Corp. Am. Fam. Credit Union*, which states, actionable interference is "'wrongful and without justification' or, said differently, 'done intentionally without cause or excuse[.]'" 2019 WL 5065183, at *21 (D. Md. Oct. 9, 2019) (quotation omitted).

*Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 694 (D. Md. 2012) (quoting *Macklin v. Robert Logan Associates*, 334 Md. 287, 301, 639 A.2d 112, 119 (1994)). Still, for PCC to argue that no wrongful conduct is alleged simply ignores every allegation of the Complaint. The wrongfulness of (and lack of justification for) PCC's actions is repeatedly alleged and framed in every category of wrongful conduct in which PCC engaged. The Complaint expressly states PCC has wrongly and unlawfully asserted control over patient healthcare records and data; serially impeded and disabled Real Time's access to that information; deactivated access to its customers' accounts through which Real Time accesses patient healthcare records and data; installed indecipherable CAPTCHA walls; and has violated both state and federal laws governing access to those patient healthcare records and data. *See* Compl. ¶¶ 7, 8, 48, 49, 51-85, 109-13, 123-24, 126, 135-36, 144-46, 153-58. The factual allegations and all reasonable inferences therefrom plausibly allege that PCC acted wrongfully and unjustifiably.

Furthermore, justification – to the extent PCC argues its conduct constitutes legitimate business – is an affirmative defense that PCC may assert in its Answer but not rely upon to dismiss the Complaint. *See Hare v. Family Publications Service, Inc.*, 334 F. Supp. 953, 958 (D. Md. 1971) (allegations of intentional interference and injury requires defendants to affirmatively to raise their defense of justification or privilege). The assertion of an affirmative defense does not defeat a motion to dismiss. *See Aleman*, 2020 U.S. Dist. LEXIS 159013 at *6. Likewise, any assertion by PCC that it competes with Real Time does not justify its wrongful conduct. Restatement 2d of Torts, § 768(2). Accordingly, PCC's motion to dismiss Count IV must be denied.

**F.     Real Time Has Alleged A Plausible Claim For Breach Of Contract To Which Real Time Is A Third-Party Beneficiary In Count V.**

Real Time is not required to be named in a contract and the Complaint is fairly and plausibly construed as asserting that Real Time is an intended beneficiary of the master

subscription agreements between PCC and the Nursing Facilities. *CR-RSC Tower I, LLC v. RSC Tower 1, LLC*, 429 Md. 387, 457-458, 56 A.3d 170, 212 (2012) (whether a third party is named in the contract is not dispositive). To state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation and a material breach of that obligation. *RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). Maryland follows the Restatement 2d of Contracts, § 302, which provides that one is an intended beneficiary if: (i) the recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and (ii) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance. *CR-RSC Tower* I, 429 Md. 458-459, 56 A.3d at 213. Consideration must be given to the surrounding circumstances when inferring intent, including extrinsic evidence. *Id.* at 458-459, 213 & n.61.

Here, the allegations that Real Time is an intended beneficiary under the PCC-Nursing Facility Master Subscription Agreements are sufficient to survive a motion to dismiss. *Furniture Rentors of America, Inc. v. Ingram Industrial Sales Co.*, No. HAR-89-3419, 1990 U.S. Dist. LEXIS 5909, at *4-5 (D. Md. May 14, 1990). Real Time expressly alleges that the Nursing Facilities "directed PCC to release to Real Time the patient medical records" and that the contracts between PCC and the Nursing Facilities "specifically allow Nursing Facilities to provide patient-data access to their care partners, including Real Time." Compl. ¶¶ 77, 160, 163; *see also id.* ¶ 42.[24] PCC also provided the healthcare information directly to Real Time (until it didn't, after 2020, as alleged in the Complaint). Compl. ¶¶ 45-6. PCC's denial that such specific direction did not occur cannot be

---

[24] MSA, §§ 1.3, 2.1 (referring to the data as "Customers' Resident/Patient Data" or "Customers' Data"); § 1.1(i) (PCC agrees to "make the Services" – *i.e.*, access to PCC's digital filing cabinet where patient healthcare records and data are stored – "available to [Nursing Facilities] and Users" – *i.e.*, those who "are authorized by [the Nursing Facility] to use and access the Services").

accepted by the Court. At best, all PCC has done is create a factual dispute that is not ripe for determination at this juncture. *Furniture Rentors*, at *4-5.

At bottom, the Nursing Facilities directed PCC to provide Real Time access to patients' healthcare records and data with PCC's full understanding of Real Time's indispensable role on the patient healthcare team – a role PCC is so intimately familiar with that PCC has decided to occupy that role at Real Time's expense. PCC knowingly provided this access to Real Time at the Nursing Facilities' direction, consistent with their contractual authority (and statutory authority) to do so, for a decade, until 2020 when PCC decided to enter the market and squeeze out Real Time.

