## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

REAL TIME MEDICAL SYSTEMS, INC.

      Plaintiff,

      v.

POINTCLICKCARE TECHNOLOGIES INC.
d/b/a POINTCLICKCARE

      Defendant.

Civil Action No. 8:24-CV-00313-PX

## MEMORANDUM OF LAW IN SUPPORT OF
## POINTCLICKCARE'S RENEWED MOTION TO DISMISS

Brian T. Burgess (D. Md. Bar No. 19251)
William C. Jackson (Admitted *Pro Hac Vice*)
Ashley M. Drake (Admitted *Pro Hac Vice*)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Tel.: +1 202 346 4215
Fax: +1 202 204 7265
BBurgess@goodwinlaw.com
WJackson@goodwinlaw.com
Amdrake@goodwinlaw.com

Jeremy M. Bylund (Admitted *Pro Hac Vice*)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 10006-1238
jbylund@willkie.com

*Attorneys for Defendant PointClickCare
Technologies Inc*

Dated: June 9, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD......................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.     Count I: RTMS Fails to State a Claim Under the Maryland Act or the Cures Act ................ 9

II.    Count II: RTMS's Unfair Competition Claim Must Be Dismissed................................. 12

III.   Count III: RTMS Fails to Allege an Unlawful Tying Arrangement................................. 13

   A.     RTMS fails to allege a tying arrangement. .......................................................... 13

   B.     RTMS fails to sufficiently allege market power. ........................................................ 15

   C.     RTMS has not alleged anticompetitive effects of a tying arrangement. ....................... 17

IV.    Count IV: RTMS Fails to Plausibly allege a Tortious Interference Claim...................... 19

   A.     RTMS must plead a breach or termination of an agreement........................................ 19

   B.     RTMS fails to allege a third-party breach or termination. ............................................ 21

   C.     RTMS fails to allege that any interference was without justification. .......................... 24

V.     Count V: RTMS Fails to Allege It Was an Intended Beneficiary of PointClickCare's
Agreements. ................................................................................................................ 25

VI.    Count VI: RTMS Fails to State Breach of Contract Claim. ............................................. 27

VII.   Count VII: RTMS's Defective Claims Do Not Merit Injunctive Relief.......................... 28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acciai Speciali Terni USA, Inc. v. M/V BERANE*,
    181 F. Supp. 2d 458 (D. Md. 2002).....................................................................27

*Aleti v. Metro. Baltimore, LLC*,
    279 A.3d 905 (Md. 2022) ...........................................................................10, 11

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)..............................................................................................11

*Amaya v. DGS Constr., LLC*,
    No. CV TDC-16-3350, 2019 WL 3945933 (D. Md. Aug. 21, 2019) ....................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................8, 9, 18, 26

*Baker v. Montgomery Cnty.*,
    50 A.3d 1112 (Md. 2012) ....................................................................................10

*Beasley v. Bernard*,
    No. CV DKC 23-3133, 2024 WL 326952 (D. Md. Jan. 29, 2024)........................27

*Berlyn Inc. v. Gazette Newspapers, Inc.*,
    223 F. Supp. 2d 718 (D. Md. 2002)......................................................................15

*Brass Metal Prod., Inc. v. E-J Enters., Inc.*,
    984 A.2d 361 (Md. Ct. Spec. App. 2009) ...........................................................19

*Brown Shoe Co v. United States*,
    370 U.S. 294 (1962)..............................................................................................16

*C&R Caulking, LLC v. Bank of Am., N.A.*,
    No. JKB-21-0499, 2021 WL 2661875 (D. Md. June 29, 2021) ...........................19

*Cal. Chamber of Com. v. Becerra*,
    No. 219-CV-02019-KJM-EFB, 2020 WL 1030980 (E.D. Cal. Mar. 3, 2020).......29

*CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*,
    No. DKC 21-1778, 2022 WL 4080320 (D. Md. Sept. 6, 2022) ...........................25

*CCBN.Com, Inc. v. Thomson Financial, Inc.*,
    270 F. Supp. 2d 146 (D. Mass. 2003) .................................................................18

*CGM, LLC v. BellSouth Telecomms., Inc.*,
  664 F.3d 46 (4th Cir. 2011) ...................................................................................10

*Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*,
  752 A.2d 265 (Md. Ct. Spec. App. 2000) ..............................................................27

*Consul, Ltd. v. Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) ................................................................................16

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
  32 A.3d 456 (Md. Ct. Spec. App. 2011) ...............................................................26

*Devil's Advoc., LLC v. Zurich Am. Ins. Co.*,
  666 F. App'x 256 (4th Cir. 2016) ............................................................................3

*Dream Big Media Inc. v. Alphabet, Inc.*,
  No. 22-CV-02314-JSW, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ..............16

*E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ................................................................................15

*Ecology Servs., Inc. v. GranTurk Equip., Inc.*,
  443 F. Supp. 2d 756 (D. Md. 2006) ......................................................................27

*Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*,
  86 F. Supp. 3d 464 (E.D. Va. 2015) ..................................................................9, 10

*Flaherty v. Weinberg*,
  492 A.2d 618 (Md. 1985) ......................................................................................25

*Fowler v. Printers II, Inc.*,
  598 A.2d 794 (Md. App. 1991) .............................................................................19

*Frazier v. Experian Info. Sols.*,
  No. CV GLR-18-68, 2018 WL 6726311 (D. Md. Dec. 21, 2018) ...................23, 28

*Ghatt v. Seiler*,
  No. CV TDC-16-3445, 2017 WL 3088373 (D. Md. July 20, 2017) ......................24

*havePOWER, LLC v. Gen. Elec. Co.*,
  183 F. Supp. 2d 779 (D. Md. 2002) ......................................................................25

*Hicks v. Gilbert*,
  762 A.2d 986 (Md. Ct. Spec. App. 2000) ........................................................12, 13

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ................................................................................14

*It's My Party, Inc. v. Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015) .................................................................13, 15

*Jones v. Bank of Am. Corp.*,
    No. 4:09-CV-162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) ...........................29

*Lake Shore Invs. v. Rite Aid Corp.*,
    509 A.2d 727 (Md. 1986) .................................................................................20, 21

*Lazarou v. Am. Board of Psychiatry and Neurology*,
    No. 19-CV-01614, 2020 WL 5518476 (N.D. Ill. Sept. 11, 2020) ...........................14

*Lee v. Life Ins. Co. of N. Am.*,
    829 F. Supp. 529 (D.R.I. 1993) ............................................................................14

*Lupo v. JPMorgan Chase Bank, N.A.*,
    No. DKC 14–0475, 2015 WL 5714641 (D. Md. Sept. 28, 2015) ...........................24

*Macklin v. Robert Logan Assocs.*,
    639 A.2d 112 (Md. 1994) ............................................................................ *passim*

*Mascaro v. Snelling & Snelling of Baltimore, Inc.*,
    243 A.2d 1 (Md. App. 1968) .................................................................................12

*Md. Indus. Grp., LLC v. Bluegrass Materials Co., LLC*,
    No. 924, Sept. Term, 2017, 2018 WL 3006354 (Md. Ct. Spec. App. June 15,
    2018) ....................................................................................................................23

*Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*,
    571 U.S. 191 (2014) ..............................................................................................9

*Mona v. Mona Elec. Grp., Inc.*,
    934 A.2d 450 (Md. Ct. Spec. App. 2007) .............................................................12

*Moye v. Avis Budget Grp.*,
    No. CIV.A. TDC-14-2714, 2015 WL 410515 (D. Md. Jan. 27, 2015) ...................26

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ..............................................................................19

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*,
    889 F.2d 524 (4th Cir. 1989) ................................................................................15

*Palmer v. Audi of Am., Inc.*,
    No. GJH–14–03189, 2015 WL 222127 (D. Md. Jan. 13, 2015) ...........................11

*Parlette v. Parlette*,
    596 A.2d 665 (Md. Ct. Spec. App. 1991) .............................................................25

*Patriot Constr., LLC v. VK Elec. Servs., LLC*,
  290 A.3d 1108 (Md. App. Ct. 2023) ....................................................................22

