**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

REAL TIME MEDICAL SYSTEMS, INC.,     )
                                           )
                Plaintiff,          )       Civil Action No.
                                             )       8:24-CV-00313-PX
       v.                             )
                                           )
POINTCLICKCARE TECHNOLOGIES INC.   )
d/b/a POINTCLICKCARE,                )
                                           )
                Defendant.        )

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

REAL TIME MEDICAL SYSTEMS, INC.,
By Counsel,

M. Celeste Bruce (Bar No. 10710)
Michael T. Marr (Bar No. 19961)
Madelaine Kramer Katz (Bar No. 19760)
Rifkin Weiner Livingston LLC
7700 Wisconsin Ave, Suite 320
Bethesda, Maryland 20814
cbruce@rwllaw.com
mmarr@rwllaw.com
mkatz@rwllaw.com
301.951.0150 (p)
301.951.0172 (f)
*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    A. PCC's Motion to Dismiss Count II – Unfair Competition –
       Should Be Denied ................................................................................................ 4

    B. PCC's Motion to Dismiss Count IV – Tortious Interference with
       Contractual Relations – Should Be Denied ........................................................ 8

    C. PCC's Motion to Dismiss Count III – Unlawful Tying –
       Should Be Denied .............................................................................................. 11

        1. Standard of Review for an Antitrust Claim ................................................. 12

        2. The Three Methods of Analyzing an Antitrust Claim ................................. 12

        3. Real Time Has Plausibly Alleged an Antitrust Injury ................................. 14

        4. PCC's Tying Practices Are Per Se Unreasonable ........................................ 15

           a. Elements 1 and 3 of a Per Se Unreasonable Tying Arrangement
             Have Been Sufficiently Plead ................................................................ 15

           b. Real Time Has Plausibly Alleged Element No. 2 – an Unlawful
             Tying Agreement ................................................................................... 16

           c. For Element 4, PCC's Unlawful Tying Substantially Harms
             Interstate Commerce ............................................................................. 17

        5. Four Motions to Dismiss Denied for Conduct Similar to PCC's ................. 18

    D. PCC's Motion to Dismiss the Remaining Counts Should Be Denied ................ 22

        1. Real Time Alleges a Plausible Claim in Count I for Declaratory
           Judgment ..................................................................................................... 22

        2. Real Time Has Alleged a Plausible Claim in Count V for Breach of
           Contract to Which Real Time Is an Intended Beneficiary ............................ 23

3.   Real Time Has Alleged a Plausible Claim in Count VI for Breach
of Contract and Specific Performance of the Parties' Mutual
Non-Disclosure Agreement .......................................................................... 26

4.   Real Time Has Alleged a Plausible Claim in Count VII for Injunctive
Relief .......................................................................................................... 29

CONCLUSION ....................................................................................................... 30

REQUEST FOR A HEARING ................................................................................. 31

## <u>TABLE OF CITATIONS</u>

**CASES:**

*Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419 (4th Cir. 1998) ........................ 22

*Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321 (4th Cir.1937) ............................................. 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................... 27, 28

*Ashcroft v. Iqbal*, 556 U.S. 678 (2009) ................................................................................ 2

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ............................................ 14

*Balt. Bedding Corp. v. Moses*, 182 Md. 229 (1943) ........................................................... 6, 7

*Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501 (D. Md. 2007) ................................. 9-10

*Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827 (7th Cir. 2014) ........................................ 17

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................................. 2, 27

*Berlyn, Inc. v. Gazette Newspapers, Inc.,* 157 F. Supp. 2d 609 (D. Md. 2001) ................. 6, 12

*Brightview Grp. v. Teeters*, 441 F. Supp. 115 (D. Md. 2020) ................................................ 4

*Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979) ............................................................... 15

*Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,*
746 F. Supp. 320 (S.D.N.Y.1990) ...................................................................................... 12

*Broeker v. New York City Dep't of Educ.*, 2023 U.S. Dist. LEXIS 55541
(E.D.N.Y. March 30, 2023) ................................................................................................... 3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .................................... 14

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ................................................................. 13

*Carl Sandburg Village Condominium Ass'n No. 1, et al., v. First Condominium
Development Co., et al.*, 758 F.2d. 203 (1985) ................................................................ 21-22

*Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082 (9th Cir. 2014) ........................ 28

*Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256 (4th Cir. 2019) ......... 2

*Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499 (4th Cir. 2002) .......... 12-13, 14, 15

*Crawford v. LVNV Funding, LLC*, 758 F.3d 1254 (11th Cir. 2014) ...................................... 23

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387 (2012) ....................................... 25

*Crownanalytics, LLC v. SPINS LLC*, No. 22-01275, 2023 U.S. Dist. LEXIS 72072
(D. Colo. Apr. 25, 2023) ................................................................................................. 19, 20

*CX Reinsurance Co. Ltd. v. Johnson*, 481 Md. 472 (2022) .................................................. 25

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) ............ 16, 17

*De Simone v. VSL Pharm., Inc.*, No. TDC-15-1356, 2017 U.S. Dist. LEXIS 1827,
2017 WL 66323 (D. Md. Jan. 5, 2017) ................................................................................ 30

*Dream Big Media Inc. v. Alphabet Inc.*, 2024 U.S. Dist. Ct. LEXIS 124261
(N.D. Cal. July 15, 2024) ................................................................................ 19

*Dwoskin v. Bank of Am., N.A.*, 850 F.Supp.2d 557 (D. Md. 2012) ........................ 29

*Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) ............. 17

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) .................................... 3

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443
(E.D. Va. 2009) ................................................................................................ 14

*Entri LLC v. GoDaddy.com*, 2024 U.S. Dist. LEXIS 185727
(E.D.VA. October 10, 2024) ................................................................ 14, 18, 19

*Fashion Television Assocs., L.P. v. Spiegel, Inc.*, 849 F. Supp. 19 (S.D.N.Y. 1994) .............. 3

*Fornter Enters., Inc. v. U.S. Steel.*, 394 U.S. 495 (1969) ...................................... 18

*Fowler v. Printers II, Inc.*, 89 Md. App. 448 (1991) ............................................. 8

*Gonzalez v. Spunk Indus.*, No. ELH-18-2935, 2019 U.S. Dist. LEXIS 156489
(D. Md. Sep. 13, 2019) ..................................................................................... 28

*G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446 (D. Md. 2023) ...................... 6

*Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md. App. 42 (1981) ........................... 12, 13

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) ............. 30

*Hamilton & Spiegel, Inc. v. Bd. of Ed. of Montgomery County*, 233 Md. 196
(1963) ............................................................................................................ 26

*Holzman v. Fiola Blum, Inc.*, 125 Md. App. 602 (1999) ......................................... 26

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ............................... 12, 17

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000) ......................... 12

*Int'l Council of Shopping Ctrs., Inc. v. RECONCRE, LLC*, 2021 U.S. Dist. LEXIS 7423
(D.D.C 2021) .................................................................................................... 3

*It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 490 (2015) ........................ 17-18

*Intus Care, Inc. v. RTZ Assocs., Inc.,* No. 24-cv-01132, 2024 U.S. Dist. LEXIS 100190
(N.D. Cal. June 5, 2024) ..................................................................................... 6

*Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2 (1984) ....................... 13, 16-17

*Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677 (D. Del. 2013) ........................ 19

*King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016) ................................................ 2

*Kolon Indus., Inc. v. E.I. duPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2011) ......... 15-16

*Krause Marine Towing Corp. v. Ass'n of Maryland Pilots*, 205 Md. App. 194 (2012) ......... 13

*Lake Shore Invs. v. Rite Aid Corp.*, 67 Md. App. 743 (1986) ................................ 8, 9

*Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015) ....................... 28

*Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331 (N.D. Ga. 2021) ................... 20, 21

iv

*Macklin v. Robert Logan Assocs.*, 334 Md. 287 (1994) ........................................................... 8

*Malibu Media, LLC v. Doe*, No. PWG-13-365, 2014 U.S. Dist. LEXIS 174225, 2014 WL 7188822 (D. Md. Dec. 16, 2014) .................................................................... 27, 28

*Martin Marietta Materials, Inc. v. Redland Genstar, Inc.*, 1999 U.S. Dist. LEXIS 23 (D. Md. 1999) ...................................................................................................................... 25

*Marvel Comics Ltd. v. Defiant,* 837 F. Supp. 546 (S.D.N.Y. 1993) ......................................... 3

*Mayor of Balt. v. Azar*, 973 F.3d 258 (4th Cir. 2020) ............................................................ 30

*McLain v. Real Estate Board,* 444 U.S. 232 (1980) .............................................................. 12

*Mediacom Se. LLC v. BellSouth Telcoms., Inc.*, 672 F.3d 396 (6th Cir. 2012) ...................... 2