PCC owed a contractual duty to the Nursing Facilities, fulfilled that contractual duty for a period of years during which Real Time had access to patient healthcare records and data, thus demonstrating that PCC understood and appreciated that Real Time was an intended beneficiary of this continuing obligation. While Real Time ultimately has the burden of proving it was an intended beneficiary, this "Court cannot simply accept [PCC]'s blanket denial on this issue" on a motion to dismiss when Real Time has alleged its third party beneficiary status under the Master Subscription Agreements, and Real Time "must be given a chance to conduct proper discovery in order for it to carry its burden of proof." *Id.* (denying motion to dismiss).

G.   **Real Time Has Sufficiently Alleged A Plausible Claim For Breach Of Contract And Specific Performance** ███████████████████████████████████ **In Count VI.**

Real Time has sufficiently pled plausible claims for both aspects of Count VI—PCC's breach ██████████████████████████████ for improperly using Real Time's Confidential and Technical Information, and specific performance to return the improperly held Information. ████████████████████████████████████████████. Instead, PCC claims there are not enough facts concerning PCC's breach. Against the backdrop of the

contextual facts of paragraphs 13-97 and 173 of the Complaint, ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████. Compl. ¶ 98(i)-(iii). ██████████████████████████████████████

███████████:

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*Id.* at ¶¶ 98 (i), (iv), 99-100, 175-6. Real Time alleges it sent a raft of Confidential and Technical Information to PCC ████████████████████. *Id.* at ¶¶ 101-07. Two consequences of the disclosure of Real Time's Confidential and Technical Information are alleged to have occurred ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████—namely, as an aid in the development and/or implementation of PCC's competing product[25] and, second, by failing to return the Information. *Id.* at ¶¶ 177-78.

While Paragraph 178 is based "upon information and belief," this remains a permissible manner in which to allege a factual connection that Real Time reasonably believes is true but for which Real Time may need discovery to gather and confirm its evidentiary basis. *See* Fed. R. Civ. P. 11(b) advisory committee's note to 1993 amendment. "[A]llegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224 (3d ed.); *see also*, *e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts "alleged upon information and belief" where the facts are peculiarly

---

[25] For PCC's direct competition with Real Time's products, see the references in Section C, *supra*.

within the possession or control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible . . . .") (quoting *Boykin v. Keycorp*, 521 F.3d 202, 215 (2d Cir. 2008)); *Century Metal Recycling Private Ltd. v. Metal Worldwide, Inc.*, Civ. No. JKB-12-2650, 2013 WL 4851696, at *7 n.13 (D. Md. Sept. 10, 2013) (citing to the 1993 Advisory Committee Note to Rule 11(b)).

Real Time has pled specific factual allegations of PCC's competitive angst over Real Time; competitive failures with Real Time (*e.g.*, Compl. ¶16); PCC's development and marketing of products directed at Real Time's products and customers; ███████████████████████ ████████████████████████████████████████; and PCC's refusal to return that Information ██████████. In the face of these facts, that ¶178 is pled upon information and belief is of no moment because the alleged facts are sufficient, and the balance are peculiarly within the possession or control of PCC. *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015).

Further, the failure to return Real Time's Confidential and Technical Information is not compensable █████████████████. ████████████████████████████ ███████████. The only mechanism for which a monetary payment would have been sufficient in exchange for the Information would have been ████████████████████████ █████████████████████████████████████, PCC has no right of possession, custody, or control of Real Time's Confidential and Technical Information and therefore must return it to Real Time ██████████. Specific performance, while an "extraordinary equitable remedy" is nevertheless tailored for PCC's conduct and consistent with compelling PCC to return the Information ██████████████████████████████████. *Yaffe v. Scarlett Place Residential Condo.*, 205 Md. App. 429, 454, 45 A.3d 844, 858 (2012) ("Each

26

party hereby agrees that the other may be entitled to specific performance of the recipient's obligations."); Compl. ¶ 98(v).

**H.      Real Time Has Alleged A Plausible Claim In Count VII For Injunctive Relief.**

Consistent with its claim for injunctive relief, Real Time has shown that it is: (1) likely to succeed on the merits of its claims; (2) likely to suffer irreparable harm; (3) that the balance of equities tips in its favor over PCC; and (4) that an injunction against PCC is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

By Count VII in PCC's Motion, PCC either gave up and threw a line in mischaracterizing Real Time's Complaint, or PCC does not understand the claims asserted. This is not a fight over data. Rather, the fight is over PCC's unlawful usurpation of patient healthcare records and data no individual, corporation, or federal or state government has granted to PCC—and a usurpation that runs roughshod over the CURES Act, the Medical Records Act, Maryland contract law, and Maryland tort law. PCC's unsupported and bald declaration that there is nothing that can be done about its conduct because patients' healthcare records and data belong to it argues heavily in favor of injunctive relief.