*Peruzzi Bros, Inc. v. Contee*,
  527 A.2d 821 (Md. App. 1987) ............................................................................12

*Phillips v. Crown Cent. Petroleum Corp.*,
  395 F. Supp. 735 (D. Md. 1975) ..........................................................................19

*Pillar to Post, Inc. v. Md. Home Inspectors, Inc.*,
  No. CV DKC 18-3761, 2020 WL 1158583 (D. Md. Mar. 10, 2020) ..............22, 24

*Polido v. Crowley*,
  No. No. 8:23-CV-00459, 2024 WL 263578 (D. Md. Jan. 24, 2024) .....................10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) .................................................................................16

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
  131 F.4th 205 (4th Cir. 2025) ..............................................................3, 8, 10, 12

*Reilly v. Apple, Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...........................................................17, 18

*Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*,
  511 A.2d 492 (Md. 1986) .....................................................................................24

*RRC Ne., LLC v. BAA Md., Inc.*,
  994 A.2d 430 (Md. 2010) .....................................................................................22

*ScanSource, Inc. v. Thurston Grp., LLC*,
  No. CIV.A. DKC 11-0380, 2011 WL 1884775 (D. Md. May 18, 2011) ...............28

*Shillman v. Hobstetter*,
  241 A.2d 570 (Md. 1968) .....................................................................................25

*Sidibe v. Sutter Health*,
  4 F. Supp. 3d 1160 (N.D. Cal. 2013) ....................................................................18

*Silkworth v. Cedar Hill Cemetery*,
  No. 694, 1993 WL 122104 (Md. App. Feb. 11, 1993) .................................13, 15, 17

*Skapinetz v. CoesterVMS.com, Inc.*,
  No. 8:17-CV-01098, 2019 WL 2579120 (D. Md. June 24, 2019) .........................19

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
  903 F.2d 988 (4th Cir. 1990) ...............................................................................14

*Taylor v. NationsBank, N.A.*,
    776 A.2d 645 (Md. 2001) ..............................................................................................27

*Terry v. Corp. Am. Fam. Credit Union*,
    No. CV JKB-19-1065, 2019 WL 5065183 (D. Md. Oct. 9, 2019) ...........................25

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
    705 F. Supp. 3d 510 (D. Md. 2023) ..............................................................................21

*United Bank v. Buckingham*,
    761 F. App'x 185 (4th Cir. 2019) ...................................................................................9

*United States v. Loew's, Inc.*,
    371 U.S. 38 (1962) .........................................................................................................17

*United States v. Payne*,
    54 F.4th 748 (4th Cir. 2022) ..........................................................................................11

*Verbal v. Giant of Md., LLC*,
    204 F. Supp. 3d 837 (D. Md. 2016) ....................................................................9, 23, 28

*Wag More Dogs Liab. Corp. v. Cozart*,
    680 F.3d 359 (4th Cir. 2012) ...........................................................................................9

*Webb v. Green Tree Servicing, LLC*,
    No. ELH–11–2105, 2011 WL 6141464 (D. Md. Dec. 9, 2011) .............................21

*White v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    913 F.2d 165 (4th Cir. 1990) ...........................................................................................9

*WM. T. Burnett Holding LLC v. Berg Bros. Co.*,
    175 A.3d 876 (Md. Ct. Spec. App. 2017) ....................................................................25, 26

*Zos v. Nat'l Ass'n of Power Eng'rs Educ. Found., Inc.*,
    No. 8:23-CV-00025, 2025 WL 814522 (D. Md. Mar. 13, 2025) ...........................20

**Statutes**

42 U.S.C. § 300jj-52(a)......................................................................................................3

2023 Md. Laws Ch. 333 (S.B. 648) ........................................................................ *passim*

21st Century Cures Act, Pub. L. No. 114-255, 130 Stat. 1037.............................. *passim*

Md. Code Ann., Health-Gen § 4-302.6...........................................................................5, 11

**Other Authorities**

45 C.F.R. § 171.201 ...........................................................................................................3

45 C.F.R. § 171.202 ........................................................................................................3

45 C.F.R. § 171.203 .....................................................................................................3, 4

45 C.F.R. § 171.204 .....................................................................................................3, 4

45 C.F.R. § 171.205 .....................................................................................................3, 4

45 C.F.R. § 171.206 ........................................................................................................3

45 C.F.R. § 171.301 .....................................................................................................3, 4

45 C.F.R. §§ 171.302 ...........................................................................................3, 4, 5, 12

45 C.F.R. §§ 171.303 ......................................................................................................3

Fed. R. Civ. P. 12(b)(6) ...................................................................................................8

Restatement (Second) of Contracts § 302 (1981) .............................................................26

## INTRODUCTION

RTMS infiltrates PointClickCare's software and extracts data from PointClickCare's electronic health information ("EHI") repository using automated bots that disrupt PointClickCare's systems, causing slowdowns and even outages for PointClickCare's paying customers. RTMS pays PointClickCare nothing for this access or the problems its bots cause. Nevertheless, RTMS asserts that it should be able to continue this practice based on an expansive and incorrect view of federal and Maryland data-sharing laws.

Although this Court granted RTMS a preliminary injunction that bars PointClickCare from using technical security protocols to prevent RTMS's bots from monopolizing PointClickCare's computing power and ransacking its EHI repository, the preliminary injunction record was limited and one-sided. Further discovery would demonstrate that PointClickCare is justified in enforcing its contractual provisions with its customers that bar all bots, including RTMS's, from its system, because they pose an unacceptable security threat, and their use unreasonably interferes with the operation of PointClickCare's IT systems. Further, additional discovery would show that PointClickCare has in fact negotiated in good faith with RTMS and has offered RTMS multiple manners of access that satisfy the alternative access prongs of the manner exception to the Cures Act. It is not PointClickCare's reasonable requests but RTMS's intransigence—its repeated and stubborn demands to be allowed to run bots on PointClickCare's system and its consistent refusal to pay a reasonable rate for substitute, bespoke access—that has left the parties unable to reach agreement.

But here no further discovery should be allowed, because RTMS's complaint is due to be dismissed in its entirety. RTMS's centerpiece unfair competition claim—the claim on which this Court premised, and the Fourth Circuit affirmed, its preliminary injunction—fails as a matter of law because RTMS has admitted that its hands are unclean. RTMS's bot-based access to

PointClickCare's systems breaches customer contracts with PointClickCare that bar such access. RTMS alleges that it knew as much but kept running bots anyway, unlawfully and unreasonably interfering with PointClickCare's contracts with its customers. Further, despite contending that it should have the benefit of the Cures Act to use PointClickCare's software, RTMS has refused at every turn to pay PointClickCare the reasonable fees that the Cures Act contemplates for the access RTMS demands. Maryland law is clear that an unfair competition claim may not proceed where the party asserting it has unclean hands.

As to RTMS's other claims, its demand for a declaratory judgment that PointClickCare has violated the Cures Act and Maryland's Nursing Home Records Act (Count I) fails because RTMS does not identify any private right of action for either statutory claim. RTMS's unlawful tying claim (Count III) fails because RTMS fails to allege *any* of the three essential elements of the claim, including, most notably, that customers are coerced into purchasing a tied product.

RTMS's contract-related claims fare no better. As to its tortious interference claim (Count IV), RTMS fails to allege that PointClickCare caused a breach or termination of any of RTMS's contracts—an essential element of the claim. And, in any event, as RTMS's allegations confirm, PointClickCare's contractual rights justified PointClickCare's actions. Further, RTMS cannot and does not plausibly allege that it was an intended beneficiary of *PointClickCare's* contracts, which is fatal to RTMS's third-party-beneficiary breach of contract claim (Count V). And RTMS likewise fails to sufficiently allege any breach of RTMS's and PointClickCare's Mutual Nondisclosure Agreement ("NDA") (Count VI). Finally, because RTMS's claim for injunctive relief (Count VII) depends on its other deficient claims, Count VII likewise fails. PointClickCare

2

therefore moves this Court to dismiss RTMS's Complaint in its entirety.[1]

## BACKGROUND

*Federal regulation of EHI interoperability.* Congress enacted the 21st Century Cures Act in 2016. Pub. L. No. 114-255, 130 Stat. 1037 (the "Cures Act"). The Cures Act bars "information blocking," which is any practice "likely to interfere with, prevent, or materially discourage access, exchange, or use of [EHI]" so long as the entity "knows, or should know, that such practice is likely to interfere with, prevent, or materially discourage the access, exchange, or use of [EHI]." 42 U.S.C. § 300jj-52(a)(1). Congress, however, understood that some activities that fit this broad definition are necessary to a well-functioning, innovative, secure, and interoperable exchange of EHI. The Cures Act accordingly commanded that the Secretary of HHS "shall identify reasonable and necessary activities that do not constitute information blocking." *Id.* § 300jj-52(a)(3). HHS subsequently promulgated regulations identifying certain practices that do not constitute information blocking. *See* 45 C.F.R. §§ 171.201–206 and §§ 171.301–303.