*Med. Assur. Co. v. Hellman*, 610 F.3d 371 (7th Cir. 2010) ................................................... 28

*Moonracer, Inc. v. Collard,* 2013 U.S. Dist. LEXIS 159109 (E.D.N.C. 2013) ....................... 3

*Nat'l Mortg. Warehouse, LLC v. Trikeriotis,*, 201 F. Supp. 2d 499 (D. Md. 2002) ............... 1

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ....................................... 14

*Natural Design, Inc. v. Rouse Co.*, 302 Md. 47 (1984) ......................................................... 12

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ............................................ 13

*Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) ............................................... 14

*Owens v. Balt. City State's Att'ys Off*, 767 F.3d 379 (4th Cir. 2014) ...................................... 2

*Paccar Inc. v. Elliott Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675 (2012) ................. 7, 8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436 (7th Cir. 2011) .................................................................................................................... 28

*Planned Parenthood South Atl. v. Wilson*, 2021 U.S. Dist. LEXIS 81389 (D.S.C. April 28, 2021) .............................................................................................................. 3

*Potomac Conf. Corp. of Seventh Day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2 F. Supp. 3d 758 (D. Md. 2014) ............................................................................................ 1

*Ray v. Roane*, 948 F.3d 222 (4th Cir. 2020) ......................................................................... 2

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205 (4th Cir. 2025) .................................................................................................................... 6

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S. Ct. 1237 (2010) .............................. 16

*RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638 (2010) ............................................... 26

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp.2d 703 (D. Md. 2003) ...... 2

*Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992) ............................ 13

*Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590 (7th Cir. 2008) ........................... 17

*Sherwood Brands, Inc. v. Levie*, 2006 U.S. Dist. LEXIS 13099 (D. Md. March 24, 2006) .......................................................................................................... 25

*Shofer v. Stuart Hack Co.*, 124 Md. App. 516 (1999) .......................................................... 25

*State Oil Co. v. Khan*, 522 U.S. 3, 139 L. Ed. 2d 199, 118 S. Ct. 275 (1997)........................ 15

*Taylor v. NationsBank, N.A.*, 365 Md. 166 (2001) ................................................................ 10

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*, 529 F. Supp. 3d 303
(D. Del. 2021) ......................................................................................................................... 28

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22-1648, 2024 U.S. Dist. LEXIS 95694
(N.D. Ill. May 30, 2024) ......................................................................................................... 21

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 2023 U.S. Dist.
LEXIS 219620 (D. Md. Dec. 11, 2023)................................................................................... 10

*Town Sound & Custom Tops, Inc. v. Chrysler Motors, Corp.*, 959 F.2d 468
(3d Cir. 1992)........................................................................................................................... 13

*Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885 (4th Cir. 1992) .................................... 8, 10

*U.S. v. Aramony*, 155 F.3d F.3d 655 (4th Cir. 1999) ............................................................... 3

*United States v. Google LLC*, No. 1:23-cv-108, 2025 U.S. Dist. LEXIS 74956
(E.D. Va. Apr. 17, 2025).......................................................................................................... 15

*United States v. Grinell Corp.*, 384 U.S. 563 (1966)) ............................................................ 15

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................................ 11

*United States v. Swift & Co.*, 286 U.S. 106, 52 S. Ct. 460, 76 L. Ed. 999 (1932) ................. 15

*Utah v. Babbitt*, 137 F.3d 1193 (10th Cir. 1998) ...................................................................... 3

*Venkatraman v. REI Sys., Inc.* 417 F.3d 418 (4th Cir. 2005) .................................................. 1

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581 (4th Cir. 2004) .......... 22

*Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16 (2007)..................................................... 10

*Yaffe v. Scarlett Place Residential Condo.*, 205 Md. App. 429 (2012) ................................. 29

**RULES:**

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 2, 12, 22

Fed. R. Civ. P. 57 ...................................................................................................... 22

**STATUTES:**

21st Century Cures Act, Pub. L. No. 114-255, 130 Stat. 1037................. 3, 4, 5, 6, 7, 8, 23, 24

15 U.S.C. § 1 (Sherman Act) ........................................................................... 17, 20

28 U.S.C. § 2201(a) ............................................................................................... 22

42 U.S.C. § 300jj-52(a)(1) ..................................................................................... 5, 6

Md. Code Ann., Comm. Law § 11-204(a)(1) .................................................... 16, 22

Md. Code Ann., Health-Gen. § 4-302.6............................................................. 6, 23

Md. Code Ann., Health-Gen. § 4-302.9................................................................. 23

**OTHER AUTHORITIES:**

Areeda & Hokenkamp, *Antitrust Law* ¶ 1752c ..................................................... 17

Black's Law Dictionary 225 (10th ed. 2014) ......................................................... 10

Restatement (Second) Contracts, § 302(1)(b)................................................... 25, 26

Rest. (3rd) of Unfair Competition § 1 (1995) ...................................................... 5-6

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**</u>

In opposition to PointClickCare Technologies, Inc.'s ("PCC") renewed Rule 12(b)(6) motion to dismiss, Real Time Medical Systems, Inc. ("Real Time") submits the following:

<u>**INTRODUCTION**</u>

PCC's motion to dismiss is anything but. The inquiry before the Court on PCC's motion to dismiss the complaint is well settled: whether Real Time has alleged facts sufficient to state a claim that is plausible on its face—taking as true of course the facts alleged and drawing all reasonable inferences from those facts in Real Time's favor. PCC's motion does not ask the Court to answer this question or look within the four corners of the complaint. Instead, PCC injects self-serving, unproven, unsworn "facts," first by asserting "further discovery would demonstrate…." and "additional discovery would show…." and then, by presenting almost seven pages of additional "facts." *See* PCC's Memorandum in Support of Motion to Dismiss at pp. 1-8. Truly those submissions on a Rule 12(b)(6) motion are beside the point if for no other reason than this Court should only grant PCC's motion to dismiss if it appears that ***the plaintiff*** "can prove no set of facts which would support his claim and entitle him to relief." *Venkatraman v. REI Sys., Inc.* 417 F.3d 418, 420 (4th Cir. 2005) (citation omitted) (emphasis added). A motion to dismiss does not ask the Court, as PCC's motion does, to determine whether ***PCC*** can prove a set of facts or defenses that would defeat Real Time's claims or to choose whose set of facts the Court prefers at this stage of the litigation. *Nat'l Mortg. Warehouse, LLC v. Trikeriotis,*, 201 F. Supp. 2d 499, 504 (D. Md. 2002) ("Rule 12(b)(6) motion does not invite resolution of contested facts and examination of potential defenses"); *Potomac Conf. Corp. of Seventh Day Adventists v. Takoma Academy Alumni Ass'n, Inc.*, 2 F. Supp. 3d 758, 767-68 (D. Md. 2014) (courts cannot weigh the facts at this stage). Crediting PCC's, rather than Real Time's version of facts, would unduly and improperly raise the

1

pleading standard beyond plausibility to persuasive. *See Mediacom Se. LLC v. BellSouth Telcoms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012); *Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019).

In keeping with the plausibility standard of review, Real Time has provided sufficient factual content that would allow the Court to draw the reasonable inference that PCC is liable for the misconduct alleged in the Complaint, *Ashcroft v. Iqbal*, 556 U.S. 678, and shown Real Time has a "more-than conceivable chance of success on the merits" on its claims. *Owens v. Balt. City State's Atty's Off*, 767 F.3d 379, 396 (4th Cir. 2014). PCC's efforts here, limited as it is to raising contested "facts," arguing the merits of Real Time's claims, and asserting the applicability of its defenses to Real Time's claims,[1] have no place in a motion to dismiss and no bearing on the Court's decision to deny or grant that motion. *See Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (motion to dismiss does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp.2d 703 (D. Md. 2003) (contrary allegations of defendant must be disregarded). Those efforts should be rejected and this motion to dismiss denied.

## **STANDARD OF REVIEW**

In reviewing a Rule 12(b)(6) motion to dismiss, the Court takes as true all well-pleaded factual allegations, construes them in the plaintiff's favor, and draws all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 559 U.S. 544, 555 (2007). A Rule 12(b)(6) motion tests the sufficiency of a complaint; it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). A Rule 12(b)(6) motion to dismiss should therefore only be granted "if…it appears certain that the

---

[1] That inapplicability would include the facts and defenses of Real Time's "unclean hands" and the various business purposes/ justifications and statutory exceptions PCC argues and promises further discovery will corroborate.