What is lost on PCC is that the patient healthcare records and data it has usurped belong to real people—vulnerable, elderly people—who are relying upon the nursing home to take care of them. The maintenance of access to these patient healthcare records and data, and the disclosure thereof, are governed by federal law, state law, contract law, and tort law—not by PCC's corporate fiat or its declaration of unilateral authority to decide the extent of access by a member of a patient's healthcare team. Applicable law and contracts have already determined that PCC does not decide and is not allowed to leverage its electronic filing cabinet to divert to itself Real Time's market position with the Nursing Facilities.

27

Real Time has demonstrated its success for each Count and has also made clear the irreparable harm that will occur if PCC is permitted to persist in its systemic misconduct. To provide competent and life-saving medical care, the Nursing Facilities have partnered with Real Time to augment their resources and bring on Real Time as a member of a patient's healthcare team in order to provide better patient outcomes. The Nursing Facilities have expressly granted Real Time access to patient healthcare records and data stored in a digital filing cabinet.

To force Real Time out of the market PCC wants to capture, it has violated and continues to violate federal and state law requirements by blocking access to patient healthcare records and data. So eager to "compete" with Real Time (by which PCC means to remove Real Time completely from the market), PCC has been willing to violate federal and state laws, breach its contracts with Nursing Facilities, and put Nursing Facilities in breach of their contracts with Real Time. PCC's misconduct has harmed everyone involved in necessary patient care provided to the elderly in these Nursing Facilities.

The Complaint establishes that PCC is a bad actor on every front—and its misconduct and indifference to laws or contractual obligations falls naturally into the multiple causes of action Real Time has asserted—all of which have been sufficiently pled such that the likelihood of success on the merits at this initial pleading stage is undeniable. Moreover, the balance of equities in connection with the sound patient healthcare tips in Real Time's favor and given the healthcare implications of PCC's wrongful conduct, an injunction against PCC lies soundly in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## CONCLUSION

Real Time has sufficiently pled plausible claims against PCC for a declaratory judgment that PCC has violated both the CURES Act and the Maryland Medical Records Act; unfair

competition; unlawful tying; tortious interference with contractual relations; breaches of contract; specific performance; and injunctive relief. Thus, for the foregoing reasons, this Honorable Court should deny PCC's motion to dismiss, order PCC to file an Answer within 14 days, and order further relief as the Court deems just and proper.[26]

## REQUEST FOR A HEARING

Pursuant to Local Rule 105.6, and because the Complaint asserts claims of particular importance to the healthcare and well-being of patients and the effectiveness of caregivers served by the CURES and Medical Records Acts, Real Time respectfully requests a hearing on Defendant's Motion and this Opposition.

---

[26] To the extent this Court is inclined to grant any portion of PCC's motion, Real Time respectfully requests leave to amend its Complaint to articulate additional facts, and that any dismissal be without prejudice.

29

Dated: April 26, 2024                           Respectfully submitted,

                                                **REAL TIME MEDICAL SYSTEMS, INC.,**
                                                **By Counsel**,

                                                */s/ M. Celeste Bruce*
                                                M. Celeste Bruce (Bar No. 10710)
                                                Madelaine Kramer Katz (Bar No. 19760)
                                                Rifkin Weiner Livingston LLC
                                                7700 Wisconsin Ave, Suite 320
                                                Bethesda, Maryland 20814
                                                cbruce@rwllaw.com
                                                mkatz@rwllaw.com
                                                301.951.0150 (p)
                                                301.951.0172 (f)
                                                *Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on April 26, 2024, a copy of the foregoing was served on all

counsel of record via the CM/ECF System as follows:

> Brian T. Burgess (D. Md. Bar No. 19251)
> William C. Jackson (Admitted Pro Hac Vice)
> Ashley M. Drake (Admitted Pro Hac Vice)
> Goodwin Procter LLP
> 1900 N Street, NW
> Washington, DC 20036
> BBurgess@goodwinlaw.com
> WJackson@goodwinlaw.com
> Amdrake@goodwinlaw.com
>
> Rod J. Rosenstein (D. Md. Bar No. 14793)
> King & Spalding LLP
> 1700 Pennsylvania Avenue, NW, Suite 900
> Washington, DC 20006
> RRosenstein@kslaw.com
>
> *Counsel for Defendant*

And a courtesy copy was delivered to Judge Xinis's Chambers pursuant to the Local

Rules.

> /s/ M. Celeste Bruce
> M. Celeste Bruce (Bar No. 10710)
> Madelaine Kramer Katz (Bar No. 19760)
> Rifkin Weiner Livingston LLC
> 7700 Wisconsin Ave, Suite 320
> Bethesda, Maryland 20814
> cbruce@rwllaw.com
> mkatz@rwllaw.com
> 301.951.0150 (p)
> 301.951.0172 (f)
> *Counsel for Plaintiff*