Four of those exceptions are of particular relevance here. *First*, under the manner exception, § 171.301, when a requestor seeks EHI access in a particular manner but either the custodian "is technically unable to fulfill the request or cannot reach agreeable terms with the requestor to fulfill the request in the manner requested," the custodian may instead provide the requestor with access "in an alternative manner," choosing either one of two standardized delivery methods or "an alternative machine-readable format … agreed upon with the requestor."[2] *Id.* § 171.301(a)(1); (b)(1). Under this exception, in other words, the custodian may not deny the

---

[1] This court should dismiss the Complaint with prejudice because any amendment would be futile. *See Devil's Advoc., LLC v. Zurich Am. Ins. Co.*, 666 F. App'x 256, 267 (4th Cir. 2016) (affirming denial of request for leave to amend where amending the complaint would not cure the deficiencies).

[2] The Fourth Circuit imposed an additional gloss demanding that the custodian also prove that it engaged in "good-faith negotiation" before being unable to reach agreement with the requestor. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 233 (4th Cir. 2025). While PointClickCare disagrees with this reading, it binds this Court for the purposes of this motion.

3

requestor access *entirely*, but it need not "fulfill the request in the manner requested" if it instead provides an alternative manner of access.

Relatedly, the infeasibility exception, § 171.204, provides that a custodian need not continue offering alternative manners of access under the manner exception until it finds one the requestor likes. Under that exception, a custodian that "is technically unable to fulfill the request or cannot reach agreeable terms" and that "offered at least two alternative manners" of access specified in § 171.301(b), at least one of which is a standardized method from § 171.301(b)(1)(i) or (b)(1)(ii), has "exhausted" the manner exception and "not fulfilling [the] request … will not be considered information blocking." *Id.* § 171.204(a)(4). When combined, these two exceptions reflect HHS's judgment that EHI custodians should not be required to expend time, effort, and resources generating one-off solutions to accommodate unreasonable demands.

Separately, the Health IT Performance Exception allows a custodian to deny access to "a third party application that is negatively impacting the health IT's performance." *Id.* § 171.205(b). And the Security Exception allows a custodian to enforce protocols "directly related to safeguarding the confidentiality, integrity, and availability of electronic health information." *Id.* § 171.203(a).

Under the Cures Act regulations, EHI custodians are expressly authorized to charge fees, "including fees that result in a reasonable profit margin, for accessing, exchanging, or using" EHI. *See id.* § 171.302; *see also id.* § 171.301(b)(2).

***Maryland's Nursing Homes Act.*** In 2023, the Maryland General Assembly, under heavy lobbying from Maryland-based RTMS, enacted legislation requiring EHI custodians to hand over nursing home patients' medical records to third parties upon request for free. 2023 Md. Laws Ch. 333 (S.B. 648) ("Maryland Act"). RTMS's purpose in lobbying for the law was to obtain full

access, at no cost, to PointClickCare's software and EHI repository. Under the Maryland Act, a "nursing home may direct the electronic health network or electronic medical record vendor to release patient medical records or electronic health care transactions … to a business associate of the nursing home." Md. Code Ann., Health-Gen. § 4-302.6(b)(1); ¶¶ 120–21.[3] The Maryland Act requires networks to make that data "available on a regular basis and release the information in a timely manner to support patient care and monitoring" and prohibits networks from "restrict[ing], limit[ing], or charg[ing] a fee for the release" of the data. *Id.* § 4-302.6(b)(2)(ii), (iii). The Maryland Act directly conflicts with the Cures Act by, among other things, barring custodians from charging reasonable fees. *Compare id.* § 4-302.6(b)(2)(iii) *with* 45 C.F.R. § 171.302.

*PointClickCare's data-sharing systems.* PointClickCare is a leading provider of comprehensive software solutions for the senior-care industry. The company offers a variety of services including an electronic EHI repository that provides nursing and other patient-care facilities, including many in Maryland, a secure, cloud-based means to organize, analyze, track, store, share, and exchange residents' EHI. *See* ¶¶ 20–21. One such service is PointClickCare's "Data Relay" solution, which automatically delivers regularly scheduled extracts of electronic health record data. *Id.* ¶¶ 20, 30. Nursing facilities can choose to use Data Relay to export patients' EHI and then share the data with business associates like RTMS. ¶ 31. RTMS alleges that it has obtained data through the Data Relay service and that it runs reports on PointClickCare's system using nursing facilities' login credentials. ¶¶ 31–32. PointClickCare users may also access multiple custom reports, which collate patient EHI into proprietary reporting formats. *See* ¶¶ 28–29. These reports are generated upon a user's demand. ¶ 32.

PointClickCare and its customers enter into agreements that dictate the use of

---

[3] All citations to paragraph numbers are citations of RTMS's Complaint, R.1-3.

PointClickCare's system by the nursing facilities and their business associates. ¶ 42. RTMS acknowledges that PointClickCare's agreements with its customers prohibit "any automated or other process such as screen-scraping, by using robots, … or any other sort of bot or tool, for the purpose of extracting data." ¶ 43. PointClickCare also allows vetted third-party vendors to provide their applications via the PointClickCare platform. ¶ 42.

*RTMS's business.* RTMS has predicated its business on retrieving data from PointClickCare, the EHI custodian, at no cost. To that end, RTMS contends that it must continue to enjoy cost-free access to PointClickCare's systems, no matter if that access violates the contracts PointClickCare negotiated with its and RTMS's joint customers.

RTMS has never contracted with PointClickCare to access the data PointClickCare manages. *See* ¶¶ 39–41. Instead, RTMS alleges that it is entitled to cost-free access to PointClickCare's software as a purported third-party beneficiary of PointClickCare's contracts with its nursing-facility clients, and that as a result RTMS should be allowed to run bots on PointClickCare's system. ¶¶ 160–72.

RTMS alleges that its software "monitors patients' electronic medical records in real time and identifies certain dangerous patient information and data patterns that busy doctors and nurses may otherwise overlook," and sends the information through an alert system to caretakers. ¶¶ 13–19. To obtain access to RTMS's service, nursing facilities execute a "Subscription Agreement" and a "Business Associate Agreement," through which they "acknowledge" RTMS's need to access their data and grant RTMS licenses to use that data. ¶ 40.

*RTMS alleges that PointClickCare interfered with RTMS's contractually prohibited bot access.* RTMS alleges that around 2020, PointClickCare made system "alterations" that increased

the time to generate custom reports.[4] ¶ 48. RTMS argues that this purported system self-sabotage was done with the intent to have nursing facilities "breach their contracts with" RTMS and instead use PointClickCare's new products. ¶ 49. RTMS then alleges that PointClickCare sought to blame the degradation of its system's performance on RTMS. ¶ 114.

RTMS further alleges that about two years after PointClickCare's system "alterations," PointClickCare introduced Completely Automated Public Turing Test to Tell Computers and Humans Apart ("CAPTCHA") walls into its system, which RTMS alleges became increasing illegible, to prevent automated access of its system consistent with PointClickCare's contractual prohibition on "automated or other process[es]" ¶¶ 43, 51, 56–58. Because PointClickCare may lock or deactivate accounts that repeatedly fail to pass the CAPTCHA, RTMS was unable to log in with certain accounts to retrieve patient data. ¶ 60. PointClickCare employs indecipherable CAPTCHAs as a means of barring user accounts PointClickCare has confirmed are operating prohibited bots.