2

plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)

Because this present motion to dismiss follows the Court's grant of Real Times' preliminary injunction, the Fourth Circuit's affirmance, and the mootness of the Defendant's first motion to dismiss, it is worth noting that the plausibility standard for a motion to dismiss is more lenient than the probability or likelihood of success standard imposed on Real Time's preliminary injunction—and the standard for a preliminary injunction, which Real Time already met, is more stringent. *See Moonracer, Inc. v. Collard*, 2013 U.S. Dist. LEXIS 159109, *7 (E.D.N.C. 2013); *Int'l Council of Shopping Ctrs., Inc. v. RECONCRE, LLC*, 2021 U.S. Dist. LEXIS 7423, *4-5 (D.D.C 2021) ("The divergent outcomes are a function of the different burden associated with each motion. ICSC pleads enough facts to satisfy the low plausibility standard that governs motions to dismiss, but it fails to meet the much heavier burden of clearly showing that it is entitled to a preliminary injunction.").[2] Moreover, the factual findings from the preliminary injunction do not have to be ignored if the Court deems them useful. *See e.g.. Broeker v. New York City Dep't of Educ.*, 2023 U.S. Dist. LEXIS 55541 *21-23 (E.D.N.Y. March 30, 2023) (citations omitted). Similarly, the Court's prior holdings concerning both the unfair competition and tortious interference claims, as well as the Fourth Circuit's affirmance related to the unfair competition claim and the CURES Act, apply here to the motion to dismiss. *Planned Parenthood South Atl. v. Wilson*, 2021 U.S. Dist. LEXIS 81389, * (D.S.C. April 28, 2021) (citing *U.S. v. Aramony*, 155 F.3d F.3d 655, 661 (4th Cir. 1999) ("[T]he doctrine of the law of the case posits that when a court

---

[2] *See also, Fashion Television Assocs., L.P. v. Spiegel, Inc.*, 849 F. Supp. 19, 22 n.7 (S.D.N.Y. 1994) ("[T]he standard in deciding a motion for a preliminary injunction is more stringent than that used in a motion to dismiss . . . .") (citing *Marvel Comics Ltd. v. Defiant*, 837 F. Supp. 546, 549 (S.D.N.Y. 1993); *Utah v. Babbitt*, 137 F.3d 1193, 1205 (10th Cir. 1998).

decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.")

## ARGUMENT

**A. PCC's Motion to Dismiss Count II – Unfair Competition – Should Be Denied.**

Real Time has stated a plausible claim for unfair competition by alleging those facts that demonstrate PCC has intentionally thwarted Real Time's ability to compete in the value-based care data analytics market (until the preliminary injunction enjoined the indecipherable CAPTCHAs). *Brightview Grp. v. Teeters*, 441 F. Supp. 3d 115, 134-35 (D. Md. 2020) ("Acts that can constitute unfair competition include those that 'substantially interfere[] with the ability to compete....'"). PCC is mistaken in both its characterization of Count II as the centerpiece of Real Time's lawsuit (there are seven counts) and its reliance on the CURES Act. Simply put, PCC's anti-competitive conduct includes more misconduct than PCC's violation of that federal statute, and PCC's pretextual explanations for doing so.

PCC's insistence on narrowing the focus of Real Time's unfair competition to only the CURES Act misses the larger point of Count II—although an unfair competition claim grounded solely on a violation of the CURES Act would be sufficient.  PCC, as a new rival competitor in the value-based care, data analytics market, has abused and exploited its separate and primary role as an EHR platform to render Real Time unable to compete against PCC for those Nursing Facilities that store their patient's information with PCC. PCC ignores what is the "centerpiece" on a motion to dismiss—the factual allegations of PCC's escalating destruction of Real Time's ability to compete fairly with PCC's new data analytics software. Compl. ¶¶ 46-114.

To be sure, PCC's violations of the CURES Act should not be ignored. In violation of the CURES Act, PCC knew that its actions impeded access to patient data it does not own. *See*

42 U.S.C. § 300jj-52(a)(1). Real Time alleges that (i) PCC *actually knew* that its actions materially impeded Real Time's access, because Real Time repeatedly told PCC as much, *see* Compl. at ¶¶ 86–88 (communications regarding "tenfold" increase); *id* at ¶¶ 61, 89–90 (communications regarding early CAPTCHA walls); *id.* at ¶¶ 92–95 (communications following October 2023 CAPTCHA walls), and (ii) interfering with Real Time's access was *the single goal* of PCC's attacks, *see id.* at ¶ 49 ("tenfold" increase was "intended to render Real Time's product ineffective"); *id.* at ¶ 53 (CAPTCHAs were implemented "for the purpose of hindering . . . Real Time's access" to patient healthcare records and data). It is true that PCC as an EHR platform, by cutting off Real Time's long-standing access—crippled Real Time's ability to compete fairly on the merits until this Court imposed a preliminary injunction. *Id.* ¶¶ 61-65. PCC engaged in multiple, unfair methods to not simply gain a competitive advantage over Real Time but to put Real Time out of business. It just so happens that one of those unfair methods has been codified under federal law—declaring what should have been obvious—(i) obstructing interoperability, (ii) repudiating access, exchange, and use of electronic health information, and (iii) interrupting the coordination and efficacy of patient care are unlawful—especially here, where PCC's conduct was meant to serve a single, self-serving purpose: to insulate PCC from competition in the patient data analytics market. There is simply no rational construction of the CURES Act that would approve of the exploitation by PCC of its EHR platform with its predominant market share to force out a competitor in the separate, patient data analytics market, who must have access to its customers' patient healthcare records to survive.

The violation of the CURES Act that Real Time has pled is a sufficient ground for an unfair competition claim under Maryland law. *See e.g.,* Rest. (3rd) of Unfair Competition § 1 (1995)

("harm [that] relates to acts prohibited under federal or state statutes")[3]; *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 624 (D. Md. Aug. 9, 2001); *Intus Care, Inc. v. RTZ Assocs., Inc.,* No. 24-cv-01132, 2024 U.S. Dist. LEXIS 100190, at *8 (N.D. Cal. June 5, 2024).[4] But Real Time has alleged multiple grounds and anti-competitive acts in addition to the CURES Act, including PCC's flagrant violation of the Maryland Medical Records Act,[5] that the law of unfair competition is meant to prevent, which taken together set forth a plausible claim.

Well before PCC entered the data analytics market and before the enactment of the CURES Act, PCC did not, as it does now, obstruct or restrict Real Time's access to its customers' patient healthcare records and data stored on the PCC platform for 10 years. *See* Compl. at ¶¶ 15, 45. Real Time retrieved patient data "in consistent volumes and with a frequency of up to four cycles per day from PCC's EHR platform" (*Id.* at ¶ 38)—a volume and frequency PCC has publicly boasted it can handle. *Id.* at ¶ 37. The retrieval of the patient data necessary to improve vulnerable patient outcomes cannot be accomplished manually, by human beings without putting Real Time out of business. *Id.* at ¶ 37. That decade-long cooperation ended when PCC entered the patient data analytics market in 2020 to compete with Real Time. *Id.* at ¶ 46.

While the tort of unfair competition is extremely broad, and its application to each set of facts and circumstances highly flexible, *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 450 (D. Md. 2023); *Balt. Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943), the law of unfair competition is specifically aimed at preventing PCC from damaging and jeopardizing Real Time's patient data analytics business by "unfair methods of any sort," *Balt. Bedding Corp.*, 182 Md. at

---

[3] *See* 42 U.S.C. § 300jj-52(a)(1) ("Information blocking" is any practice that such a company "knows" or "should know" is "likely to interfere with, prevent, or materially discourage access, exchange, or use of electronic health information.").

[4] *See also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 238 (4th Cir. 2025).

[5] The Maryland Medical Records Act provides that if (a) a "nursing home" directs an "electronic health network or electronic medical record vendor" to release records to a "business associate," then (b) the network or vendor cannot "restrict," "limit," or delay the release of those records. Md. Code Ann., Health-Gen. § 4-302.6.