**_PointClickCare elected not to purchase RTMS._** PointClickCare and RTMS have been in communication regarding their dispute over RTMS's screen scraping practices. ¶¶ 54, 86–95. In December 2023, PointClickCare and RTMS even engaged in potential merger discussions. ¶ 96. As part of those discussions the Parties executed an NDA, in which each party agreed not to use any confidential information for purposes other than evaluating the potential merger, and to return or destroy Confidential and Technical Information received. ¶¶ 97–113. Under that NDA, RTMS sent PointClickCare proprietary information. ¶¶ 103–06. PointClickCare declined to purchase

---

[4] In the spring of 2020, as many other businesses were transitioning to remote access during the opening months of the COVID-19 pandemic, PointClickCare began migrating its service from on-premise servers to a cloud-based platform. _See_ R.38-13 at 2 (noting that PointClickCare offers "cloud-based" services). While the cloud-based platform offers PointClickCare's customers many advantages—including ready remote access—it exacerbates the problems caused by bots like the ones RTMS employs. The cloud system addresses requests on a first-come, first-served basis, and so when it receives large numbers of requests in rapid succession from a single user, those requests occupy its computing power, rendering it unable to respond to other requests.

RTMS and subsequently destroyed RTMS's confidential information.

*Procedural history.* On January 9, 2024, RTMS filed a complaint in the Montgomery County (Maryland) Circuit Court asserting claims for a declaratory judgment for a violation of the Cures Act and Maryland Act (Count I); unfair competition under Maryland law (Count II); unlawful tying (Count III); tortious interference with contractual relations (Count IV); intended-beneficiary breach of contract (Count V); and breach of the parties' NDA (Count VI). It also sought a preliminary and permanent injunction (Count VII) as relief. R.6.[5] PointClickCare subsequently removed, R.1, and moved to dismiss the complaint, R.21.

While PointClickCare's motion to dismiss was pending, RTMS sought a preliminary injunction barring PointClickCare from employing indecipherable CAPTCHAs. R.38. After a two-day hearing, *see* R.61, this Court granted the motion, R.69 & R.70. PointClickCare timely appealed that order. R.72.

The Fourth Circuit affirmed in a published opinion. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205 (4th Cir. 2025). Although the Court of Appeals affirmed this Court's injunction, it made clear that RTMS's demands for expensive, bespoke access "can be resolved through charging higher fees," 131 F.4th at 234, and it held that PointClickCare need show only that it engaged in "good-faith efforts to reach agreeable terms before claiming that it cannot do so" and invoking the alternative-access provisions of the manner exception, *id.* at 233 n.12 (cleaned up).

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

---

[5] All citations to "R." refer to the trial court docket.

8

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While this court must accept well-pleaded factual allegations as true, the facts alleged must amount to "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, this court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quotation marks and citations omitted). "Conclusory factual allegations devoid of any reference to actual events" are likewise insufficient. *Verbal v. Giant of Md., LLC*, 204 F. Supp. 3d 837, 844 (D. Md. 2016).

## ARGUMENT

### I.    Count I: RTMS Fails to State a Claim Under the Maryland Act or the Cures Act

RTMS seeks a declaratory judgment that PointClickCare has violated the Maryland Act and the Cures Act. *See* ¶¶ 115–28. "Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even [if] the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.2d 165, 167 (4th Cir. 1990). The Supreme Court has "long considered the operation of the Declaratory Judgment Act to be only procedural, leaving substantive rights unchanged." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (cleaned up). For declaratory judgment to be appropriate, "[a plaintiff] must first identify an underlying right." *Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464, 471 (E.D. Va. 2015). If a plaintiff could not receive substantive relief on the underlying claim, then its claim for a declaratory judgment "must fail." *United Bank v. Buckingham*, 761 F. App'x 185, 193 n.7 (4th Cir. 2019). RTMS has not identified a private right of action that allows it to sue PointClickCare for violation of the Cures Act or the Maryland Act. As a consequence, whether that is viewed as failure to state a claim or failure to establish standing,

9

the outcome is the same: Count I fails and should be dismissed.

"[A] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 55–56 (4th Cir. 2011) (cleaned up). Thus, to bring a declaratory judgment claim, RTMS must have some underlying right of action—and without one, its claim for a declaratory judgment fails. *Campbell*, 86 F. Supp. 3d at 471 (dismissing declaratory-judgment count because there was no private right of action for a violation of the relevant statute), *aff'd*, 616 F. App'x 74 (4th Cir. 2015). RTMS's failure to identify a private right of action is fatal. *Polido v. Crowley*, 2024 WL 263578, at *3 (D. Md. Jan. 24, 2024) ("Defendants first argue that [Plaintiff's] claims … must be dismissed because neither statute creates a private right of action. They are correct.").[6]

With respect to the Cures Act, as the Fourth Circuit recently confirmed (and RTMS has conceded) there is no private right of action to enforce the statute. *See Real Time*, 131 F.4th at 227.

RTMS also does not have a private right to enforce the Maryland Act.[7] RTMS's complaint does not point to any *express* private right of action under the Maryland Act. Nor does that Act *imply* a private right. "A private cause of action … does not exist simply because a claim is framed that a statute was violated and a plaintiff or class of plaintiffs was harmed by it." *Baker v. Montgomery Cnty.*, 50 A.3d 1112, 1122 (Md. 2012). To determine whether a Maryland statute "contains an implied private right of action, [Maryland courts have] adopted the same test applied to federal statutes by the Supreme Court." *Aleti v. Metro. Baltimore, LLC*, 279 A.3d 905, 920 (Md. 2022). That test requires the Court to consider whether "the plaintiff [is] one of the class for whose special benefit the statute was enacted." *Id.* "The question … is not simply who would benefit

---

[6] That is why in *CGM* the Fourth Circuit affirmed the dismissal of a declaratory-judgment case when the underlying statutes did not provide a private cause of action. 664 F.3d at 50–53, 55.

[7] The Fourth Circuit was silent on RTMS's claims and arguments concerning the Maryland Act, including whether the statute contains a private right of action.

from the enactment, but whether it was intended to confer rights upon those beneficiaries." *Id.* at 922 (cleaned up).

The Maryland Act did not intend to confer rights on RTMS. The Maryland Act governs relationships between EHI custodians and nursing homes. *See* Md. Code Ann., Health-Gen. § 4-302.6(b) (stating what an EHI custodian "shall" do upon direction from a nursing home with which it has a contract). Even assuming that business associates of nursing homes, like RTMS, "would benefit from" the Act, there is no reason to conclude that the Act was "intended to confer rights upon" those business associates. *Aleti*, 279 A.3d at 920–22; *cf. Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'"). RTMS does not have a private right of action under the Act.

This points to a more fundamental problem with RTMS's declaratory-judgment claim: RTMS must meet the federal jurisdictional requirement of standing as to each count of its complaint. But even separate from its failure to assert a plausible claim of injury, RTMS's failure to identify any right to proceed against PointClickCare under either statute it asserts in Count I separately deprives it of standing. "To be justiciable the issue must present more than a mere difference of opinion, and there must be more than a mere prayer for declaratory relief." *Palmer v. Audi of Am., Inc.*, 2015 WL 222127, *2 (D. Md. Jan. 13, 2015). "Indeed, the addressing of non-justiciable issues would place courts in the position of rendering purely advisory opinions[.]" *Id.*

Because RTMS has failed to identify any private right of action or right to receive substantive relief on its statutory claims, Count I must be dismissed. *United States v. Payne*, 54 F.4th 748, 753–54 (4th Cir. 2022).

11

## II.      Count II: RTMS's Unfair Competition Claim Must Be Dismissed

RTMS's unfair competition claim asserts that the same allegations that constitute violations of the Maryland Act and the Cures Act also constitute unfair competition. In RTMS's view, it is unfair that PointClickCare has not provided RTMS with unfettered access to EHI stored on PointClickCare's platform. ¶¶ 131–34.