237. An unfair competition claim addresses "an array of actions that interfere with vital aspects of business." *Paccar Inc. v. Elliott Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691-92 (2012). Since PCC's market entry into competition with Real Time, PCC has adopted a vast "array of actions" to incapacitate Real Time, which squarely fall within the meaning of unfair competition including **(i)** violating the CURES Act (*see* Compl. ¶¶ 80-85) and the Maryland Medical Records Act (*Id.* ¶¶ 71-79); **(ii)** adversely possessing patient health information (*Id.* ¶¶ 67-69)[6]; **(iii)** degrading the EHR platform's speed and performance and imposing increasingly impassible barriers to access patient healthcare records upon Real Time (*Id.* ¶¶ 45-70; 86-95); **(iv)** attempting to limit access to patient data (*Id.* ¶¶ 32, 48); **(v)** refusing to export patient data to Real Time despite PCC's ability to do so and practice of exporting the data to others, just not Real Time (*Id.* ¶ 69); **(vi)** rejecting six proposals by Real Time to address PCC's purported system-integrity concerns, severed Real Time's access in certain instances, and wrongly acquired Real Time's Confidential and Technical Information, because, as PCC expressly declared, it is Real Time's competitor and intends to be the sole source provider of this aspect of patient care. *Id.* at ¶¶ 86-113; **(vii)** fraudulently and deceptively seeking a merger, entering into an NDA to acquire Real Time's Confidential and Technical Information to build, support, and bolster its own competitive products and services (*Id.* ¶¶ 96-113); **(viii)** deactivating and locking accounts suspected as being used by Real Time (*Id.* ¶ 61); and **(ix)** materially and falsely misrepresenting to Real Time customers that Real Time was responsible for  degradation of PCC's health records storage platform. (*Id.* ¶¶ 114(i)-(iv)).  The purpose behind these combined efforts was to render Real Time's product ineffective, causing Nursing Facilities to breach their contracts with Real Time and use PCC's competing product instead. *Id.* ¶¶ 49, 110. In other words, PCC effected a widespread campaign

---

[6] *See also* Compl. ¶ 35 ("Thus, the Nursing Facilities' patient data from the Medical Record System accessed through PCC's servers is not proprietary data of PCC.")

to substantially interfere with Real Time's ability to compete with PCC on the merits of their data analytics, all the while conflicting with the public policy annunciated in the CURES Act and Maryland's Medical Records Act.[7]

In the end, "[i]f [Real Time has pleaded] any action by [PCC] such as interfering with [Real Time's] contract with its customers, making disparaging remarks about [Real Time] to [Real Time's] customers, restricting product shipments . . . if any of those acts were taken to exclude [Real Time] . . . from the marketplace, or to damage them as competitors, then . . . such conduct constitute[s] unfair competition." *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992) (upholding jury instruction as accurate recitation of Maryland's unfair competition law) (cited with approval by *Paccar Inc.*, 905 F. Supp. 2d at 692 (D. Md. 2012). PCC's motion should be denied.

**B. PCC's Motion to Dismiss Count IV – Tortious Interference with Contractual Relations – Should Be Denied.**

Real Time has alleged a plausible claim for tortious interference with Real Time's contractual relations. Five elements are necessary to state a claim for tortious interference with contractual relations and five elements have been pled in the Complaint: (1) a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) hindrance to the performance of the contract; and (5) resulting damages. *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991); *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 301 (1994); *Lake Shore Invs. v. Rite Aid Corp.*, 67 Md. App. 743, 753 (1986). PCC had full knowledge of Real Time's Subscription Agreements from three sources: 1. Real Time's unhindered access to PCC's platform for 10 years; 2. Real Time's winning bid over PCC for Maryland's CRISP program; and 3. Real Time's full disclosure per the parties' NDA. *See*

---

[7] *See* Compl. ¶¶ 80-85 (CURES Act) and *Id.* ¶¶ 71-79 (Maryland Medical Records Act).

Compl. ¶¶ 16, 38, 96-113. PCC's anticompetitive campaign to drive Real Time from the patient data analytics market placed both parties' to the Real Time/Nursing Facility Subscription Agreement in breach: the Nursing Facility was in breach because Real Time's contractually promised access had been cut off (*Id.* ¶ 153); and Real Time was in breach of contracts for hundreds of facilities because Real Time could no longer provide real time patient data analytics and alerts. (*Id.* ¶¶ 13, 40(i), 60, 65, 89, 153).

As if that were not enough interference, PCC has slandered Real Time to their shared customers, blaming its performance on Real Time. (*Id.* ¶ 114(i)-(iv)). PCC knew its misconduct had a harmful effect on Real Time's business relationships, because Real Time told PCC so. (*Id.* at ¶¶ 60-61). Despite this warning in October 2023, and likely because of it, PCC caused complete business disruption when it "began outright deactivating or locking accounts that it suspected were being used by Real Time," and "redoubled its attack" in the early morning hours of November 8, 2023 "introducing thousands of new CAPTCHA walls across the Nursing Facilities' accounts— over 6,000 illegible and undecipherable CAPTCHA walls to impede Real Time's access to the Nursing Facilities' accounts to retrieve patient data (700 Nursing Facilities owned by 33 different Real Time customers. (*Id.* ¶¶ 61-65)

Viewing this misconduct under the lens of Maryland's law of tortious interference with business relationships with the Nursing Facilities, PCC intentionally and wrongfully hindered Real Time's performance of its Subscription Agreements—and expressly tried to damage Real Time's reputation—even though there has not been a formal breach of contract. *Lake Shore Invs.*, 67 Md. App. at 753 ("Wrongfully inducing a breach is surely one way of committing this tort … [but] not the only way."); *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 524 (D. Md. 2007) ("proof of breach of contract is not an essential element of the tort" of intentional interference with

contractual relations); *Trimed, Inc.*, 977 F.2d at 889 (same). As this Court recently explained, allegations of "intentional interference with a party's rights under a contract or inducing a termination without breach" are adequate to state a claim for a tortious interference with contract cause of action. *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 518, 2023 U.S. Dist. LEXIS 219620 (D. Md. Dec. 11, 2023) (quotation omitted) (finding that defendant's conduct interfered with plaintiff's contracts with its customers because defendant's conduct prevented plaintiff from performing under existing service contracts).

But PCC misreads or ignores the factual allegations in the Complaint. Real Time *does* plead PCC induced both parties to the Real Time-Nursing Facility Agreement to breach their promises with respect to patient information. A breach of contract is a failure to perform one's own promise in a contract. *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51 (2007); Black's Law Dictionary 225 (10th ed. 2014) ("[v]iolation of contractual obligation by failing to perform one's own promise . . . or by interfering with another party's performance.") A "promise" is "manifestation of intention to act . . . in a specified way, so made to justify a promise in understanding that a commitment has been made." *Id.* (citations omitted). The elements of a breach are first, a contractual obligation, and second, a material breach of that contractual obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). "It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Id.* The Complaint identifies the mutual, material promise in the Subscription Agreement between Nursing Facility and Real Time PCC interfered with and caused a breach: Real Time, through its contract with the Nursing Facility to "use, modify, copy, process, display and prepare derivative works of

10

[patient] Data" will convert the data on a patient's chart stored with PCC into usable, lifesaving information. (Compl. ¶¶ 16-17, 23-24).

On October 11, 2023, PCC put Real Time in breach of Nursing Facilities' Subscription Agreements covering 87 Nursing Facilities—through indecipherable CAPTCHAs and locking and deactivating Nursing Facilities' accounts—because PCC was completely unable to fulfill its contractual obligations to retrieve and analyze patient data for those facilities. (*Id.* ¶¶ 56-60). Through the same improper means, PCC put these impacted Nursing Facilities in breach of their promised access to their patient data on PCC's EHR platform. On November 8, 2023, PCC put Real Time in breach of Nursing Facilities' Subscription Agreements covering 700 Nursing Facilities owned by 33 different Real Time customers. *Id.* at ¶ 65. That is, PCC caused Real Time to breach 33 different Subscription Agreements. The only thing standing in the way of the legal fallout of Real Time's breach of the Nursing Facility contracts is this Court's enjoining PCC's intentional interference with those contracts. PCC's position that its tortious conduct has not yet been successful enough in driving Real Time or the 33 Nursing Facilities to sue for the actionable breaches PCC caused is remarkably insincere and provides no justification for dismissing this claim. PCC's motion should be denied.

## C.  PCC's Motion to Dismiss Count III – Unlawful Tying – Should Be Denied.

Real Time's unlawful tying claim, and the factual allegations of PCC's anticompetitive conduct that support it, sufficiently raise the law's core concern with tying arrangements— "tying prevents goods from competing directly for consumer choice on their merits." *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001). If there is anything clear from the Complaint, it is that PCC has made every effort to prevent competition between Real Time and PCC for patient data analytics on the merits. And Real Time's complaint also highlights the essential characteristic

of an unlawful tying arrangement: the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34 (2006). If PCC had no predominant market control over the EHR/patient data market relevant here, PCC would be left without any means: to completely cut off a data analytics competitor's access to patient information PCC does not own (Compl. ¶ 34); to slander Real Time (Compl. ¶ 114); and, by doing so, to drive that competitor out of business.