RTMS's unclean hands bar this claim. "Unclean hands" is a doctrine of equity "designed to prevent the court from assisting in fraud or other inequitable conduct." *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 474 (Md. Ct. Spec. App. 2007). "[T]hose guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought," so long as that misconduct is "directly related" to the right that party seeks, may not obtain relief. *Id.* (quoting *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989)). Instead, where a plaintiff takes part in "unlawful or inequitable conduct pertaining to the matter in which relief is sought," a defendant is "entitled to judgment as a matter of law." *Hicks v. Gilbert*, 762 A.2d 986, 989–90 (Md. Ct. Spec. App. 2000); *see also Mascaro v. Snelling & Snelling of Baltimore, Inc.*, 243 A.2d 1, 11-12 (Md. App. 1968) (dismissing an unfair-competition claim on equitable grounds); *Peruzzi Bros, Inc. v. Contee*, 527 A.2d 821, 827 (Md. App. 1987) (same).

RTMS concedes it was aware of its customers' contractual prohibition on running bots on PointClickCare's system, ¶ 43, but it nevertheless used its customers' logins to violate that prohibition. RTMS contends, moreover, that it should be granted access under the Cures Act and its implementing regulations—but the Cures Act contemplates paying a reasonable fee for such access. 45 C.F.R. § 171.302; *see also Real Time Med. Sys.*, 131 F.4th at 234 (explaining that cost concerns about problematic access "could be resolved through charging higher fees") (cleaned up). RTMS has never paid PointClickCare a fee, even though its conduct imposes a cost on PointClickCare and its systems. Both its knowing interference with its customers' PointClickCare

contracts and its insistence on fee-free access to PointClickCare's systems have dirtied RMTS's hands, all in connection with "acquiring the right [it] now asserts." *Hicks*, 762 A.2d at 990 (quoting *Adams v. Manown*, 615 A.2d 611, 617 (Md. 1992)). Accordingly, RTMS cannot pursue its putative unfair-competition claim.

## III.    Count III: RTMS Fails to Allege an Unlawful Tying Arrangement.

RTMS also alleges that PointClickCare's use of CAPTCHAs and deactivation of bot-using accounts constitute an unlawful tying arrangement in violation of the Maryland Antitrust Act. To sufficiently allege a *per se* illegal tying arrangement under Maryland law, a plaintiff must establish: "(1) the existence of a tie between two products and/or services; (2) that the defendants possess significant market power in the tying product; and (3) a not insubstantial amount of affected tied product." *Silkworth v. Cedar Hill Cemetery*, 1993 WL 122104, at \*3 (Md. App. Feb. 11, 1993) (cleaned up).[8] To survive a 12(b)(6) motion, RTMS must adequately plead all three of these elements. RTMS's complaint fails to sufficiently allege a single one, and thus must be dismissed.

### A.    RTMS fails to allege a tying arrangement.

RTMS's claim fails because RTMS does not sufficiently allege any unlawful tying arrangement. By definition, tying is "[c]onditioning the sale of one product—the tying product—on the sale of a separate and distinct product—the tied product." *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 489 (D. Md. 2015). Alleging such conditioning thus requires alleging that the availability of one product is conditioned on the purchase of the other.

RTMS alleges that PointClickCare "effectively condition[s] the purchase of medical records hosting software on the purchase of analytics software" and value-based software from PointClickCare. ¶¶ 142, 144. That claim fails because, according to RTMS's own allegations, the

---

[8] In interpreting the Maryland Antitrust Act, courts are guided by the analogous federal statute—in this case, Section 1 of the Sherman Act. *See id* at \*2.

nursing facilities that purchase PointClickCare's hosting software remain free to buy—and do buy—analytics and value-based software from any vendor of their choosing. ¶¶ 142, 144. If a "buyer is free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016); *see also Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990) ("For a tying arrangement … to exist, the seller must coerce the buyer into purchasing the tied product."). RTMS has alleged just that—an arrangement in which customers are free to decline the allegedly tied product. RTMS alleges that PointClickCare "allow[s] third-party vendors, service providers, software developers and information systems—like RTMS—to provide their proprietary applications … via the [PointClickCare] software platform," and "agrees to provide access by third-party vendors, either through licensing the third-party's technology, or establishing a connection with a third party's software platform or information system and [PointClickCare's ] software platform." ¶ 42. Nor is that all: RTMS alleges that of the nursing facilities that purchase PointClickCare's hosting software, "over 1,000 have chosen [RTMS]'s analytics software." ¶ 142; *see also* ¶ 23.

Courts routinely dismiss tying claims premised on similarly defective conditioning allegations. For example, a court dismissed a claim against a medical certification board offering initial certifications and a new certification-maintenance program because the complaint made clear that customers "remain[ed] free to purchase initial certification" without participating in the new program. *Lazarou v. Am. Board of Psychiatry and Neurology*, 2020 WL 5518476, at *9 (N.D. Ill. Sept. 11, 2020). Likewise, in *Lee v. Life Insurance Co. of North America*, there was no tying arrangement between a university's education and an insurance plan where the complaint stated that students had the option to choose different insurance. 829 F. Supp. 529, 536–37 (D.R.I. 1993).

14

Assuming *arguendo* that *some* nursing facilities have purchased both analytics software and EHI hosting from PointClickCare, independent and procompetitive reasons motivate those purchases. *See It's My Party*, 811 F.3d at 685–86. As the Fourth Circuit explained in *It's My Party*, holding that buying two products from the same seller, without more, constitutes antitrust-violating tying would "strip the [tying] doctrine of its core element of coercion," and "[t]o allow tying doctrine to swell to the point of prohibiting such legitimate means of competition would make antitrust law its own worst enemy." *Id.* at 684–85.

### B.    RTMS fails to sufficiently allege market power.

Even if RTMS had identified conditioning, its tying claim would still fail as RTMS does not plausibly allege that PointClickCare has market power in the tying-product market. *Silkworth*, 1993 WL 122104, at *3. Showing market power requires establishing that the defendant has a substantial share of the relevant market. *Id.* But antitrust "plaintiffs bear the burden of proving a relevant market within which the consequences of the defendants' anticompetitive acts can be measured." *Berlyn Inc. v. Gazette Newspapers, Inc.,* 223 F. Supp. 2d 718, 742 (D. Md. 2002). "The market definition has two components—the relevant product market and the relevant geographic market." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011).

Here, RTMS's market-power case consists of a single conclusory allegation: PointClickCare "has approximately 60% of the market share of electronic medical records platforms used by Nursing Facilities." ¶ 140. This allegation does not suffice either to define the relevant product market or to identify the geographic market.

The relevant product market "is defined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 (4th Cir. 1989). Here, RTMS's cross-cutting allegations paint no clear picture of the relevant product market. RTMS refers to

15

PointClickCare as a "technology provider," ¶ 19; refers broadly to the healthcare-software industry, ¶ 143; says that PointClickCare is in the business of "electronic medical records storage," ¶ 20; and then more narrowly describes PointClickCare as a provider of "electronic medical records platforms used by Nursing Facilities," ¶ 140.

Moreover, to the extent that RTMS's cursory "60%" allegation suffices to identify the relevant product market as "electronic medical records platforms used by Nursing Facilities," ¶ 140, RTMS fails to allege substitutable products in that market—a separately fatal flaw. A product market's boundaries are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co v. United States*, 370 U.S. 294, 325 (1962). Accordingly, attempting to plead the relevant market without reference to interchangeable or substitutable products is legally insufficient. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). For example, in *Dream Big Media, Inc. v. Alphabet, Inc.*, the court dismissed a tying claim where plaintiff alleged that the relevant product markets were APIs, Route APIs, and Places APIs—which are digital mapping services—but did not allege any facts "to support a finding that the markets for any of the services encompass[] the product at issue as well as all economic substitutes for the product." 2022 WL 16579322, at *5 (N.D. Cal. Nov. 1, 2022) (internal quotations and citation omitted). Here, RTMS does not even identify alternative substitute products, much less explain how the boundaries of the market encompasses such substitutes, leaving those boundaries unclear.