1. <u>Standard of Review for an Antitrust Claim.</u>

There is no heightened pleading standard for antitrust claims. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2000). The Rule 12(b)(6) motion standard of review applies. [8] *McLain v. Real Estate Board,* 444 U.S. 232, 246 (1980) (standard of review for a motion to dismiss "applies with no less force to a Sherman Act claim."). The court's review does have a limiting principle however: "dismissals on the pleadings are especially disfavored in antitrust cases." *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F. Supp. 320, 325 (S.D.N.Y.1990); *Berlyn, Inc. v. Gazette Newspapers, Inc.,* 157 F. Supp. 2d 609, 618 (D. Md. 2001) (the determination of the existence of "antitrust injury" is usually best left to post-discovery proceedings).

2. <u>The Three Methods of Analyzing an Antitrust Claim.</u>

An unlawful tying arrangement can be analyzed three ways: (1) as *per se* unreasonable; (2) by a quick look or abbreviated rule of reason; and (3) with a full rule of reason. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508-09 (4th Cir. 2002). In each, "the criterion to be used in judging the validity of a restraint on trade is its impact on competition." *Cont'l Airlines, Inc.*,

---

[8] *See Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md. App. 42, 48 (1981); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53 (1984).

277 F.3d at 509 (4th Cir. 2002) (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984)). Some tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *per se*; "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Krause Marine Towing Corp. v. Ass'n of Maryland Pilots*, 205 Md. App. 194, 210 (2012); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992) (citing *Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 9 (1984)).

The four elements for a *per se* unlawful tying arrangement: (1) the existence of two separate products; (2) an agreement conditioning purchase of the tying product . . . upon an agreement not to purchase that product from another party; (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market; and (4) a not insubstantial impact on interstate commerce. *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992).[9] Once these elements for a *per se* claim are met, the anti-competitive effects are presumed—thereby removing the plaintiff's burden to prove actual harm or to rebut pro-competitive/pro-business justifications. *Town Sound & Custom Tops, Inc. v. Chrysler Motors, Corp.*, 959 F.2d 468, 477 (3d Cir. 1992) (*en banc*).

Other tying arrangements similarly do not need any detailed market analysis to demonstrate the anticompetitive character of the arrangement. The anti-competitive impact of the restraint is clear from a "quick look," like a *per se* case, even if pro-competitive justifications also exist. *Cont'l Airlines, Inc.*, 277 F .3d at 509; *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780-81 (1999). In

---

[9] Cp. *Greenbelt Homes, Inc.*, 48 Md. App. 48-49 ("The fact of a tying agreement, the affecting of a not insubstantial amount of interstate commerce, and sufficient economic power in the market for the tying product for the seller to restrain competition in the market for the tied product.") (internal citations omitted).

contrast, a Rule of Reason analysis requires an intensive analysis of the facts and circumstances surrounding the alleged anticompetitive conduct—if the reasonableness of the restraint cannot be determined without a "thorough analysis of its net effects on competition in the relevant market. . .covering 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.'" *Cont'l Airlines, Inc.*, 277 F.3d at 509 (citing *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) and *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Real Time has alleged a plausible clam under either of these methods of analysis.

3. Real Time Has Plausibly Alleged an Antitrust Injury.

Real Time has alleged a cognizable antitrust injury. An antitrust injury is "the type [of injury] the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Entri LLC v. GoDaddy.com*, 2024 U.S. Dist. LEXIS 185727, *8-9 (E.D.VA. October 10, 2024) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury must arise from "a competition-reducing aspect or effect of the defendant's behavior." *GoDaddy* at *9 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)). At the pleading stage, the "plaintiff [must] allege[] that [it] was excluded from participation in a particular market, and the result was a decrease in competition in that market." *GoDaddy* at *9 (quoting *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009). Real Time has plausibly plead PCC exploited its predominant position as an EHR data storage platform where it controls over 60% of the relevant market to exclude competition in the value-based care analytics market. Compl. ¶¶ 140-147.

14

4.  PCC's Tying Practices Are *Per Se* Unreasonable.

Practices suitable for *per se* analysis are, like PCC's, "ones that would always or almost always tend to restrict competition and decrease output," and those that are not "designed to increase economic efficiency and render markets more, rather than less, competitive." *Cont'l Airlines, Inc.*, 277 F.3d at 509 (citing *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979)). Such restrictions "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*" without any need to conduct a detailed study of the markets on which the restraints operate or the actual effect of those restraints on competition. *Cont'l Airlines, Inc.*, 277 F.3d at 509 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10, 139 L. Ed. 2d 199, 118 S. Ct. 275 (1997)). While Real Time has plausibly alleged these anticompetitive effects intentionally restrict competition, Real Time has nevertheless plausibly pleaded each element of a *per se* unreasonable arrangement.

a.  *Elements 1 and 3 of a Per Se Unreasonable Tying Arrangement Have Been Sufficiently Plead.*

PCC is, and has been, the predominant EHR platform for Nursing Facilities holding 60% of that market (Compl. ¶ 147),[10] which borders on pure monopoly power in that market. *United States v. Google LLC*, No. 1:23-cv-108, 2025 U.S. Dist. LEXIS 74956, at *123-24 (E.D. Va. Apr. 17, 2025) (citing *United States v. Grinell Corp.*, 384 U.S. 563, 571 (1966)); *United States v. Swift & Co.*, 286 U.S. 106, 116, 52 S. Ct. 460, 76 L. Ed. 999 (1932) (Cardozo, J.) ("[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."); and *Kolon Indus., Inc. v. E.I. duPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2011) ("market share of less than 60% during the relevant period does not necessarily

---

[10] *See also,* Compl. ¶ 21 (According to a December 2020 press release by PCC, "[i]n the United States, 97 percent of all hospitals discharge patients to skilled nursing facilities using PointClickCare.").

foreclose a finding of monopoly power"). Real Time is not a participant in the EHR/data storage market for Nursing Facilities. Real Time is a long-standing participant in the separate, value-based-care data analytics market in which PCC is a recent entrant (Compl. ¶ 13-19).  PCC now competes directly against Real Time (*Id.* ¶¶ 16, 46 ) and does not enjoy monopolistic market power in the value based-care data analytics market, but intends to acquire it (*Id.* ¶ 95) by purchasing competitors (*Id.* ¶ 46), misappropriating proprietary information (*Id.* ¶ 96-113), and exploiting the EHR platform to deny access to patient information (*Id.* ¶¶ 48-70), which is the lifeblood of a data analytics company.  Without access to patients' data, which is an absolute necessity for the functionality of Maryland's CRISP program (*Id.* ¶ 16) and the 1700 Nursing Facilities with over 150,000 residents that Real Time serves, Real Time would be out of business. (*Id.* ¶ 13, 192).

   *b. Real Time Has Plausibly Alleged Element No. 2 – an Unlawful Tying Agreement.*

   Real Time has plausibly alleged that PCC violated Md. Code. Ann., Comm. Law, § 11-204(a)(1) by creating a tying arrangement that conditioned a Nursing Facility/EHR platform user's ability to use PCC's data storage facilities on an agreement to forego the use of Real Time's patient data analytics. A negative tie is one in which an "arrangement [] conditioning the sale of one product on an agreement not to purchase a second product from competing suppliers." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994) ("Section 1 also forbids 'negative' ties"), abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010).  Specifically, Real Time has alleged "[PCC's] exploitation of its control over the tying product [here, EHR storage] to force the buyer into the purchase of a tied product [PCC's value-based care data analytics] that the buyer did not want at all or would have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist.*

*No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551 (1984), abrogated on other grounds by *Ill. Tool Works Inc.*, 547 U.S. at 31.

The Supreme Court's decision in *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 461 (1992) aptly describes PCC's tying arrangement: "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, *or at least agrees that he will not purchase that product from any other supplier*.'" 504 U.S. 451, 461 (emphasis added). Such a tying arrangement—called a "negative tie"—is prohibited and violates Sherman Act, § 1[11] where "the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) (quoting *Eastman Kodak*, 504 U.S. at 462); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) (tying can violate Section 1 when "the seller has 'market power' in the market for the tying product").

    *c.   For Element 4, PCC's Unlawful Tying Substantially Harms Interstate Commerce.*

PCC has restrained trade, harmed competition, reduced data analytics output, limited customer choice, stifled innovation, and elevated PCC's inferior product. But that conduct has not happened in a vacuum. PCC provides 60% of Nursing Facilities nationwide with EHR data storage 97% of all hospitals discharge to Nursing Facilities using PCC; PCC's aims to control 100%, not just 60%, of the value based care, data analytics market. (Compl. ¶¶ 21, 140, 147) By ridding the patient data analytics market of Real Time, PCC impacts—at least 1700 Nursing Facilities throughout the country, including Maryland (¶¶ 13, 15, 16, 27). *See It's My Party, Inc. v. Live*

---

[11] *See Data Gen. Corp. supra.*; Areeda & Hokenkamp, *Antitrust Law* ¶ 1752c (although "rarely encountered," a tying arrangement "is fully satisfied when the defendant's customer promises not to take the tied product from the defendant's rival").