Likewise, RTMS fails to allege a relevant geographic market. The Fourth Circuit has explained that the relevant geographic market "should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986). RTMS's one-sentence allegation of market power does not

even mention any geographic market. And elsewhere in the Complaint, RTMS refers to operations in the United States as a whole, and Maryland, where RTMS is based. *See* ¶¶ 16, 60, 147. Without a clearly defined geographic market, the tying claim cannot proceed. *See Silkworth*, 1993 WL 122104, at *3, n.2 (dismissing tying claim and raising issue with complaint's failure to identify the relevant geographic market).

Nor is merely defining a geographic market enough; an antitrust plaintiff must also allege facts supporting that market's proposed geographic scope. *See Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022). For example, a plaintiff failed to sufficiently allege a relevant geographic market for the Apple App Store when the complaint alleged a worldwide geographic scope but made no allegations that users in every country access the same App Store storefront or can download the same apps. *Id.* RTMS fails this test too. Because RTMS has not sufficiently alleged either a relevant product market or a geographic market, its tying claims fails to satisfy the second element—market power.

### C.    RTMS has not alleged anticompetitive effects of a tying arrangement.

RTMS's tying claim must also be dismissed because it has not alleged any anticompetitive effects. Under the governing federal law, *see supra*, fn. 8, courts have made clear that tying is "an object of antitrust concern" because it "may force buyers into giving up the purchase of substitutes for the tied product … and … may destroy the free access of competing suppliers of the tied product to the consuming market." *United States v. Loew's, Inc.*, 371 U.S. 38, 44–45 (1962), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Accordingly, the plaintiff must plausibly allege that the tying arrangement has limited competition or otherwise restrained trade.

RTMS has done nothing of the sort here. There is no allegation that RTMS *or anyone else* has been foreclosed from the market encompassing analytics or value-based software, or even that

it has suffered any decrease in sales of either product. To the contrary, RTMS alleges that more than 1,000 nursing facilities currently use RTMS's software. ¶¶ 23, 142. RTMS's *ipse dixit* assertion that PointClickCare's "effective conditioning of the use of its Medical Record System on the attendant purchase of [PointClickCare]'s analytics and value based care software has the effect of substantially lessening competition, and creates a monopoly in the market for such software," ¶ 147, amounts to precisely the kind of "[t]hreadbare recital[] of the elements … supported by mere conclusory statements" that this Court need not accept as true. *Iqbal*, 556 U.S. at 678. Courts routinely dismiss tying claims based on similarly conclusory assertions. *See, e.g.*, *CCBN.Com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146, 156 (D. Mass. 2003) (dismissing tying claim under the Sherman Act where plaintiff alleged that the arrangement "has had and will continue to have anticompetitive effects in the market for Aggregated Calendar services"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178 (N.D. Cal. 2013) (dismissing federal tying claim because allegation that defendants' operations "resulted in consolidation of its control over that market" was insufficient and too conclusory to show a negative impact on competition); *Reilly*, 578 F. Supp. 3d at 1110 (allegation that defendant's "conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service" was conclusory and insufficient to establish anti-competitive effects). And here, RTMS itself contradicts that conclusory allegation again and again, such as by alleging that PointClickCare's contracts with its clients allow third-party vendors access to PointClickCare's systems, and by alleging that RTMS itself has been able to generate a substantial client base. ¶¶ 13, 23, 42–43, 142.

### D.    PointClickCare's actions serve a legitimate business purpose.

Even if RTMS had sufficiently pleaded all three elements of a tying claim, the claim would still fail because PointClickCare's actions to restrict bot access to EHI hosted on its platform serve

18

a legitimate business purpose. *See Phillips v. Crown Cent. Petroleum Corp.*, 395 F. Supp. 735, 766 (D. Md. 1975) ("A tying arrangement which serves a legitimate business purpose is valid."); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1350–51 (9th Cir. 1987) (affirming judgement that tying arrangement was not illegal because defendant had a legitimate business interest in the quality control of its products).

## IV.    Count IV: RTMS Fails to Plausibly allege a Tortious Interference Claim.

Absent from RTMS's Complaint are allegations that (1) any third party breached or terminated an agreement, or (2) that PointClickCare's conduct was without justification. RTMS's failure to sufficiently plead either of these essential elements of a tortious interference claim justifies dismissal. *See, e.g.*, *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802–03 (Md. App. 1991) (citing tortious interference elements); *Brass Metal Prod., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 383 (Md. Ct. Spec. App. 2009) (same); *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994) (discussing elements).

### A.    RTMS must plead a breach or termination of an agreement.

Maryland recognizes two "mutually exclusive" "manifestations" of tortious interference. *C&R Caulking, LLC v. Bank of Am., N.A.*, 2021 WL 2661875, at *6 (D. Md. June 29, 2021). One "manifestation" of the tort is interference with *prospective* contractual relations, but it does not apply where—as RTMS has alleged here, ¶ 149, and as this Court recognized, R.69 at 2, 23—the parties already have a contract. *Macklin*, 639 A.2d at 117; *Skapinetz v. CoesterVMS.com, Inc.*, 2019 WL 2579120, at *7 (D. Md. June 24, 2019) (Xinis, J.) ("[T]ortious interference with economic relations protects against interference *where no contract is involved*." (emphasis added)).

The version RTMS has pleaded requires that it show PointClickCare caused a third party to breach or terminate an existing contract with RTMS. ¶ 149 (alleging that RTMS has "hundreds

19

of [existing] contracts"); Count VI ("Tortious Interference with Contractual Relations"); R.69 at

23 (noting RTMS's "contractual obligations"); *see Lake Shore Invs. v. Rite Aid Corp.*, 509 A.2d

727, 732 (Md. 1986); *Macklin*, 639 A.2d at 117; *Zos v. Nat'l Ass'n of Power Eng'rs Educ. Found.,

Inc.*, 2025 WL 814522, at *5 (D. Md. Mar. 13, 2025) (Xinis, J.) (A "contractual interference

theory" applies where "the defendant induces the breach of an existing contract.").

      This Court relied on the holding of *Lake Shore Investments* to conclude that RTMS need

not show a third-party breach to satisfy the elements of its tortious-interference claim. R.69 at 24.

But, respectfully, the Court's analysis overread the exception *Lake Shore Investments* identified.

That case did not strip the breach element from a tortious-interference-with-contract claim.

Instead, the Court of Appeals expanded that element to incorporate conduct that, although not

technically a breach, nevertheless spells the end of the parties' contractual relationship—*i.e.*,

cancellation, termination, or non-renewal. *See* 509 A.2d at 732.

      In *Lake Shore Investments,* the defendant allegedly caused a third party to cancel its

contract. *Id.* at 728. The defendant moved for summary judgment, arguing that cancellation was

not a breach, foreclosing the tortious-interference claim. *Id.* The court explained that "[t]he

principal question [it] address[ed] in th[e] case wa[s] whether a defendant who induces

cancellation of a contract may be liable for tortious interference even though no breach … has

occurred." *Id.* In answering this question, *Lake Shore* surveyed a line of cases that indicated

interference resulting in conduct similar to but not amounting to a technical breach, such as

"terminat[ion] without breach," could suffice to state a tortious interference claim. *Id.* at 729-30

(citing *Goldman v. Harford Road Building Assn.*, 133 A. 843 (Md. 1926) (explaining the tort

applies against a defendant who "causes an existing contract to be terminated without breach");

*Orfanos v. Athenian, Inc.*, 505 A.2d 131 (Md. App. 1986) (case involving defendants causing

insurance company to withhold payments due under a contract); *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 492 A.2d 977 (Md. App. 1985) (discussing that tortious interference may apply in cases where a defendant induces agreement "repudiation"); *Lucke v. The Clothing Cutters and Trimmers Assembly*, 26 A. 505 (Md. 1893) (case involving union inducing an employer to discharge a nonunion employee)). *Lake Shore* thus held that "a person who intentionally and wrongfully hinders contract performance, *as by causing a party to cancel the contract* … is liable to the injured party." *Id.* at 732 (emphasis added).