*Nation, Inc.*, 88 F. Supp. 3d 490 ($200,000 of commerce not paltry or insubstantial) (citing *Fornter Enters., Inc. v. U.S. Steel.*, 394 U.S. 495, 502 (1969).

     5.   <u>Four Motions to Dismiss Denied for Conduct Similar to PCC's.</u>

     The court denied the defendant's motion to dismiss in *Entri, LLC v. GoDaddy.com, LLC*, 2024 U.S. Dist. LEXIS 185727 (E.D. Va. October 10, 2024) and allowed Entri's negative tying claim to proceed. 2024 U.S. Dist. LEXIS 185727, *2. GoDaddy had a 40% market share of the US domain registration market and exploited that market share to change "terms of use," which directly impacted Entri's business and caused users "to forgo the use of any third-party aggregator services." *Id.* at *6-7, 12-13. The allegations of GoDaddy's market share and corresponding economic power to force users away from Entri and that multiple contracts with customers were impacted by the negative tie were sufficient to state a claim. *Id.* at *11-12. The court emphasized that GoDaddy's revised terms of use "distort[ed] users' choice by preventing [Entri] from competing on its merits against [GoDaddy's competing product] or other aggregator services" (*Id.* at *15); and underscored that "the same purchaser need not purchase both the tying and tied products in a tying arrangement, so long as the purchaser of the tying product is not permitted to purchase the tied product from other suppliers." *Id.* at *16 (citation omitted). There, when GoDaddy's actions restrained other aggregator services from accessing 40% of US-created domains, leaving customers with GoDaddy's access protocol called Domain Connect as the only option, was, by definition, improper coercion and thus indicia of an unlawful tying arrangement. *Id.* at *16-17.

     The court also appropriately and correctly rejected the argument PCC tries to make (i.e., PCC is not required to integrate its own product with other products, and it has the right to set forth the terms in which a user may access its product or 'platform'). *Id.* at *17. First, GoDaddy did not

own or have any proprietary interest in the domain space it registers for a user, but nevertheless, was attempting to regulate its use through conduct outside of its role as a registrar, whose primary purpose was to obtain and record IP addresses in order to allow its customer to have a dedicated space on the internet. Second, the court noted that GoDaddy did not initially require Entri to interface or integrate with GoDaddy's Domain Connect. Thereafter, it imposed access through its Domain Connect next imposed a fee for GoDaddy's required use of Domain Connect, and finally blocked access altogether. *Id.* at *18. In denying the motion to dismiss on the negative tying arrangement claim, the court found that a company's right to establish terms of use by which a customer may use its products and services, cannot later revise those terms in such a way as to violate antitrust laws. *Id.* at *18-19 (citing *Dream Big Media Inc. v. Alphabet Inc.*, 2024 U.S. Dist. Ct. LEXIS 124261, at *6 (N.D. Cal. July 15, 2024) and *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 685 (D. Del. 2013) (noting a company may only "freely [] exercise his own independent discretion as to parties with whom he will deal" if it is "in the absence of any purpose to create or maintain a monopoly.").

The court in *Crownanalytics, LLC v. SPINS LLC*, No. 22-01275, 2023 U.S. Dist. LEXIS 72072 (D. Colo. Apr. 25, 2023), denied the defendants' motions to dismiss the unlawful tying arrangement claim. That case involved data and data analytics in the "market of natural and organic consumer packaged goods ("NOCPG"). 2023 U.S. Dist. LEXIS 72072, *3. The defendant, SPINS, had developed "massive databases that are highly relevant to NOCPG customers." *Id.* Plaintiff Crownanalytics, provided data analytics, analyzing data customers purchased from SPINS. *Id.* Initially, as alleged in the complaint, Crownanalytics and SPINS "had an extremely collaborative relationship" until SPINS "suddenly and simultaneously moved to restrict third-party data analytic service providers—including Crownanalytics's—access to SPINS databases." *Id.* SPINS

demanded Crownanalytics discontinue use of the database. *Id.* at *5. And, "SPINS created a new 'partnership model' wherein customers who purchased data from SPINS but who planned to engage third-party data analytics firms to analyze the data would only be permitted to purchase static 'extracts' of those data to share with their chosen data analytics provider." *Id.* "These extracts would include inferior data and would be priced to significantly increase the cost to the customer using a competing data analytics company." *Id.* Crownanalytics alleged that these extracts were "virtually useless" for the services performed by third-party data analytics firms. *Id.*

The inferior data—the defendant's limitation of specific, static extracts of data—was an important allegation, which the court interpreted as "[SPINS has] essentially instructed customers that they cannot have that data analyzed by third-party providers, i.e., they have conditioned the sale on the agreement to not use third-party servicers." *Id.* at *27. In consideration of these facts the court ruled that Crownanalytics had sufficiently alleged a negative tie "pre-discovery" and denied the motion to dismiss the Sherman Act §1 claim. The court did not find dispositive that the complaint had no express allegations that the sale of SPIN's data was conditioned on customers' use of SPIN's data analytics. *Id.* at *23. It was SPINS' conduct to prevent customers from purchasing data analytics from others than SPINS that satisfied the unlawful negative tying arrangement on a motion to dismiss. *Id.* at *26-27. By blocking access to data from third party data analytic companies like Crownanalytics, SPINS "ha[s] conditioned the sale on the agreement not to use third-party services." *Id.* at 27. In *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331 (N.D. Ga. 2021), the Court denied a defendant's motion to dismiss where the defendant PowerPlan was allegedly (1) "maintaining a monopoly through negative tying and refusal to supply customers their own data if they worked with Lucasys," and (2) "restraining trade via negative tying arrangements, a concerted refusal to deal with Lucasys, and *de facto* exclusive dealing provisions."

20

576 F. Supp. at 1341, 1358, 1347 (cleaned up). Strengthening its position as the leading provider of utility management software, PowerPlan acquired its only competitor and was thereafter the only offeror of utility management software – with 99% of large utilities using PowerPlan's software. *Id.* at 1337. The plaintiff, Lucasys was able to identify and fill ensuing gaps in PowerPlan's software and provide necessary services where PowerPlan was not able to, and created with others a "supplemental services market." PowerPlan subsequently entered the market. *Id.* PowerPlan went head-to-head on a contract bid against Lucasys and lost. It thereafter began an intimidation campaign against the plaintiff, and attempted to coerce customers to terminate business relationships with the plaintiff. *Id.* at 1339-40. These allegations were sufficient to survive the motion to dismiss the tying claim.

In *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22-1648, 2024 U.S. Dist. LEXIS 95694 (N.D. Ill. May 30, 2024), the court denied the defendant's motion to dismiss plaintiff's unlawful tying claim. 2024 U.S. Dist. LEXIS 95694, *2. Defendant Southern, an alcohol distributor affirmatively blocked plaintiff's online alcohol purchasing platform, Provi, and created its own competing online platform called Proof. *Id.* at *14. This blocking constituted a "departure from a voluntary and established business practice" that the plaintiff and defendant had enjoyed for several years even after the defendant's launch of its own competing product—and then defendant suddenly terminated the relationship. *Id.* at *51-52. Plaintiff alleged that defendant Southern used its market power in distilled spirits and wine markets to coerce customers to use its new retail e-platform instead of plaintiff's long-standing platform, *id.* at *74, that is, retailers were forced to use Southern's platform to the exclusions of other e-platforms including plaintiff's. *Id.* at *77. Facts supportive of that unlawful tying arrangement included that defendant had sufficient market power "to restrain free competition in the market for the tied product." *Id.* at *83 (citing *Carl*

*Sandburg Village Condominium Ass'n No. 1, et al., v. First Condominium Development Co., et al.*, 758 F.2d. 203, 207 (1985).

Like these cases, Real Time has plausibly alleged that PCC imposed a negative tie with the express purpose of insulating itself from competing on the merits in value-based care data analytics in violation of Md. Code Ann., Comm. Law § 11-204(a)(1).

For all these reasons, PCC's motion to dismiss Count III should be denied.

**D.  PCC's Motion to Dismiss the Remaining Counts Should Be Denied.[12]**

1.  Real Time Alleges a Plausible Claim in Count I for Declaratory Judgment.

The federal Declaratory Judgment Act gives this Court discretion to "declare the legal rights and other legal relations of any interested person seeking a declaration." 28 U.S.C. § 2201(a). The Court has discretion over whether to issue a declaratory judgment, and "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed R. Civ. P. 57. When jurisdiction over a declaratory judgment action is proper, as it is here, the Court must rule on the merits of the case unless it has a "good reason" not to do so. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004). The Court considers four factors when determining whether dismissal pursuant to Federal Rule 12(b)(6) is warranted: "[w]hen it finds that the declaratory relief sought: (1) 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and (2) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir.1937)).