The Court of Appeals' decision in *Macklin* held—eight years after *Lake Shore Investments*—that to be actionable as tortious interference with an existing contract, challenged conduct "*must* induce the *breach or termination* of the contract." 639 A.2d at 119 (emphasis added); *see also Webb v. Green Tree Servicing, LLC*, 2011 WL 6141464, at *6 (D. Md. Dec. 9, 2011) ("T[his] statement from *Macklin* appears to be a more comprehensive description of this element."). Accordingly, RTMS must plead either "breach or termination of the contract" to properly plead its tortious interference claim. *Macklin*, 639 A.2d at 119. *See, e.g.*, *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 518 (D. Md. 2023) (explaining that "it is enough for a tortious interference plaintiff to allege … termination without breach"); *Webb*, 2011 WL 6141464, at *6 ("I am satisfied that … inducement of either a breach *or a termination without breach* can be actionable" (emphasis added)).

### B.    RTMS fails to allege a third-party breach or termination.

RTMS has failed to plausibly allege any third-party breach or termination of any contract. RTMS pleads neither. It fails to plead either a definite duty or the breach of such a duty, and it nowhere even hints at termination of any customer agreement.

*First*, RTMS fails to identify a definite contractual obligation that was actually breached. RTMS alleges that its nursing-facility customers must "acknowledge" that RTMS "must have

access to and use of [the Nursing Facility's] Data for [RTMS]'s System to function as documented." ¶ 40; *see also* ¶ 151. Such an "acknowledg[ment]," however, does not by itself impose on the nursing facility a duty to guarantee unfettered access to that data, let alone that RTMS have a specific type of access. *See RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 440–42 (Md. 2010) (explaining that a complaint must allege a contractual obligation with certainty and definiteness and affirming dismissal of breach claim in part for failure to allege "an explicit or implicit [binding] promise"). In fact, the Complaint affirmatively alleges that nursing facilities did grant RTMS access to PointClickCare's systems as the facilities' authorized users consistent with the facilities' "acknowledgement" of RTMS's need for access. *Id.* ¶¶ 31–32, 37, 164 (alleging nursing facilities grant data access to RTMS by providing "user credentials" and that RTMS and its nursing-facility customers "create[d]" RTMS's "automated users"). Nothing in the acknowledgment, moreover, identifies the form of access nursing facilities must provide as a condition precedent to RTMS's performance of *its own* obligation. *See RRC Ne.*, 994 A.2d at 440; *see also Patriot Constr., LLC v. VK Elec. Servs., LLC*, 290 A.3d 1108, 1117 (Md. App. Ct. 2023) (defining conditions precedent under Maryland law).

RTMS's reframing of the acknowledgement as a "require[ment]" of a particular type and level of access, ¶ 151, does not avoid this issue. Such allegations fall short of the required "certain[] and definite[] facts showing [nursing facilities owed] a contractual obligation" to RTMS that nursing facilities breached. *RRC Ne.*, 994 A.2d at 440; *see also Pillar to Post, Inc. v. Md. Home Inspectors, Inc.*, 2020 WL 1158583, at *6 (D. Md. Mar. 10, 2020) (dismissing interference claim where plaintiffs failed to specify which contractual obligation the defendant caused the third party to breach of or how defendants induced breach).

*Second*, apart from failing to show any specific contractual obligation, RTMS has also

22

failed to show that PointClickCare induced a breach or termination. *See Macklin*, 639 A.2d at 119 ("[T]o be actionable, the improper or wrongful conduct *must* induce the breach or termination of the contract." (emphasis added)); *Md. Indus. Grp., LLC v. Bluegrass Materials Co., LLC*, 2018 WL 3006354, at *7 (Md. Ct. Spec. App. June 15, 2018) (affirming dismissal of tortious interference claim and explaining that "[a]claim for tortious interference with contract must fail in the absence of a breach by the third party"). RTMS cannot survive dismissal by making vague reference to nursing facilities' "acknowledgements" and then simply asserting that they were breached. *See Verbal*, 204 F. Supp. 3d at 844. Indeed, RTMS's Complaint reflects that nursing facilities provided RTMS with PointClickCare login credentials—which is performance, not breach. ¶¶ 31, 164.

RTMS's allegations concerning a fear that one of its customers might one day breach an agreement with it also do not suffice. RTMS alleges "[o]n information and belief, by increasing tenfold the time to generate FUQ Reports, [PointClickCare] intended to render [RTMS]'s product ineffective, and thus force Nursing Facilities to … breach their contracts with [RTMS]." ¶ 49. Information-and-belief pleading—especially of this conclusory nature—is insufficient. *See Frazier v. Experian Info. Sols.*, 2018 WL 6726311, at *6–7 (D. Md. Dec. 21, 2018) (granting a defendant's motion to dismiss and explaining that claims wholly based "upon information and belief" are "insufficient to defeat a motion to dismiss"); *see also Verbal*, 204 F. Supp. 3d at 844 (conclusory allegations are insufficient to survive dismissal). Nowhere does that allegation—or any other allegation in the Complaint—allege how the nursing facilities breached their contracts with RTMS.

And, *third*, nowhere in the Complaint does RTMS allege that any of its customers has terminated, cancelled, or otherwise ended a contract with it as a purported result of

PointClickCare's alleged conduct.[9]

Absent sufficient allegations of breach or termination, RTMS's tortious-interference claim must be dismissed. *See, e.g. Macklin*, 639 A.2d at 119 (discussing that the conduct "must" induce a "breach or termination"); *Pillar to Post*, 2020 WL 1158583, at *6; *Ghatt v. Seiler*, 2017 WL 3088373, at *6 (D. Md. July 20, 2017) (dismissing interference claim for failure to sufficiently allege third parties breached the contracts); *Lupo v. JPMorgan Chase Bank, N.A.*, 2015 WL 5714641, at *21 (D. Md. Sept. 28, 2015) (dismissing claim where plaintiff had not alleged that his "contracts were terminated or breached as a result of [defendant's] conduct").

### C.    RTMS fails to allege that any interference was without justification.

RTMS's Complaint separately establishes that the alleged PointClickCare conduct of which RTMS complains, was justified, which provides an independent basis for dismissal of Count IV. *See Macklin*, 639 A.2d at 119 ("No matter with what intention a person may have acted, his or her conduct is not improper or wrongful if he or she had the right to cause the termination."). RTMS alleges that PointClickCare's "Service Agreements … include a prohibition on accessing its Medical Record System using 'any automated or other process such as screen scraping, by using robots, web-crawlers, spiders or any other sort of bot or tool, for the purpose of extracting data,'" ¶ 43. In other words, PointClickCare undisputedly possessed a contractual right to prohibit bot use on its systems. *See Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 498 (Md. 1986) (explaining that a tortious interference claim fails where the defendant has a "right to cause the breach"). At a minimum, RTMS does not plead a sufficient factual basis to support an inference that PointClickCare acted without justification. *See, e.g., Terry v. Corp. Am.*

---

[9] Moreover, amendment would be futile because RTMS conceded during the preliminary-injunction hearing that none of its customers has terminated or even threatened to terminate a contract with it. Prelim. Inj. Hr'g Tr. (R. 61) at 52-54.

*Fam. Credit Union*, 2019 WL 5065183, at *7 (D. Md. Oct. 9, 2019) (dismissing interference claim for failure to plead sufficient factual support of any inference that the defendant acted without justification); *havePOWER, LLC v. Gen. Elec. Co.*, 183 F. Supp. 2d 779, 784 (D. Md. 2002) (dismissing claim for failure to allege wrongful interference where complaint evidenced that defendant's conduct was motivated by a non-wrongful economic justification). RTMS's tortious-interference claim should be dismissed.