---

[12] The Remaining Counts (I, V-VII) will be taken in numerical order.

It is true the CURES Act does not have a private cause of action and therefore a declaratory judgment of that statutory violation may not satisfy the Court's discretion. The same cannot be said for the Maryland Medical Records Act. The Maryland Act provides that if (a) a "nursing home" directs an "electronic health network or electronic medical record vendor" to release all medical records to a "business associate," then (b) the network or vendor cannot "restrict," "limit," or delay the release of those records. Md. Code Ann., Health-Gen. § 4-302.6. The Complaint sets forth the anti-competitive campaign to restrict, limit, and delay the release of the Nursing Facilities patient records to Real Time. *See* Compl. ¶¶ 48-52, 54-56, 60, 62-64, 78-79, 123. Real Time *does* possess an underlying right of action upon which it could seek a declaration that PCC has violated Maryland's Medical Records Act. Courts find that private rights of action exist where statutes permit the recovery of "actual damages." *See e.g.*, *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1258 (11th Cir. 2014) (finding FDCPA equipped debtors with private right of action where Act stated, "debt collectors who violate the Act [are] liable for actual damages."). Here, the Maryland legislature expressly provided for the recovery of "actual damages" for any knowing violation of Subtitle Three of Title Four of the Health-General Code. *See* Md. Code Ann., Health-Gen. § 4-302.9. The Medical Records Act is codified within Subtitle Three: Confidentiality of Medical Records. *See Id.* § 4-302.6. Real Time thus possesses a right of action because it seeks actual damages for PCC's knowing violation of the Medical Records Act. *See Id.* § 4-302.9; *see also Crawford v. LVNV Funding, LLC*, 758 F.3d at 1258.

2.  Real Time Has Alleged a Plausible Claim in Count V for Breach of Contract to Which Real Time Is an Intended Beneficiary.

As set forth in Paragraph 42 of the Complaint, PCC has acknowledged in its Master Service Agreement[13] with Nursing Facilities (also known as Subscription Agreements (Compl. ¶ 160) that

---

[13] The MSA was attached to PCC's original Motion to Dismiss as Exhibit 1.  *See* ECF 26.

PCC has no right, no title, and no interest in any patient data stored with PCC (§ 5.2). The absence of any possessory right in a Nursing Facility data other than a passive EHR repository for others' information has always been true (until of course PCC conflated its position as new competitor with its longstanding role as a data storage facility). While a Nursing Facility stores its patient data with PCC, PCC has promised **(1)** to comply with applicable laws and government regulations (§ 1.1);[14] **(2)** to "allow[] third-party vendors, service providers, software developers and information systems" [like Real Time] "to provide their proprietary applications . . . via the PCC [Medical Record System] software platform" (§ 3.1); and **(3)** to provide access by third-party vendors, either through licensing the third-party's technology, or "establishing a connection with a third party's software platform or information system and PCC's [Medical Record System] software platform" (§ 3.1). Compl. ¶ 42. PCC further warranted that the Nursing Facility "ha[d] the right to use any embedded third-party software" on PCC's system, and that "the functionality of the Services [rendered by PCC] shall not be decreased materially during the Term" of the Service Agreement (Section 7.3). Compl. ¶ 42.*15*

These contractual provisions, above, are fundamental to those Nursing Facilities that contract with someone other than PCC for data analytics (those vendors/suppliers/developers PCC mentions in the MSA) because the access, connectivity, and functionality for the vendor/provider/developer like Real Time (i) is an explicit and material feature of the anticipated fulfillment of the MSA; (ii) is intentionally active (not passive like a data storage facility); and (iii) relies upon the functionality of an EHR platform that PCC has promised will not be degraded during the term of the MSA. Conversely, PCC's promises of active access to the patient data

---

[14] That would include both the CURES Act and the Maryland Medical Records Act.
[15] MSA, §§ 1.3, 2.1 (referring to the data as "Customers' Resident/Patient Data" or "Customers' Data"); § 1.1(i) (PCC agrees to "make the Services" – *i.e.*, access to PCC's digital warehouse – "available to [Nursing Facilities] and Users" – *i.e.*, those who "are authorized by [the Nursing Facility] to use and access the Services").

through those vendors/providers/developers, and the functionality of the PCC platform would be unnecessary surplusage if the Nursing Facility purchased data analytics from PCC and not those identified in the MSA. This contract would serve no purpose without the vendors, providers, and developers identified in the MSA and PCC's promises therein if these third parties were not granted access to patient data. *See* Restatement (Second) Contracts, § 302(1).[16]

The CRISP program is illustrative. Compl., ¶ 16. As PCC knows, because it too bid for the State of Maryland CRISP program (*Id.* ¶ 16), Maryland contracted for Real Time's platform to assist the State in reducing hospitalizations and costs, and to protect Maryland's unique Medicare Hospital Waiver. The State of Maryland's storage of CRISP-related data with PCC is not the mechanism by which the State reduces hospital admissions; it is Real Time's access to PCC's EHR platform that is required for those hospital admissions and cost reductions analyses to occur.

The thrust of the PCC MSA, and the explicit provisions cited in the Complaint, is not simply storage; it is access by parties like Real Time because Nursing Facilities cannot provide for themselves the daily data analytics and corresponding results Real Time provides. *Id.* ¶¶ 13-14, 18-19. *CX Reinsurance Co. Ltd. v. Johnson*, 481 Md. 472, 487 (citing *CR-RSC Tower I, LLC*, 429 Md. at 457. Real Time is "a part of the class of persons specifically intended to be beneficiaries of [PCC's] undertaking" to provide access, connectivity, and functionality. *Sherwood Brands, Inc. v. Levie*, 2006 U.S. Dist. LEXIS 13099 at *48-49 (D. Md. March 24, 2006) (quoting S*hofer v. Stuart Hack Co.*, 124 Md. App. 516, 529 (1999); *Martin Marietta Materials, Inc. v. Redland Genstar, Inc.*, 1999 U.S. Dist. LEXIS 23 at *11 (D. Md. 1999) (same).

Real Time has service contracts (also, Subscription Agreements) with Nursing Facilities that store patient data with PCC.  Compl. ¶ 149. Currently, over a thousand Real Time clients use

---

[16] Maryland follows the Restatement (Second) of Contracts, § 302. *See e.g., CR-RSC Tower I, LLC v. RSC Tower I, LLC,* 429 Md. 387, 458-59 (2012).

PCC's EHR platform and contract with Real Time for lifesaving, patient data analytics. *Id.* ¶ 24. PCC has had full knowledge of these service agreements for over the past 10 years—including Real Time's access to patient information in PCC's storage facility, *id.* ¶¶ 23,38, 152—and full knowledge of Real Time's routine, decade-long retrieval of patient health and medical data in consistent volumes and frequency without PCC limiting that access. *Id.* ¶¶ 38, 45, 87. *See* Restatement (Second) Contracts, § 302(1)(b).

In addition to these Subscription Agreements (*Id.* ¶ 150), and the heretofore-unhindered-access to the PCC EHR platform, several other sources affirm the Nursing Facilities' intent to give Real Time the benefit of PCC's promises of access and functionality: Requests made by Nursing Facilities to PCC, to provide Real Time access to the Medical Record System; and the communications between PCC and the over a thousand Nursing Facilities that are customers of both PCC and Real Time (*Id.* ¶¶ 23,38, 152).

The intention of the MSA, "revealed by its terms in light of the surrounding circumstances above is the controlling determinative." *Id.* (quoting *Hamilton & Spiegel, Inc. v. Bd. of Ed. of Montgomery County*, 233 Md. 196, 199 (1963). Here, PCC and the Nursing Facility have entered an agreement for a direct benefit to Real Time (and other vendors), which allows Real Time to sue on the MSA despite a lack of privity. *Holzman v. Fiola Blum, Inc.*, 125 Md. App. 602, 625 (1999).