## V.    Count V: RTMS Fails to Allege It Was an Intended Beneficiary of PointClickCare's Agreements.

The intended-beneficiary rule is a "limited exception" to the strict privity rule of contracts. *Flaherty v. Weinberg*, 492 A.2d 618, 624 (Md. 1985). In order to recover for breach of contract under an intended-beneficiary theory, a plaintiff must show "that the parties to the contract clearly intended that the third party benefit from it." *Parlette v. Parlette*, 596 A.2d 665, 670 (Md. Ct. Spec. App. 1991). In other words, to be an intended beneficiary, "[i]t must clearly appear that the parties intend to recognize [the third party] as the primary party in interest and as privy to the promise." *WM. T. Burnett Holding LLC v. Berg Bros. Co.*, 175 A.3d 876, 882 (Md. Ct. Spec. App. 2017) (cleaned up). RTMS has not, and cannot, allege that PointClickCare and its nursing-facility customers clearly intended that RTMS benefit from their agreements. As a result, Count V should be dismissed.

"Maryland law is quite restrictive on the issue of whether one may be considered a third-party beneficiary." *CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*, 2022 WL 4080320, at *24 (D. Md. Sept. 6, 2022) (quotation omitted). It is not enough that a third party may benefit incidentally from a contract. Instead, the alleged third-party beneficiary must show "the promise [was] made to him in fact, though not in form." *Shillman v. Hobstetter*, 241 A.2d 570, 575 (Md. 1968); *see also, e.g.*, Restatement (Second) of Contracts § 302 (1981) ("[A] beneficiary … is an

intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the" parties' intent "and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."); *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 483 (Md. Ct. Spec. App. 2011) (explaining that Maryland follows the Restatement). Courts consider whether the third party is named in the contract, whether pertinent provisions were inserted particularly for the third party's benefit, whether the portions creating a third-party interest are central rather than merely peripheral, and whether the contract gives the third party enforcement power. *Amaya v. DGS Constr., LLC*, 2019 WL 3945933, at *4–5 (D. Md. Aug. 21, 2019). Put simply, "[t]he primary method of determining the intention of the parties to a contract is to look at the language in the contract." *CR-RSC Tower I*, 32 A.3d at 484.

RTMS asserts that PointClickCare's agreements with nursing facilities "are intended to benefit [RTMS], by granting [RTMS] and other care-partners access to … patient data" and contends that RTMS therefore "is an intended beneficiary of the [a]greements between Nursing Facilities" and PointClickCare. ¶¶ 161, 163. But that conclusory legal assertion is not enough. *Iqbal*, 556 U.S. at 678. RTMS fails to point to any express language in any agreement showing that PointClickCare and the nursing facilities clearly and expressly intended for RTMS to be the "primary party in interest" of the contract and not merely a stranger to the agreement that may potentially and incidentally benefit from it. *WM. T. Burnett*, 175 A.3d at 882; *see also Moye v. Avis Budget Grp.*, 2015 WL 410515, at *5 (D. Md. Jan. 27, 2015) (rejecting intended beneficiary theory and dismissing claim where plaintiff did not allege the agreement was expressly made for her benefit); *Beasley v. Bernard*, 2024 WL 326952, at *7 (D. Md. Jan. 29, 2024) (dismissing claim

where plaintiff failed to allege she was a "primary party in interest" or "privy to the promise").

In addition, even if PointClickCare had intended RTMS to be a third-party beneficiary (it did not), RTMS cannot demand that PointClickCare take steps that are inconsistent with the contract's express terms. *See Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 752 A.2d 265, 276 (Md. Ct. Spec. App. 2000) (stating that a third party beneficiary is "bound by the contract provisions"); *see also Acciai Speciali Terni USA, Inc. v. M/V BERANE*, 181 F. Supp. 2d 458, 465 (D. Md. 2002) (noting that "[t]he beneficiary 'cannot accept the benefits and avoid the burdens or limitations' of the contract" (citation omitted)). As RTMS concedes, PointClickCare's Service Agreements prohibit bot access. ¶ 43. RTMS asks the Court to ignore that *express* provision but to read into the agreements an imaginary provision that has no basis in the agreements' other terms or the contract parties' intent. That counter-textual demand should be denied.

## VI.    Count VI: RTMS Fails to State Breach of Contract Claim.

RTMS's claim alleging a breach of the NDA signed during potential merger negotiations and seeking specific performance of that NDA should be dismissed as moot. On January 22, 2024—the day before RTMS sent PointClickCare the complaint filed in Maryland state court—PointClickCare confirmed that it had complied with the NDA and had destroyed RTMS's information exchanged pursuant to the NDA. *See Ecology Servs., Inc. v. GranTurk Equip., Inc.*, 443 F. Supp. 2d 756, 767 (D. Md. 2006) (explaining a claim for specific performance was moot where the requested action had already occurred).

Separately, the claim is also deficient. To state a breach of contract claim, a plaintiff must show that the defendant owed the plaintiff a contractual obligation and breached it. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Here RTMS alleges "upon information and belief, [PointClickCare] is using and will use [RTMS]'s Confidential Information and Technical

27

Information to build, support and/or bolster its own software services." ¶ 113. But RTMS does not identify any use of that information by PointClickCare, or even raise an inference of such use. Such a speculative conclusion devoid of any "specific factual allegations" supporting RTMS's "belief" is insufficient. *Frazier*, 2018 WL 6726311, at *6–7 (granting a defendant's motion to dismiss a complaint for this reason); *see also ScanSource, Inc. v. Thurston Grp., LLC*, 2011 WL 1884775, at *4 (D. Md. May 18, 2011) (dismissing breach of contract claim where the complaint failed to allege specific facts sufficient to state breach of any contractual provision).

The Complaint also alleges that PointClickCare breached the NDA by not returning or destroying the information received from RTMS when RTMS demanded it. ¶¶ 111–12. But RTMS alleges that it sent PointClickCare its destruction demand on December 28, 2023—a mere *seven business days* before RTMS filed its Complaint. ¶ 177. RTMS alleges no facts suggesting an intent by PointClickCare not to comply with its request, nor does RTMS allege that the Parties agreed that destruction or return must be confirmed in under seven business days. Instead, RTMS once again relies on speculation and asks this Court to leap to impermissible conclusions without the necessary facts. *See Verbal*, 204 F. Supp. 3d at 844 (explaining this court need not entertain conclusory factual allegations); *see also Thurston Grp.*, 2011 WL 1884775, at *4 (dismissing breach of contract claim for failure to state a breach of any contractual provision). Given these deficiencies, this Court should dismiss RTMS's breach of contract claim.

## VII.     Count VII: RTMS's Defective Claims Do Not Merit Injunctive Relief.

Finally, RTMS's claim for a permanent injunction should likewise be denied. Count VII seeks injunctive relief based on RTMS's other underlying claims including its claims under the Maryland Act and Cures Act, interference, and contract claims.[10] *See* ¶¶ 186–203. Because its

---

[10] RTMS has abandoned its claim for preliminary injunctive relief as to the NDA. *See* ¶ 197. Its preliminary injunction motion did not seek any relief related to the NDA (R. 38).

injunctive relief claim is premised on RTMS's other deficient claims, Count VII fails with them. *See Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *9 (E.D. Va. Aug. 24, 2010) (granting motion to dismiss request for temporary injunction based in part on dismissal of "each of the [plaintiff's] claims"); *see also Cal. Chamber of Com. v. Becerra*, 2020 WL 1030980, at *6 (E.D. Cal. Mar. 3, 2020) (citing cases for proposition that dismissal of motion for preliminary injunction is appropriate where related claims are subject to dismissal).

29

Dated: June 9, 2025                         Respectfully submitted,


                                            */s/ Brian T. Burgess*
                                            Brian T. Burgess (D. Md. Bar No. 19251)
                                            William C. Jackson (Admitted Pro Hac Vice)
                                            Ashley M. Drake (Admitted Pro Hac Vice)
                                            Goodwin Procter LLP
                                            1900 N Street, NW
                                            Washington, DC 20036
                                            Tel.: +1 202 346 4215
                                            Fax: +1 202 204 7265
                                            BBurgess@goodwinlaw.com
                                            WJackson@goodwinlaw.com
                                            Amdrake@goodwinlaw.com

                                            Jeremy M. Bylund (Admitted Pro Hac Vice)
                                            Willkie Farr & Gallagher LLP
                                            1875 K Street, N.W.
                                            Washington, DC 10006-1238
                                            jbylund@willkie.com


                                            *Attorneys for Defendant PointClickCare Technologies
                                            Inc.*