3. <u>Real Time Has Alleged a Plausible Claim in Count VI for Breach of Contract and Specific Performance of the Parties' Mutual Non-Disclosure Agreement.</u>

In order to sufficiently state a claim for breach of contract under Maryland law, a plaintiff needs only allege the existence of a contractual obligation owed by the defendant, and a material breach of that obligation by the defendant. *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 658 (2010). Real Time has alleged a contractual obligation owed by PCC through the parties' Mutual Nondisclosure Agreement and has alleged PCC's material breach. Compl. ¶ 96-113, 173-

185. As part of the NDA, Real Time fully disclosed its Confidential and Technical Information to PCC. *Id.* at ¶¶ 101-07.  PCC could not use Real Time's Confidential and Technical Information "for any purpose other than to carry out the Purpose [i.e., to review and evaluate in connection with a potential merger with or acquisition of Real Time] or in any manner that would constitute a violation of any applicable laws or regulations."  *Id.* at ¶¶ 98 (i), (iv), 99-100, 175-6. Real Time has alleged two material breaches of the NDA: PCC is using RTMS's Confidential and Technical Information for another purpose than the M&A discussion—namely, as an aid in the development of PCC's competing product and, has failed to return the Information.  *Id.* at ¶¶ 177-78.

While Paragraph 178 of the Complaint is based "upon information and belief," this remains a permissible way to indicate a factual connection that RTMS reasonably believes is true but for which RTMS may need discovery to gather and confirm its evidentiary basis. PCC's argument that the Federal Rules of Civil Procedure do not permit facts pleaded 'upon information and belief' to serve as the sole basis for relief is incorrect. "The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation mark omitted). *See also Malibu Media, LLC v. Doe*, No. PWG-13-365, 2014 U.S. Dist. LEXIS 174225, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014) (noting the importance of differentiating "between a case in which pleading 'upon information and belief' is used as an inadequate substitute for providing detail as to why the element is present in an action [and the] proper use of 'upon information and belief,' where a plaintiff does not have personal knowledge of the facts being asserted." (citations and internal quotation marks omitted)). When, in this case, information about PCC's exploitation of Real

Time's Confidential and Technical Information "is particularly within defendants' knowledge and control," the use of "upon information and belief" is warranted. *Gonzalez v. Spunk Indus.*, No. ELH-18-2935, 2019 U.S. Dist. LEXIS 156489, at *14-15 (D. Md. Sep. 13, 2019) (citation and quotation omitted).[17] Real Time had no obligation under Rule 8 to conduct more fact finding before filing the Complaint through reverse engineering PCC's newly minted, competing product. *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*, 529 F. Supp. 3d 303, 313-14 (D. Del. 2021) (citing *Malibu Media, LLC,* 2014 WL 7188822, at *3-4). PCC's use of Real Time's proprietary and confidential business information is solely within PCC's knowledge, and Real Time would not, outside the context of this litigation, be permitted or attempt to reverse engineer PCC's code and risk a misappropriation of trade secret counterclaim.

Real Time has accompanied this theory of liability with factual allegations that make the claim plausible—(i) alongside a competing product launch, PCC has denied Real Time's access to Patient Data (Compl. ¶¶45-70)  (ii) since developing its competing products, PCC has spurned Real Time's attempts at cooperation (*Id.* ¶¶ 86-96), (iii) PCC has attempted to eliminate Real Time from competition by pretending to be interested in acquiring Real Time (*Id.* ¶¶ 96-113); and in that attempt, PCC received "the details of Real Time's proprietary technology and solutions and intellectual property . . . concerning Real Time's technology and services, including the HITRUST Certified cloud-based solution, to create or further refine a competitor product. (*Id.* ¶¶ 101-106). After the receipt of Real Time's Confidential and Technical Information and the supplemental information provided to PCC in the PCC question and answer sessions, PCC ended all merger and

---

[17] Other Circuits have accepted 'upon information and belief' allegations where the information was within the defendant's knowledge and control. *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) (citing *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011); *Med. Assur. Co. v. Hellman*, 610 F.3d 371 (7th Cir. 2010); *Arista Records, LLC*, 604 F.3d at 120).

acquisition discussions (*Id.* ¶106) and sealed that termination by declaring its ambition to become the sole provider of Value-Based Case software with a software product that directly competes with Real Time's services and product offerings. (*Id.* ¶108). All these facts justify interposing the allegation that PCC has misappropriated Real Time's Confidential and Technical Information in violation of the NDA.

Finally, the failure to return Real Time's Confidential and Technical Information is not compensable as the NDA plainly affirms. The NDA required PCC to return the Information as it was not PCC's. The only mechanism for which a monetary payment would have been sufficient in exchange for the Information would have been if PCC purchased the Information through a merger or acquisition. Since that merger or acquisition did not occur, PCC has no right of possession, custody, or control of Real Time's Confidential and Technical Information and therefore must return it to Real Time per the NDA. Specific performance, while an "extraordinary equitable remedy" is nevertheless tailored for PCC's conduct and consistent with compelling PCC to return the Information per NDA, and one the parties agreed to in the NDA. *Yaffe v. Scarlett Place Residential Condo.*, 205 Md. App. 429, 454 (2012) ("Each party hereby agrees that the other may be entitled to specific performance of the recipient's obligations."); Compl. ¶ 98(v).

4. Real Time Has Alleged a Plausible Claim in Count VII for Injunctive Relief.

A motion to dismiss is not the appropriate stage to determine whether monetary damages are sufficient to compensate Real Time for PCC's wrongs. *Dwoskin v. Bank of Am., N.A.*, 850 F.Supp.2d 557, 574 (D. Md. 2012). Real Time's claim for the remedy of injunctive relief stems from two different fact patterns of improper, anti-competitive conduct: (a) (i) PCC's indecipherable CAPTCHAs, (ii) denial of Real Time's decade-long access to patient information, and (iii) interference with Real Time's contracts for data analytics with Nursing Facilities (Compl. ¶¶ 187-

29

88,[18]); and (b) PCC's violation of terms of the parties' non-disclosure agreement by its unlawful use of Real Time's proprietary information and the failure to return or destroy that information. *Id.* ¶¶ 197-201.

The preliminary injunction on the first fact pattern has been granted, appealed, and affirmed. It remains in place. The outstanding issue of a permanent injunction on the first and second fact patterns are not ripe. *Mayor of Balt. v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020). If the eventual outcome is a permanent injunction enjoining the unlawful conduct, then the permanent injunction "establishes that the defendant should not have been engaging in the conduct that was enjoined" – past tense. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999). Even so, Real Time has stated a plausible claim that PCC violated the parties' NDA; and in connection with the wrongful use of Real Time's Confidential and Technical Information, an injunction is an appropriate remedy for the legal wrongs alleged in Count VII. *De Simone v. VSL Pharm., Inc.*, No. TDC-15-1356, 2017 U.S. Dist. LEXIS 1827, 2017 WL 66323, at \*10 (D. Md. Jan. 5, 2017) (quotations omitted). This request for injunctive relief should therefore remain a part of the Complaint against PCC.

## CONCLUSION

Real Time has sufficiently pled plausible claims against PCC for a declaratory judgment; unfair competition; unlawful tying; tortious interference with contractual relations; breaches of contract; specific performance; and injunctive relief. Thus, for the foregoing reasons, this Honorable Court should deny PCC's motion to dismiss, order PCC to file an Answer within 14 days, and order other and further relief as the Court deems just and proper.[19]

---

[18] *See also*, Compl., Prayer for Relief (v)-(viii).

[19] To the extent this Court is inclined to grant any portion of PCC's motion, Real Time respectfully requests leave to amend its Complaint to articulate additional facts, and that any dismissal be without prejudice.

## REQUEST FOR A HEARING

Pursuant to Local Rule 105.6, and because the Complaint asserts claims of particular importance to the healthcare and well-being of patients and the effectiveness of caregivers served in the State of Maryland, Real Time respectfully requests a hearing on Defendant's Motion and this Opposition.

Dated: July 9, 2025                Respectfully submitted,

REAL TIME MEDICAL SYSTEMS, INC.,
By Counsel,

*/s/        Michael T. Marr*
M. Celeste Bruce (Bar No. 10710)
Michael T. Marr (Bar No. 19961)
Madelaine Kramer Katz (Bar No. 19760)
Rifkin Weiner Livingston LLC
7700 Wisconsin Ave, Suite 320
Bethesda, Maryland 20814
cbruce@rwllaw.com
mmarr@rwllaw.com
301.951.0150 (p)
301.951.0172 (f)
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 9, 2025, a copy of the foregoing was served on all counsel of record via CM/ECF as follows:

Brian T. Burgess (D. Md. Bar No. 19251)
William C. Jackson (Admitted Pro Hac Vice)
Ashley M. Drake (Admitted Pro Hac Vice)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
BBurgess@goodwinlaw.com
WJackson@goodwinlaw.com
Amdrake@goodwinlaw.com

Rod J. Rosenstein (D. Md. Bar No. 14793)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
RRosenstein@kslaw.com
*Counsel for Defendant*

*/s/      Michael T. Marr*
Michael T. Marr (Bar No. 19961)